**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

---

**NO. 16-2795**

---
---

UNITED STATES OF AMERICA

v.

ASKIA WASHINGTON
a/k/a   SKI

Appellant

---

BRIEF OF APPELLANT

---

Appeal from the Judgement of Sentence entered on June 13, 2016 by the United States District Court for the Eastern District of Pennsylvania, Criminal No. 13-cr-00171-002.

---

BY: MARK S. GREENBERG, ESQUIRE
920 Lenmar Drive
Blue Bell, Pennsylvania 19422
(267) 253-7933
**ATTORNEY FOR APPELLANT**

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

STATEMENT OF SUBJECT MATTER JURISDICTION
    AND APPELLATE JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STATEMENT OF RELATED CASES AND PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . 18

STATEMENT OF THE STANDARD AND SCOPE OF REVIEW. . . . . . . . . . . . . . . . . . . . 18

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  43

CERTIFICATION OF BAR MEMBERSHIP

CERTIFICATION OF WORD COUNT

CERTIFICATION OF IDENTICAL COMPLIANCE OF E-BRIEF
AND HARD COPY OF BRIEF

# TABLE OF AUTHORITIES

**PAGE**

<u>CASES</u>

Chavez v. Illinois State Police, 251 F.3d 612 (7th Cir. 2001).......................................24

Mason v. Hanks, 97 F.3d 887 (7th Cir.1996) ...........................................................17

Strickland v. Washington, 466 U.S. 668 (1984) ...............................................2, 16, 22, 23, 33

United States v. Armstrong, 517 U.S. 456 (1996)...........................................2, 11, 22

United States v. Bass, 536 U.S. 862 (2002)..................................................................11, 30

United States v. Briggs, 623 F.3d 724  (9th Cir. 2010)....................................................38

United States v. Bryant, et al., 12–cr–346 (E. D. Pa.) (Dalzell, J.)...............................10

United States v. Davis, 793 F.3d 712 (7th Cir. 2015) (*en banc)* ......................19, 24, 25-27, 30, 32

United States v. Hare, 820 F.3d 93 (4th Cir. 2016)......................................19, 25, 28, 29

United States v. Headley, 923 F.2d 1079 (3rd Cir. 1991)................................................33

United States v. Markus, 721 F.2d 442, 443 (3rd Cir. 1983)...........................................22

United States v. McLean, 2016 WL 4179669 (E.D. Pa. Aug. 8, 2016) ............................20, 39-42

United States v. McLean, 85 F. Supp. 3d 825 (E.D. Pa. 2015) ...............................38, 39

United States v. Walker, 473 F.3d 71 (3rd Cir. 2007)....................................................37

United States v. Weems & Smith, 09–cr–708 (E. D. Pa.) (Slomsky, J.).......................10

United States v. Whitfield, et al., 12–cr–418 (E. D. Pa.) *affd*
    United States v. Whitfield, 2016 WL 2587175
    (3rd Cir. May 5, 2016) (non-precedential)....................................................................10-11
.

<u>PUBLICATIONS</u>

Brad Heath, <u>Investigation: ATF Drug Stings Targeted Minorities</u>, USA Today, July 20, 2014,

available at:
http://www.usatoday.com/story/news/nation/2014/07/20/
atf-stash-house-stingsracial-profiling/12
800195/. ........................................................................................................23, 30

Brad Heath, <u>ATF uses fake drugs, big bucks to snare suspects</u>, USA Today, June 28, 2013,
available at:
http://www.usatoday.com/story/news/nation/2013/06/27/
atf-stash-houses-stingusatodayinvestigation/2457109/. ............................................30

**STATEMENT OF SUBJECT MATTER JURISDICTION
AND APPELLATE JURISDICTION**

This litigation began as a criminal prosecution against Askia Washington, ("Washington"), for an alleged violation of the laws of the United States. The United States district courts have jurisdiction over such prosecutions. 18 U.S.C. § 3231.

This is an appeal from the judgment of conviction and sentence entered by the District Court on June 13, 2016. App. 2. Notice of Appeal was timely filed on June 14, 2016. App. 1. It is certified that this is an appeal from a final judgment of the District Court in accordance with 18 U.S.C. § 3742(a)(1) and 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    In a "selective enforcement" challenge to an ATF phony stash house robbery sting, did the District Court err in applying the "selective prosecution" standards set forth in <u>United States v. Armstrong</u>, 517 U.S. 456 (1996) in evaluating Washington's discovery motion?

   **The District Court held that the standards set forth in <u>Armstrong</u> govern both a "selective prosecution" claim and a "selective enforcement" claim. App. 13-14, n. 2; 24.**

2.    In a phony stash house robbery sting where Washington received a mandatory minimum sentence of twenty years' incarceration on the counts charging him with Title 21 drug offenses, did the District Court err in concluding that Washington's trial counsel was not ineffective when he elicited that Washington previously had been convicted of a drug offense?

   **The District Court held that trial counsel did not have a "sound strategy" to elicit Washington's prior drug conviction on cross-examination of the case agent but that his malfeasance did not prejudice Washington under the second prong of the ineffective assistance of counsel standard set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). App. 42-43.**

3.    In this phony stash house robbery sting prosecution, did the District Court err in ruling that it was "bound" to impose a mandatory minimum sentence of twenty years' incarceration on the counts of conviction involving Title 21 drug offenses?

   **Answered in the affirmative by the District Court. App. 93.**

2

## STATEMENT OF THE CASE

This appeal stems from a phony stash house robbery sting operation that was orchestrated by the Bureau of Alcohol, Tobacco and Firearms ("ATF")  in Philadelphia from February to March of 2013. A total of four individuals, including Washington and Dwight Berry ("Berry"), were arrested. All but Washington plead guilty. A jury found Washington guilty of conspiracy to commit robbery which interferes with interstate commerce, in violation of 18 U.S.C. § 1951(a) (Count One); attempted robbery which interferes with interstate commerce, in violation of 18 U.S.C. §§ 1951(a) & 2 (Count Two); conspiracy to possess with the intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846 & 841(b)(1)(A) (Count Three); and attempted possession with the intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A) & 2 (Count Four). The jury acquitted Washington of Count Five charging him with a section 924 ( c) firearms violation, which led to the government to withdraw Count Six charging Washington with being a felon in possession of a firearm. App. 28-29. An attorney ("trial counsel") other than undersigned counsel represented Washington at trial. AUSA Salvatore Astolfi ("Astolfi") represented the government.

Prior to trial, Washington, who is African-American[1], filed a Motion for Discovery and Evidentiary Hearing on the Issue of Racial Profiling/Selective Prosecution. App. 9; App. 75 (D.E. # 126). Washington alleged that ATF and the United States Attorney's Office, Eastern District of Pennsylvania, have a discriminatory law enforcement policy or practice of targeting African American and Latino individuals for sting operations involving robberies of phony drug stash houses. App. 11. Washington alleged that he was arrested and indicted as a result of one of

---

[1]As were his three co-defendants.

these discriminatory sting operations. Id.

Washington's discovery motion sought the disclosure of records pertaining to similar sting operations that took place in the Eastern District of Pennsylvania and the District of New Jersey as of 2009. App. 12. The government opposed the Motion. App. 75 (D.E. # 127). In an "Opinion" dated June 30, 2014, the District Court denied Washington's Motion. App. 9. (D.E. # 135). United States v. Washington, 2014 WL 2959493 (E.D. Pa. June 30, 2014). Washington filed a *pro se* Petition for Reconsideration on July 7, 2014, app. 76 (D.E. # 137) which the District Court considered but denied in an Order dated August 7, 2014. App. 22.

On the first day of trial, June 3, 2015, the District Court ordered the government to supply Washington with a portion of a March 2013 ATF publication entitled "Current Home Invasion Protocols." App. 32; Sealed App. 1. The excerpts supplied to Washington set out the some of the factors ATF agents should consider in connection with the investigation of "home invasions." Id. Washington extensively used the excerpts at trial to impeach the ATF agents who testified. App. 32-33.

After trial but before sentencing, Washington wrote the District Court a letter requesting the appointment of new counsel, in part, because trial counsel ". . . has an alcohol problem and needs help." App. 34. The District Court granted Washington's request to relieve trial counsel and appointed the undersigned to represent him.

A hearing was held on November 9, 2015 regarding the allegations surrounding trial counsel's use of alcohol both at trial and during trial preparation. App. 35. Both Astolfi[2] and Washington testified. Trial counsel declined an invitation to testify. App. 34. Washington

---

[2]AUSA Eric B. Henson represented the government at the hearing.

thereafter filed a Motion for a New Trial alleging ineffective assistance of trial counsel due to counsel's alcohol consumption prior to and at trial. App. 35; 83 (D.E. ## 260; 261). The District Court denied the motion in a Superseding Opinion dated May 3, 2016. App. 27; 84 (D.E. # 280). United States v. Washington, 2016 WL 2346363 (E.D. Pa. May 3, 2016).

Washington was sentenced on June 13, 2016 to, *inter alia*, a total of twenty-two years' incarceration: two years on Counts One and Two charging the Hobbs Act robbery violations and a consecutive mandatory minimum sentence of twenty years' incarceration on Counts Three and Four charging the Title 21 Drug Act violations. App. 4. Washington, who had previously been convicted of a drug felony [3], objected to the imposition of the enhanced twenty-year mandatory minimum sentence on the ground that a phony stash house sting operation which did not involve actual drugs was an inappropriate case to impose such a draconian sentence. App. 88. The District Court denied the motion believing that it was "bound" for follow the mandatory minimum sentencing law. App. 93.

Washington's notice of appeal was timely filed on June 14, 2016. App. 1.

---

[3]The government filed an Information Charging Prior Felony Drug Conviction pursuant to 21 U.S.C. § 851 on June 1, 2015 which served to increase Washington's mandatory minimum sentencing exposure from ten years to twenty years' incarceration on Counts Three and Four. App. 80 (D.E. # 202).

### STATEMENT OF FACTS

On February 19, 2015, the Government filed a Superseding Indictment against Washington and three others, charging them with crimes involving a plan to rob a drug stash house of 10 kilograms of "cocaine." App. 57. The case arose from the sting operation undertaken by ATF agents that targeted individuals whom ATF believed were involved in planning robberies of drug stash houses. In 2012, a confidential informant referred to at trial as "Roc" alerted ATF that Berry had asked Roc if he knew anyone Berry could rob for drugs. ATF subsequently began an investigation of Berry led by Special Agent John Bowman ("Bowman"). App. 28.

On February 18, 2013, Roc met with Berry to discuss the prospect of conducting a robbery of a drug stash house. The meeting was electronically recorded. During the meeting, Roc and Berry discussed plans to carry out a home invasion robbery of a drug stash house. Roc told Berry that he had a friend who was a drug courier in New York who frequently made trips to Philadelphia to pick up kilograms of cocaine from a drug stash house maintained by a drug supplier. This drug courier was, in reality, Special Agent Patrick Edwards ("Edwards"), an undercover agent. Berry expressed interest in robbing the stash house and discussed plans to divide the kilograms of cocaine and money that they would steal during the robbery. App. 29.

On February 20, 2013, during another recorded meeting, Berry, Roc, and Edwards, posing as the drug courier, further discussed the stash house robbery. Edwards told Berry that, while picking up cocaine from the stash house, he had "seen" over ten kilograms of cocaine inside a cooler. During the conversation, Berry expressed a willingness to shoot the intended robbery victims if necessary, and explained that he knew others who would participate in the robbery. Id.

6

On March 4, 2013, Roc and Edwards, again posing as the courier, met with Berry,

Washington and an unknown man. Washington participated in the conversation and discussed

how the robbery could unfold. Recorded phone calls from March 4 to March 15, 2013 appeared

to show that Berry and Washington spoke about the plan to rob the stash house. During this time,

Berry continued to meet with Roc and Edwards to discuss the details of the robbery.  App. 30.

The District Court's description of the events on the day of the robbery, May 15, 2013,

was taken from the government's response to the Washington's Motion for a New Trial[4]:

> The day began with a text message between Washington and Berry, both saying that they
> were "Ready for work." Shortly thereafter, the men met at Berry's mother's home where
> Berry retrieved two guns, secreted them in an Eggo Waffle box, and handed them to
> Jermau Johnston, who had joined the conspiracy and was seated in Berry's car. Berry and
> Johnston then drove to a grocery store with Washington and Antonio Ellis [another
> conspirator] following in the rented Chrysler driven by Washington's girlfriend. Johnston
> and Ellis bought gloves to use in the robbery then everyone drove to the Hilton Hotel on
> Island Avenue, in Philadelphia, Pennsylvania, where they met with the UC[ [5] ] and [Roc].
> The purpose of this final meeting was for the UC to provide the robbers with the address
> of [the] house to be robbed and review the plan once again. This was the first time both
> Ellis and Johnston participated in a meeting with [Roc] and/or [the] UC. Prior to this
> date, the government was not aware of either man. A total of five individuals met the UC
> at that location in two vehicles, including Washington's girlfriend, who arrived along with
> Washington in a rented Chrysler. [Roc] drove Berry, Ellis, and Johnston in a minivan, as
> previously requested by Berry and Washington. The UC drove in a separate vehicle.
>
> Once in the Hilton parking lot, Washington, Ellis, Johnston, Berry, and the UC got into
> the minivan with [Roc] in the driver's seat. Washington was immediately heard in the
> recording complaining about Johnston and Ellis going to the grocery store to buy gloves,
> Washington repeatedly complained that the men could have been observed on video tape
> purchasing the gloves. [FN 1: Washington was right. The men were caught on the store's
> surveillance system and the video played for the jury at trial, as was the recording of the
> conversations inside the minivan and numerous other recordings.] Washington also told

---

[4]The District Court made detailed findings of fact in ruling on Washington's Motion for a
New alleging ineffectiveness of  trial counsel. Washington agrees that the record may be read to
support the District Court's findings of fact. As a result, Washington has not included the trial
transcript corresponding to the factual findings in the Appendix.

[5]"UC" is ATF Agent Edwards.

the men, "If y'all would have told me you ain't had that shit [referring to the gloves], I would have got it already."...

Once all of the men were inside the van, Berry instructed the UC to review the details of the planned robbery with everyone. At Berry's direction, the UC explained, again, that the target of the robbery was a house at which 10 kilograms of cocaine would be found; that the building would be guarded by a man at the door, who carried a firearm; that a second man further inside the home would also be armed; that the second man would have control of the drugs; that the drugs would be stored in a white cooler; and that there would be no money found in the house. The men then discussed their plan of action; that they would all drive to a staging area closer to the target location; that when they made their assault on the drug house, two of them would be the first to enter the house; that they would be armed; that they would likely bind the people inside the house; that they would treat the UC, who would be in the house, as if he were another victim to evade the suspicion by the drug dealers....During the conversation, Washington asked the UC if he got the address yet and requested that he text it to him and the other robbers when he did, so they could circle the block before the robbery....A search of Washington's iPhone revealed that on March 15, 2013, at 3:00 a.m. he downloaded a police scanner app.

From the hotel, the UC and the five member robbery crew drove to a parking lot in Southwest Philadelphia where the robbery conspirators were arrested. Washington, Ellis, and Johnston were immediately taken into custody, but Berry fled on foot and was found hiding in an attempt to evade apprehension. He was removed from his hiding place and placed under arrest. After the defendants were arrested, ATF Special Agents recovered from inside the minivan two firearms secreted inside the Eggo Waffle box, ammunition, gloves, and zip ties. From the Chrysler, Agents recovered a backpack, gloves, a mask, a lighter, and lighter fluid. According to the testimony of Washington's coconspirator, Washington intended to burn down the stash house if things went bad.

App. 31-32.

Washington's Motion for Discovery and Evidentiary Hearing on the Issue of Racial Profiling/Selective Prosecution sought disclosure of all phony stash house robbery cases involving confidential informants and undercover agents within the Eastern District of Pennsylvania and New Jersey from 2009 to April 27, 2014, the date is was filed. App. 11. Washington sought this information in order to prepare a motion to dismiss the indictment on the basis of racial profiling and/or selective prosecution of racial minorities. Id. Washington's "selective enforcement" claim alleged that the government targets African Americans and

Latinos for these sting operations and that his arrest and indictment resulted from this practice of racial profiling. Id.

Washington's discovery motion requested the following materials pertaining to fictitious stash house robberies:

• A list by case name, number and the race of each defendant of all phony stash house robbery cases brought by the United States Attorney's Office for the Eastern District of Pennsylvania [and the District of New Jersey] from 2009 to the present based on investigations conducted by ATF or any other federal law enforcement agency, and any documents that show that the information stated in paragraph 4 [of the Motion] is incorrect.

• For each such case listed in response to section "a" above, a statement of prior [c]riminal contact each investigating federal agency had with each defendant prior to initiating every fictitious stash house robbery. (If all such information for a particular case is contained in the criminal complaint, provision of a copy of the complaint would be a sufficient response).

• The statutory or regulatory authority for ATF or any other federal law enforcement agency to instigate and/or pursue fictitious stash house robbery cases involving any pretext of illegal drugs (e.g. heroin, cocaine, crack, ecstasy, methamphetamine, etc.), or any decision by any federal agency, the Justice Department or the White House to authorize ATF or any other federal law enforcement agency to pursue such cases in the Eastern District of Pennsylvania [and the District of New Jersey].

• All national and Philadelphia Field Office ATF manuals, circulars, field notes, correspondence or any other material which discuss "stings", "reverse stings", "phony stash house rip-offs or robberies" or entrapment operations, including protocols and/or directions to agents and to confidential informants regarding how to conduct such operations, how to determine which persons to pursue as potential targets or ultimate defendants, how to ensure that the targets do not seek to quit or leave before an arrest can be made, and how to ensure that the agents are not targeting persons for such operations on the basis of their race, color, ancestry or national origin.

• All documents that contain information on whether and how supervisors and managers of the Philadelphia Area ATF and other federal law enforcement agencies involved in phony stash house robbery cases sought to determine whether or not its agents and informants were targeting persons on the basis of their race, color, ancestry or national origin for these phony stash house robbery cases, and what actions did the Philadelphia Area ATF (i.e., operating in the Eastern District of Pennsylvania [and the District of New Jersey]) or other federal law enforcement agency supervisors and managers took [sic] to

9

ensure that agents and/or informants were not targeting persons for such operations on the basis of their race, color, ancestry or national origin.

• The number of paid and unpaid confidential informants utilized by the Philadelphia Area ATF from 2009 to the present and the number of those confidential informants who had access to non-African American or persons of non-African descent who could be targeted for fictitious stash house robbery cases.

• The factual basis in each case cited in paragraph 4 and cases produced in response to the above and the cases produced in response to paragraph 10a regarding decisions made to pursue or initiate an investigation against any of the individuals listed as defendants in these cases.

• All documents containing instructions given to Assistant United States Attorneys since 2009 regarding the responsibilities of Assistant United States Attorney to ensure that defendants in cases brought by the Office of the United States Attorney for the Eastern District of Pennsylvania [and the District of New Jersey] have not been targeted due to their race, color, ancestry or national origin and specifically that those persons who are defendants in phony stash house cases in which ATF was the investigatory agency have not been targeted due to their race, color, ancestry or national origin and that such prosecutions have not been brought with any discriminatory intent on the basis of the defendant's race, color, ancestry or national origin.

• All documents that contain information ... regarding all duties and responsibilities of Assistant United States Attorneys for the Eastern District of Pennsylvania [and the District of New Jersey] to ensure and/or check to determine that defendants ... have not been targeted due to their race, color, ancestry or national origin and ... that [phony stash house cases] have not been brought with any discriminatory intent on the basis of the defendant's race, color, ancestry or national origin.

App. 12-13.

In support of the motion, Washington asserted that from 2009 to the date the motion was filed, the government had brought at least four phony stash house cases against twenty individuals, all of whom were African Americans[6]. App. 15. Washington submitted the following

---

[6]In addition to the instant case, the cases cited by Washington were United States v. Weems & Smith, 09–cr–708 (E. D. Pa.) (Slomsky, J.); United States v. Bryant, et al., 12–cr–346 (E. D. Pa.) (Dalzell, J.); United States v. Whitfield, et al., 12–cr–418 (E. D. Pa.) (Sanchez, J.). App. 15 n. 3. Whitfield went up on appeal to this Court which, in a non-precedential decision, ruled that Whitfield had forfeited his right to raise the "selective enforcement" discovery claim

documents in support of the motion: various news articles discussing the government's use of

these types of sting operations; filings in phony stash house robbery cases from outside of the

Third Circuit; and Department of Justice Guidelines regarding the impermissablity of racial

profiling by federal law enforcement agencies. App. 15; 75 (D.E. # 121); 94-106.

The District Court concluded that the disposition of Washington's "selective

enforcement[7]" motion was controlled by the decisions of the United States Supreme Court in

United States v. Armstrong, 517 U.S. 456 (1996) and United States v. Bass, 536 U.S. 862 (2002).

App. 13-15. In Armstrong, a "selective prosecution case," the Supreme Court ruled that in order

to overcome the "presumption of regularity" that supports prosecutorial discretion,

> [t]he claimant must demonstrate that the federal prosecutorial policy "had a
> discriminatory effect and that it was motivated by a discriminatory purpose." To establish
> a discriminatory effect in a race case, the claimant must show that similarly situated
> individuals of a different race were not prosecuted.

Id. at 456-465 (internal quotations omitted). In Bass, a "selective prosecution" case involving

prosecutorial discretion in the application of the death penalty, the Court ruled that "raw

statistics" that are not related to "similarly situated individuals" are insufficient to establish a

discriminatory effect under Armstrong.. Bass, 536 U.S. at 864.

After considering Washington's submissions, the District Court denied Washington's

motion ruling:

> . . . it is only under limited circumstances, as annunciated in Armstrong, that a court will

_____

since he had filed it after conviction. United States v. Whitfield, 2016 WL 2587175, at *2 (3rd
Cir. May 5, 2016).

[7]The District Court observed that Washington's motion was one that involved a claim of
"selective enforcement" rather that a claim of "selective prosecution." App. 13-14, n 2. The
District Court nonetheless ruled that the Armstrong standards applied to an analysis of both types
of claims. Id.

afford criminal defendants an opportunity to challenge the Government's law enforcement or prosecutorial decisions. This case is not one of those situations. Defendant has not demonstrated that the Government's use of fictitious stash house sting operations has both a discriminatory effect and a discriminatory purpose. Thus, he cannot meet <u>Armstrong</u>'s rigorous burden and is not entitled to discovery.

App. 20.

Washington filed a *pro se* motion for reconsideration which the District Court considered[8] and denied. App. 23. Washington argued in the motion that the District Court should not have applied the "rigorous" <u>Armstrong</u> standards governing a "selective prosecution" challenge in evaluating his "selective enforcement" discovery request. App. 23-24. The District Court disagreed and held that <u>Armstrong</u> applied in either case. Id.

After the District Court denied the discovery motion, Washington proceeded to trial. Trial counsel's theory of defense was that "ATF created stash house robbery setups in order to target poor, unintelligent, and desperate African Americans who otherwise were not involved in criminal activity." App. 33. The District Court provided some of the excerpts from counsel's closing argument in support of this theory of defense:

> The Government has created these scenarios that are impacting, not real criminals, not known criminals, but stupid individuals who are hungry, poor, broke, and invariably lacking in education...

> The question is, why isn't ATF focusing on doing something about getting drugs off the street as opposed to putting the idea of drugs in the minds of people who are so hungry and broke that they're willing to even consider the idea of doing something like that?...

> Why is it the African Americans are the only ones that are being prosecuted for these crimes. Is it because African Americans are the only ones that are violent? Animals that have to be taken off the street, is that where we are?...

---

[8]The District Court, after acknowledging that a criminal defendant who is represented by counsel generally is not entitled to "hybrid representation," nonetheless decided to consider Washington's <u>pro se</u> reconsideration motion. App. 22-23.

> We don't know about Agent Bowman. Other than the fact that he testified that he was involved in these type of cases before. And what? All of them involved African Americans. What's the inference there? And there is a risk in targeting African Americans, or the minorities that are poor, economically and socially challenged. The government would create these criminal enterprises that would not have come into existence but for the temptation of a big payday.

App. 33.

In an effort to counteract Washington's words and actions that seemingly demonstrated his intention to participate in the phony stash house robbery, trial counsel focused the jury's attention on Washington's actions that belied he had fully committed to participating in the robbery. These actions included being driven separately from the others to the phony location of the robbery by his girlfriend. Trial counsel argued:

> I submit to you that Mr. Washington was on yellow. Caution. That's why he was criticizing those boys about those things. He was on caution. He had that girl there because he was ready to get out of there. Otherwise if he was committed, he'd be like, okay, Baby, you go ahead, I got this. Right? That didn't happen.

App. 42, n.3.

In his Motion for a New Trial alleging ineffective assistance of trial counsel[9], Washington contended that trial counsel eviscerated his theory of defense—that Washington was an innocent minority unfairly targeted by ATF— by referencing Washington's prior drug conviction on cross-examination of Agent Bowman. Trial counsel's cross-examination opened the door for the government to elicit Washington's drug conviction a second time during its re-direct examination of Bowman. The District Court accurately recounted the sequence of questions and answers that brought Washington's prior drug conviction to the jury's attention:

---

[9]Washington raised two grounds of ineffectiveness of trial counsel but prosecutes only the first one in this appeal.

13

Q: [By trial counsel]: Okay. But as it stands right now, 100 percent of the individuals that you've been involved in prosecuting have been African American?

A: [By Bowman]: In this type of investigation, yes.

Q: Yeah. That's what I'm talking about. I'm not going outside of the stash house investigation. Okay?

A: Correct.

Q: All right. Now we know that you didn't use – they didn't have my client identified before he was arrested. You knew him as Ski, or some other name, right?

A. Correct.

Q: So you didn't know if he had a prior criminal history, right?

A: No, not during the investigation.

Q: All right. And you found out after the arrest and some checking, you found out that my client doesn't have a history for robbery, right?

A: (No verbal response)

Q: And he doesn't have a history for drugs, does he?

A: I don't recall.

Q: If he did, you would recall, sir, wouldn't you? Isn't that fair?

A: I don't want to misstate, but I'm pretty sure he had a –

Q: If you're not sure, you probable shouldn't say –

A: – drug arrest.

Q: – you probably shouldn't say, you're not sure. I've had his record, and I can say, I didn't see a robbery conviction, no.

A: I don't recall.

App. 39-40.

Trial counsel's cross-examination of Agent Bowman opened the door to AUSA Astolfi

14

bringing Washington's prior drug conviction to the jury's attention on re-direct examination:

> Q: [By Astolfi] : [Trial counsel] asked you some questions about Mr. Washington's criminal history:
>
> A: Yes.
>
> Q: You said you weren't sure when he asked you specific questions about whether he had a drug conviction, whether he had a robbery conviction, whether he had a violent crime conviction. You said, I don't recall –
>
> [Trial Counsel]: Objection, Your Honor. I didn't ask about a violent crime conviction. I said robbery and drugs.
>
> MR. ASTOLFI: Okay. I'll keep it to robbery and drugs.
>
> Q: You said you weren't sure, correct?
>
> A: Correct.
>
> Q: I want to take a moment and show you Government's Exhibit 403, 404 and 405 . . .
>       Did you review those three exhibits?
>
> A: Yes.
>
> Q: And after reviewing them, are you sure whether or not Mr. Washington has a prior drug conviction.
>
> A: He does have a prior drug conviction.

App. 40-41.

The evidentiary hearing addressing trial counsel's consumption of alcohol prior to and during trial was held on November 9, 2015. At the hearing, Astolfi and Washington both testified that trial counsel's conduct at trial was unusual. As recounted by the District Court, Astolfi testified that trial counsel checked each microphone in the courtroom, a task normally performed by courtroom personnel. Astolfi also testified that he smelled alcohol on trial counsel's breath on the morning of June 3, 2015, the first day of trial. During the lunch break that day, Astolfi asked

trial counsel whether he had consumed alcohol. Trial counsel responded that he had "one" at lunch (which would have been after Astolfi smelled alcohol on trial counsel's breath that morning). Astolfi testified that he did not smell alcohol on trial counsel's breath again. App. 35.

As recounted by the District Court, Washington testified that his trial attorney had "liquor on his breath" at least three times during pre-trial visits with him at the Federal Detention Center. When he asked trial counsel about the smell, his lawyer replied that "a shot after work ain't gonna hurt nothing." Washington testified that he saw trial counsel eat peppermint candies, which Washington believed were used to cover up the smell of alcohol. Washington further testified that, at one point during trial, his lawyer "snapped" at a deputy marshal regarding what Washington was allowed to wear at trial. Like Astolfi, Washington testified that the only day that he smelled alcohol and peppermints was on the first day of trial. Id.

In a lengthy Superseding Opinion[10], the District Court denied Washington's Motion for a New Trial. The District Court applied the familiar test governing ineffective assistance of counsel claims set forth in Strickland v. Washington, 466 U.S. 668 (1984). Under this test, trial counsel is presumed to have acted reasonably and effectively unless the defendant can show that: (1) trial counsel's "representation fell below an objective standard of reasonableness[;]" and (2) there was a "reasonable probability that, but for [trial counsel's] unprofessional errors, the result of the proceeding would have been different." Id. at 687–88, 694. The District Court noted and applied the Supreme Court's admonition that "[a] court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as

---

[10]The original Opinion, dated April 12, 2016, app. 83 (D.E. # 269), was withdrawn and modified in response to the government's. App. 84 (D.E. # 271).

a result of the alleged deficiencies. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed."App. 39.

The District Court appeared to agree with Washington that trial counsel's action in opening the door on cross-examination to Astolfi eliciting the existence of Washington's drug conviction on redirect examination of Bowman "fell below an objective standard of reasonableness;" the first prong in <u>Strickland</u>. The District Court wrote:

> On the record, during his cross-examination of Agent Bowman, defense counsel said, "And I have his record, I didn't see a drug conviction," when in fact, Defendant's criminal record reflected a drug conviction. A lawyer does not make a strategic decision in the best interest of a client if he opens the door for the admission of prejudicial evidence that for some reason he overlooked. See <u>Mason v. Hanks</u>, 97 F.3d 887, 893 (7th Cir.1996) (stating that when counsel "omits (without legitimate strategic purpose) 'a significant and obvious issue,' " his performance is deficient). <u>Thus, it does not appear on this record that defense counsel's conduct with respect to Defendant's prior drug conviction was based on sound trial strategy.</u>

App. 43, n. 4 (internal citation omitted) (emphasis supplied).

The District Court went on, however, to deny Washington's Motion for a New Trial on this issue for failure to show that trial counsel's deficient performance prejudiced him. App. 43.

At sentencing, Washington objected to the imposition of a twenty-year mandatory minimum sentence. App. 88. Washington argued that "to allow the Government to increase a defendant's sentencing exposure as dramatically as it has in this case and to manipulate the amount of cocaine to attain that mandatory minimum . . . provides the Government with unbridled discretion to manipulate sentences and was not envisioned by Congress to warrant a doubling of the mandatory minimum sentence." App. 88-89. The District Court, feeling "bound" by the law, rejected Washington's argument and imposed the mandatory minimum sentence of twenty-years incarceration on Counts Three and Four. App. 92.

17

## STATEMENT OF RELATED CASES AND PROCEEDINGS

Washington's three co-defendants plead guilty in the District Court. None of the three filed an appeal to this Court. To Washington's knowledge, his is the only matter that is presently before the Court.

## STATEMENT OF THE STANDARD AND SCOPE OF REVIEW

The standard and scope of review are referenced in the Argument section of this brief preceding the particular issue presented for review.

## SUMMARY OF THE ARGUMENT

The District Court erred in applying <u>Armstrong</u>'s "rigorous" "selective prosecution" standards to Washington's "selective enforcement" discovery request. The public policy concerns underlying the "presumption of regularity" in the exercise of prosecutorial discretion in a "selective prosecution" claim do not arise in a claim of "selective enforcement" brought against a law enforcement agency like the ATF. ATF agents are not protected by a privilege or covered by a presumption of constitutional behavior. Unlike prosecutors, ATF agents regularly testify in criminal cases, and their credibility is subject to attack by defense counsel. Statements that ATF agents make in affidavits for search or arrest warrants may be contested and they may be personally liable for withholding evidence from prosecutors in violation of the constitutional requirement that defendants have access to material, exculpatory evidence. The sort of considerations that led to the outcome in <u>Armstrong</u> do not apply to a contention that ATF agents engaged in racial discrimination when selecting targets for sting operations, or when deciding which suspects to refer for prosecution. See generally <u>United States v. Davis</u>, 793 F.3d 712, 720-721 (7th Cir. 2015) *(en banc)*.

Second, application of the <u>Armstrong</u> standards to a "selective enforcement" claim would make it virtually impossible for a defendant to make a showing of discriminatory effect and intent for similarly situated individuals "as there are less likely to be records of similarly situated individuals who were never investigated or arrested." <u>United States v. Hare</u>, 820 F.3d 93, 100 (4th Cir. 2016). As a result, this matter should be remanded, consistent with the decision of the Seventh Circuit in <u>United States v. Davis</u>, 793 F.3d 712 (7th Cir. 2015) *(en banc)*, for the District Court to apply "measured steps" in addressing Washington's discovery motion in determining

19

whether race played a role in Washington's investigation and arrest.

In the alternative, Washington should be granted a new trial based on trial counsel's ineffectiveness in eliciting Washington's drug conviction in front of the jury. Trial counsel's blunder destroyed Washington's defense that he was illegally targeted by the ATF in this phony stash house robbery sting because of his race. Washington, who was on trial for two Title 21 drug offenses, was prejudiced by trial counsel's opening the door to Astolfi bringing up Washington's drug conviction on redirect examination because it demonstrated Washington's propensity to involve himself in an illegal drug transaction. This prejudice was brought home in dramatic relief when the District Court imposed a mandatory minimum sentence of twenty years incarceration on Washington on the Title 21 drug counts versus the two year sentence of incarceration on the Hobbs Act robbery counts.

Finally, the District Court erred in ruling that it was "bound" to impose a mandatory minimum twenty year sentence on the Title 21 drug counts in this phony stash house robbery sting. The sentencing manipulation inherent in phony stash house robbery cases was thoughtfully addressed by a district court in our circuit in United States v. McLean, 2016 WL 4179669 (E.D. Pa. Aug. 8, 2016). There, the court examined the disconnect between the ATF's need to inflate the "quantity" of non-existent drugs to maintain investigatory credibility—which increases a defendant's exposure to enhanced mandatory minimum sentences—versus a defendant's actual culpability and desire to traffic in those quantities. The court in McLean, in addressing facts similar to those underlying the instant case, went on to rule that it would be a substantive due process violation to apply the enhanced twenty year mandatory minimum sentence on a defendant who, like Washington, had a prior drug conviction. Accordingly, this matter should be

20

remanded for the District Court to resentence Washington without being "bound" by imposition of an enhanced mandatory minimum sentence.

## ARGUMENT

**THE DISTRICT COURT ERRED IN APPLYING <u>ARMSTRONG</u>'S "SELECTIVE PROSECUTION" STANDARDS TO WASHINGTON'S "SELECTIVE ENFORCEMENT" DISCOVERY REQUEST.**

### Standard of review

A determination of whether Washington's "selective enforcement" discovery request should be subject to the <u>Armstrong</u> standard governing "selective prosecution" claims involves a matter of law which is subject to plenary review by this Court. See <u>United States v. Markus</u>, 721 F.2d 442, 443 (3rd Cir. 1983).

The District Court denied Washington's discovery motion in this "selective enforcement" matter based on the Supreme Court's decision in <u>United States v. Armstrong</u>, 517 U.S. 456 (1996). There, the Court addressed the standards of proof necessary to support a claim of "selective prosecution," <u>i.e.</u>, a claim that the "prosecutor has brought the charge for reasons forbidden by the [the Due Process Clause of the] Constitution," such as race. <u>Id</u>. at 463. The Court explained that the Attorney General and United States Attorneys, having been designated by the President to help execute the nation's laws, enjoy "broad discretion" and a "presumption of regularity" in their prosecutorial decisions. <u>Id</u>. at 464. "In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary" by demonstrating that a prosecutorial policy "had a discriminatory effect and ... was motivated by a discriminatory purpose." <u>Id</u>. at 465. "To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." <u>Id</u>.

The District Court, after applying <u>Armstrong</u>'s "rigorous standard to obtain discovery," denied Washington's motion because, according to the District Court, he failed to present evidence that "similarly situated individuals" were not targeted for these sting operations. App.

19. "Moreover, <u>Armstrong</u> . . . requires a showing of a discriminatory purpose" which, according to the District Court, Washington likewise failed to show. <u>Id</u>. In denying Washington's motion for reconsideration challenging the District Court's application of <u>Armstrong</u>'s "rigorous standards" to a selective enforcement claim, the District Court wrote,

> [p]resently, Defendant cites to a recent analysis by <u>USA Today</u> which revealed that out of 635 stash house defendant, 91% were minorities, primarily African American and Hispanic. Contrary to Defendant's beliefs, this is not "some evidence" of discriminatory effect as defined by the Supreme Court. . . . The fact that the government has only charged African American defendants in at least four phony stash house robbery cases in this District since 2009 does not establish that similarly situated whites were not targeted in the initial sting operations.

App. 25.

The District Court's application of <u>Armstrong</u> to Washington's "selective enforcement" discovery request was erroneous on a number of levels. At the outset, the <u>Armstrong</u> Court's analysis of the defendant's "selective prosecution" claim focused on the constitutional implications of interfering with the prosecutorial function of the Executive Branch:

> A selective-prosecution claim asks a court to exercise judicial power over a "special province" of the Executive. The Attorney General and the United States Attorneys retain "broad discretion" to enforce the Nation's criminal laws. They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to "take Care that the Laws be faithfully executed." . . . Judicial deference to the decisions of these executive officers rests in part on an assessment of the relative competence of prosecutors and courts.... It also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function.

<u>Armstrong</u>, 517 U.S. at 464–65 (citations omitted).

By contrast, the rationale underlying the "regularity" of prosecutorial discretion exercised by the U.S. Attorney's office in filing charges, challenged in a "selective prosecution" claim, does not apply to a "selective enforcement" claim challenging a law enforcement agency's initial

investigation of those charges.

> Agents of the ATF and FBI are not protected by a powerful privilege or covered by a presumption of constitutional behavior. Unlike prosecutors, agents regularly testify in criminal cases, and their credibility may be relentlessly attacked by defense counsel. They also may have to testify in pretrial proceedings, such as hearings on motions to suppress evidence, and again their honesty is open to challenge. Statements that agents make in affidavits for search or arrest warrants may be contested, and the court may need their testimony to decide whether if shorn of untruthful statements the affidavits would have established probable cause. Agents may be personally liable for withholding evidence from prosecutors and thus causing violations of the constitutional requirement that defendants have access to material, exculpatory evidence. Before holding hearings (or civil trials) district judges regularly, and properly, allow discovery into nonprivileged aspects of what agents have said or done. In sum, the sort of considerations that led to the outcome in Armstrong do not apply to a contention that agents of the FBI or ATF engaged in racial discrimination when selecting targets for sting operations, or when deciding which suspects to refer for prosecution.

United States v. Davis, 793 F.3d at 720–21 (citations omitted).

Second, it is considerably harder to demonstrate discriminatory effect in a "selective enforcement" claim than it is in a "selective prosecution" claim "as there are less likely to be records of similarly situated individuals who were never investigated or arrested." United States v. Hare, 820 F.3d 93, 100 (4th Cir. 2016). In fact, applying Armstrong's standards may make it virtually impossible to prove a meritorious "selective enforcement" claim. Chavez v. Illinois State Police, 251 F.3d 612 (7th Cir. 2001). Chavez involved a "selective enforcement" civil rights action involving racial profiling in traffic stops. In distinguishing the availability of evidence of discriminatory effect in a "selective prosecution" action versus a "selective enforcement" action, the court observed:

> In a meritorious selective prosecution claim, a criminal defendant would be able to name others arrested for the same offense who were not prosecuted by the arresting law enforcement agency; conversely, plaintiffs who allege that they were stopped due to racial profiling would not, barring some type of test operation, be able to provide the names of other similarly situated motorists who were not stopped.

Id. at 640.

The same discovery concerns apply in a stash house sting "selective enforcement"

claim.

> In the stash house sting context, a defendant would face considerable difficulty obtaining credible evidence of similarly situated individuals who were not investigated by ATF. Even if a defendant could, for example, use state or federal prosecutions to identify white individuals involved in drug offenses or armed robberies, without discovery into what ATF knew about these individuals, the defendant would be hard pressed to demonstrate that there were no distinguishing factors that would justify different enforcement treatment.

United States v. Hare, 820 F.3d at 101.

Instead of applying Armstrong's "selective prosecution" standards to Washington's entire

discovery request, the District Court should have considered Washington's discovery requests

that did not impinge on prosecutorial discretion or corresponding privilege, as was done by the

Seventh Circuit in United States v. Davis, 793 F.3d 712 (7th Cir. 2015) (en banc)[11]. In Davis, the

defendant and six confederates were charged with federal offenses arising from a plan to rob a

phony stash house. The defendants demanded extensive pre-trial discovery in an effort to show

that they were the victims of "selective enforcement" by the U.S. Attorney's office, the ATF and

the FBI, in violation of the Due Process Clause's equal-protection component. In support of their

"selective enforcement" claims, the defendants, all of whom were African Americans, told the

district court that since 2006, the United States Attorney for the Northern District of Illinois had

prosecuted 20 stash house stings, and that of the defendants in these cases, 75 were black and 19

---

[11]Many of the cases granting discovery in phony stash house robbery cases, which the District Court noted but rejected, arose in the Northern District of Illinois which is in the Seventh Circuit. App. 16-18. The Seventh Circuit's opinion in Davis, which was published after the District Court's opinion denying Washington's discovery motion, obviously supplants the rationale of those Northern District of Illinois cases.

white. According to defendants, 13 of the 19 white defendants were Hispanic. Id. at 715.

The prosecutor opposed this motion, contending that Armstrong forbids discovery into prosecutorial selectivity unless the defense first shows that similarly situated persons have not been prosecuted, which defendants did not do. Id. The district court rejected the prosecutor's contention and entered an extremely broad discovery order based on a finding that "the prosecution in this District has brought at least twenty purported phony stash house cases, with the overwhelming majority of the defendants named being individuals of color." Id. The district court did not identify any similarly situated person who had not been prosecuted or explain why Armstrong allows a court to compel disclosures by the prosecutor, as opposed to the ATF or FBI, in the absence of that information. Id.

The prosecutor filed an interlocutory appeal of the district court's decision. After concluding that it had jurisdiction to entertain the appeal, the court in Davis reversed the district court's discovery order.

> This order is vastly overbroad. A good deal of the discovery it requires is blocked by Armstrong (on the current record) because it concerns the exercise of prosecutorial discretion. Other discovery is blocked by executive privilege independent of Armstrong; a district court is not entitled to require "the White House" (which is to say, the President) to reveal confidential orders given to criminal investigators.

Id. at 722.

By contrast, the court noted that some of the discovery requested by the defendants, including "information from supervisors or case agents of the FBI and ATF, was "outside the scope of Armstrong, the executive privilege, and the deliberative-process privilege." Id. As such, its disclosure to defendant's was not foreclosed by Armstrong. The court reasoned: "[t]he racial disproportion in stash-house prosecutions remains troubling . . . and it is a legitimate reason for

discovery provided that the district court does not transgress <u>Armstrong</u> or an applicable

privilege." <u>Id</u>.

The court in <u>Davis</u> next considered how the district court should consider a discovery

request in a phony stash house sting "selective enforcement" claim:

> Instead of starting with a blunderbuss order, a district court should proceed in measured steps. Logically the first question is whether there is any reason to believe that race played a role in the investigation of these seven defendants.

<u>Id</u>.

Next,

> [i]f the initial inquiry gives the judge reason to think that suspects of another race, and otherwise similarly situated, would not have been offered the opportunity for a stash-house robbery, it might be appropriate to require the FBI and ATF to disclose, in confidence, their criteria for stash-house stings. Analysis of the targeting criteria (and whether agents followed those rules in practice) could shed light on whether an initial suspicion of race discrimination in this case is justified. . . . If after that inquiry the judge continues to think that racial discrimination may have led to this prosecution, more information could be gathered.

<u>Id</u>. at 723. The matter was remanded to the district court to undertake this "measured step[]"

analysis.

In the instant case, the District Court ordered the prosecutor to disclose pertinent portions

of written ATF guidelines on sting operations to Washington on the day of trial which

Washington used to impeach the ATF agents who testified. App. 43-45. In its Superseding

Opinion denying Washington a new trial, the District Court noted the numerous instances where

the agents in this investigation did not follow ATF guidelines. <u>Id</u>. But the disclosure of the ATF

guidelines in this case was made in the context of use at trial for impeachment purposes, not as a

starting point for a "selective enforcement" discovery request designed to determine whether

Washington was improperly targeted because of his race.

27

This is what distinguishes this case from the decision of the Fourth Circuit in United States v. Hare, 820 F.3d 93 (4ᵗʰ Cir. 2016), another phony stash house robbery case where similar ATF policy materials were supplied to the defendants. In Hare, the defendants moved pretrial for discovery into whether race played a role in the ATF's decision to target an individual named Bowden who ultimately recruited the defendants for the stash house sting operation. Defendants presented evidence indicating that there had been a total of five stash house sting cases prosecuted in the District of Maryland since 2011 (including their case) and that all 20 defendants in those cases were African American. Id. at 97. The district court denied defendants' motion, finding that their evidence did not satisfy the standard for discovery set forth in Armstrong.

The district court, nevertheless, ordered the government to investigate whether ATF had a manual related to stash house sting operations and to provide any such manual to the court for in camera review. The government produced an ATF operations manual that was created in July 2013, after the events at issue in Hare. After reviewing the government's submission in camera, the district court ordered the government to produce a single page of the manual to defendants, which set forth the "procedures and guidelines for selecting a target." Hare, 820 F.3d at 98.

On appeal, the defendants revised the figures it had presented in the district court to 8 prosecutions involving 32 defendants, all of whom were African American. Also on appeal, defendants identified a "known white 'crew [ ]' involved in robberies and drug distribution" in the District of Maryland whose members were arrested and prosecuted, but were "not the subject of a 'stash house sting' or other ATF investigation." Id. at 98. Defendants argued that this evidence entitled them to discovery that focused on "the methodology employed by ATF in these

cases, their selection criteria for targets, their use of informants, and any efforts to ensure law enforcement did not ensnare the otherwise innocent and those lacking predisposition." Id.

The court in Hare began its analysis by concluding that the defendants had failed, under Armstrong, to put forth "some evidence" making a "credible showing" of the elements of a discrimination claim. Hare, 820 F.3d at 100. Yet, the court went on to acknowledge as "well taken," the validity of the defendants' arguments challenging the application of Armstrong to a selective enforcement claim and cited the Seventh Circuit decisions in Chavez and Davis with approval:

> First, Appellants note that it is considerably harder to demonstrate that a law enforcement action has a discriminatory effect, as there are less likely to be records of similarly situated individuals who were never investigated or arrested.
> . . .
> Second, Appellants note that Armstrong was primarily concerned with respecting the province of federal prosecutors, who are "designated by statute as the President's delegates to help him" execute the nation's laws, and thus enjoy a "presum[ption] that they have properly discharged their official duties." Law enforcement officers, however, are not accorded equal deference

Id. at 100; 101 (citations omitted).

Nonetheless, the court in Hare went on to hold that

> even if we assume that their evidentiary showing is sufficient to warrant discovery into selective enforcement, Appellants have not shown that they are entitled to discovery beyond what the government has already produced.

Id. at 101.

In the instant case, by contrast, Washington is entitled to discovery additional to the ATF manual excerpts that were provided to him only on the day of trial. Washington proffered facts demonstrating a racially tinged pattern of phony stash house robbery stings involving at least four

29

prosecutions against twenty defendants, all of whom were African Americans[12]. App. 15. In addition, Washington demonstrated a similar patten of racial profiling nationally in phony stash house robbery cases by attaching news articles—particularly the U.S. Today article[13]—which revealed that out of 635 phony stash house defendants, 91% were minorities, primarily African Americans and Hispanics. App. 25; App. 94-106.

Quoting United States v. Bass, 536 U.S. 862 (2002), the District Court dismissed Washington's evidence as "'raw statistics regarding overall charges [that] say nothing about charges brought against similarly situated defendants.'" App. 18. But Bass, like Armstrong, involved a "selective prosecution" case challenging prosecutorial discretion in pursuing the death penalty; it did not involve a "selective enforcement" claim against a law enforcement agency like the ATF. Thus, Bass is not applicable in a "selective enforcement" claim involving a law enforcement agency; indeed, it wasn't even referenced by the Seventh Circuit in Davis in its analysis of whether the statistics cited by the defendant justified his discovery motion moving forward[14].

---

[12]Washington's proffer was even more compelling than that set forth in Davis where 75 out of 94 defendants were African Americans.

[13]Brad Heath, Investigation: ATF Drug Stings Targeted Minorities, U.S.A. Today, July 20, 2014, available at: http://www.usatoday.com/story/news/nation/2014/07/20/atf-stash-house-stingsracial-profiling/12 800195/. App. 103. This article, referenced by Washington in his motion for reconsideration, was a follow-up to the article the District Court cited in its opinion denying the discovery motion. Brad Heath, ATF uses fake drugs, big bucks to snare suspects, USA Today, June 28, 2013, available at http://www.usatoday.com/story/news/nation/2013/06/27/atf-stash-houses-stingusatodayinvestigat ion/2457109/. App. 94. See App. 16, n. 4.

[14]The court in Davis did reference Bass, but only in the context of whether the court had jurisdiction to hear the government's interlocutory appeal. United States v. Davis, 793 F.3d at 718.

The District Court identified nine bullet discovery topics Washington requested in his discovery motion. App. 12-13. While some of Washington's discovery request concededly "transgress <u>Armstrong</u> or an applicable privilege," the following discovery requests, under the rationale of <u>Davis</u>, do not :

• A list by case name, number and the race of each defendant of all phony stash house robbery cases brought by the United States Attorney's Office for the Eastern District of Pennsylvania [and the District of New Jersey] from 2009 to the present based on investigations conducted by ATF or any other federal law enforcement agency, and any documents that show that the information stated in paragraph 4 [of the Motion] is incorrect.

• For each such case listed in response to section "a" above, a statement of prior [c]riminal contact each investigating federal agency had with each defendant prior to initiating every fictitious stash house robbery. (If all such information for a particular case is contained in the criminal complaint, provision of a copy of the complaint would be a sufficient response).

• The statutory or regulatory authority for ATF or any other federal law enforcement agency to instigate and/or pursue fictitious stash house robbery cases involving any pretext of illegal drugs (e.g. heroin, cocaine, crack, ecstasy, methamphetamine, etc.), . . .

• All national and Philadelphia Field Office ATF manuals, circulars, field notes, correspondence or any other material which discuss "stings", "reverse stings", "phony stash house rip-offs or robberies" or entrapment operations, including protocols and/or directions to agents and to confidential informants regarding how to conduct such operations, how to determine which persons to pursue as potential targets or ultimate defendants, how to ensure that the targets do not seek to quit or leave before an arrest can be made, and how to ensure that the agents are not targeting persons for such operations on the basis of their race, color, ancestry or national origin.

• All documents that contain information on whether and how supervisors and managers of the Philadelphia Area ATF and other federal law enforcement agencies involved in phony stash house robbery cases sought to determine whether or not its agents and informants were targeting persons on the basis of their race, color, ancestry or national origin for these phony stash house robbery cases, and what actions did the Philadelphia Area ATF (i.e., operating in the Eastern District of Pennsylvania [and the District of New Jersey] ) or other federal law enforcement agency supervisors and managers took [sic] to ensure that agents and/or informants were not targeting persons for such operations on the basis of their race, color, ancestry or national origin.

• The number of paid and unpaid confidential informants utilized by the Philadelphia Area ATF from 2009 to the present and the number of those confidential informants who had access to non-African American or persons of non-African descent who could be targeted for fictitious stash house robbery cases.

• The factual basis in each case cited in paragraph 4 and cases produced in response to the above and the cases produced in response to paragraph 10a regarding decisions made to pursue or initiate an investigation against any of the individuals listed as defendants in these cases.

App. 12-13.

Because these discovery request do not implicate prosecutorial discretion, the case should be remanded to the District Court with instructions that the government supply the requested discovery materials so the District Court can examine the materials in "measured steps." If the initial inquiry gives the District Court reason to think that similarly situated suspects would not have been offered the opportunity to participate in a stash-house robbery because of their race, the District Court should continue its examination of the discovery until it is able to make a final determination of whether Washington, as an African American, was targeted because of his race.

Finally, the District Court noted that Berry, not a government agent or informant, recruited Washington to rob the alleged stash house. App. 19, n. 4. This fact, according to the District Court, rebutted a showing under Armstrong of discriminatory purpose. App. 19. But the court in Davis rejected the notion that the actions of a defendant in initiating the idea of a stash house robbery automatically forecloses a "selective enforcement" claim:

The prosecutor says that [race] cannot have [played a role in the investigation of these seven defendants] because Davis himself initiated matters by pestering the informant for robbery opportunities and then chose his own comrades. Still, it remains possible that the FBI and the ATF would not have pursued this investigation had Davis been white.

Davis. at 722–23. Same too here; even though Berry may have initiated the idea to rob a stash house and recruited Washington and others to do so, this fact does not mean that the ATF would

have pursued the investigation had Berry and Washington been white. Thus, the matter should be

remanded for the District Court to take "measured step" in considering Washington's discovery

request in an endeavor to determine whether race played a role in his investigation and

prosecution.

## THE DISTRICT COURT ERRED IN DENYING WASHINGTON'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM.

### Standard of Review

Ineffective assistance of counsel claims are not generally entertained on direct appeal except where, as here, an evidentiary hearing to develop the facts is not needed and the record is sufficient to allow determination of ineffective assistance of counsel claim. United States v. Headley, 923 F.2d 1079, 1083 (3rd Cir. 1991). In Strickland v. Washington, 466 U.S. 668 (1984) the Court held that trial counsel is presumed to have acted reasonably and effectively unless the defendant can show that: (1) trial counsel's "representation fell below an objective standard of reasonableness[;]" and (2) there was a "reasonable probability that, but for [trial counsel's] unprofessional errors, the result of the proceeding would have been different." Id. at 687–88, 694.

The District Court, in denying Washington's claim of ineffective assistance of trial

counsel, ruled that Washington had failed to show "prejudice" under the second prong of the

Strickland test[15]:

> There is no prejudice as formulated under Strickland for the following reasons: (1) the ATF guidelines on sting operations require that investigations only target individuals who show a propensity of doing harm to the public through violent behavior, and a drug conviction does not indicate such a propensity; (2) the kind of drug conviction was not disclosed and Agent Bowman testified that "during the investigation," he did not know whether Defendant had a criminal record; (3) Astolfi did not refer to the prior drug conviction at trial after it was introduced; and (4) the evidence was so overwhelming against Defendant that testimony about the prior drug conviction by itself did not create a situation where there was a reasonable probability that the result of the trial would have been different.

---

[15]The District Court appeared to agree with Washington that the first prong in Strickland had been met when the Court wrote that trial counsel had no "sound strategy" to elicit Washington's prior drug conviction. App. 43, n. 4.

33

App. 43.

The District Court devoted much of its opinion on the issue of prejudice to trial counsel's

use of the ATF policy manual in his cross-examination of Agent Bowman:

> First, after successfully arguing for the admission of pertinent portions of written
> ATF guidelines on sting operations, defense counsel continuously referred to the manuals
> to argue that ATF policies were violated because Defendant was not known to be a
> violent criminal. . . .
> Moreover, defense counsel focused his cross-examination of Agent Bowman on
> the failure of ATF agents to follow the ATF procedures laid out in the policy manuals
> used by ATF. . . .
> Therefore, based on the evidence, defense counsel could argue that Agent
> Bowman was not in compliance with the ATF policy that "Investigations should only be
> pursued that target individuals who show a propensity of doing harm to the public
> through violent behavior, armed robberies and whose activities have been documented
> either through criminal history, criminal reputation or self-incrimination." Regardless of
> any prior drug conviction of Defendant, defense counsel's argument that Defendant was
> targeted in violation of ATF policy was a viable one for the jury's consideration, and was
> supported by the fact that Defendant had no record of robberies or other violent crimes.

App. 43-45 (internal citations to record omitted).

The District Court's analysis misses the salient point: trial counsel did not need to open

the door to the introduction of Washington's drug conviction in order to effectively cross-

examine Bowman on his noncompliance with the ATF policy manual. Trial counsel rightly

demonstrated in his cross-examination of Bowman that ATF failed to comply with its manual:

Washington was not known to be a violent criminal and did not have a "record of robberies or

other violent crimes." But in eliciting Washington's drug conviction, trial counsel did not

succeed in proving that Washington was not a violent criminal; rather, he succeed in proving that

Washington was a convicted drug offender. At bottom, trial counsel did not have to prove that

Washington was not a violent offender with evidence that he had a prior drug conviction; rather,

all he had to do was to have Agent Bowman acknowledge that Washington had not been

34

convicted of robbery.

Second, the District Court posits that Washington was not prejudiced because the jury did not learn of the nature of Washington's drug conviction and Astolfi did not refer to it in closing argument or rebuttal. App. 45-46. But it bears repeating that Washington was on trial for two Title 21 drug offenses <u>for which he received a mandatory minimum sentence of twenty years' incarceration</u>. By contrast, Washington was sentenced to only two years' incarceration on the Hobb's Act counts. Thus, Counts Three and Four, the drug counts, were the most important counts in the indictment from the standpoint of sentencing exposure. The District Court would have been on firmer ground if Washington had not been on trial for drug offenses or if trial counsel had elicited a prior conviction that wasn't drug-related. Instead, the jury's knowledge that Washington had a prior "drug conviction" could only be viewed as evidence that he had a propensity to commit a drug crime; the very offenses for which he stood trial.

That Astolfi held his fire on closing argument and rebuttal did not un-ring the bell. Reference to Washington's drug conviction at trial was not just in passing; the jury heard it twice: first, in trial counsel's cross-examination of Bowman when Bowman said "I'm pretty sure he had a drug arrest" and second, in Astolfi's redirect when Astolfi showed Bowman Washington's record and confirmed the existence of the drug conviction.

Finally, the evidence in this case, while sufficient get past a Rule 29 motion for a judgement of acquittal, was not overwhelming. Trial counsel was correct in arguing that Washington's actions on the day of the robbery in going to the scene with his girlfriend in a separate car demonstrated his hesitancy in committing to the robbery. As recognized by the District Court, trial counsel's argument demonstrated that

> Defendant was not fully committed to the robbery [and] was consistent with the theory that Defendant was not guilty, because Defendant never reached a point where he "attempted" to commit a crime. Attempt was part of the charged offenses filed against him and defense counsel's argument was strategically designed to enhance Defendant's chance of acquittal.

Id.[16]

Moreover, Washington's acquittal of Count Five charging the section 924( c) firearm violation also demonstrates that the jury was **not** disposed to view the evidence against him as "overwhelming." Notwithstanding the government's focus on the tapes and Washington's talk about "guns" and "shooting the fuck out of this joint[17]," the jury demonstrated it reservations about the level of Washington's commitment to the robbery by acquitting him of the section 924 ( c) count. Indeed, the jury made two requests of the District Court during deliberation: first, the jury requested the opportunity to view the video and transcript of the arrest "takedown" and second, "'a definition or explanation of entrapment or enticement.'" App. at 107-108. These twin requests by the jury belie the District Court's view that Washington "faced a mountain of evidence against him." App. 46. Trial counsel's blunder in opening the door to the introduction of Washington's drug conviction demonstrated Washington's propensity to participate in a drug offense and refuted trial counsel's theory of defense that Washington had been racially profiled

---

[16]The District Court misconstrues Washington's Motion for a New Trial regarding the propriety of trial counsel's argument that Washington was not fully committed on the day his arrest. Instead of claiming that trial counsel was "wrong to argue to the jury that Defendant was not yet committed to the robbery when he drove to the stash house," app. 42, n. 3, Washington wrote in his Motion for a New Trial: "[Trial counsel's] argument that defendant was " . . . on yellow. . . . Caution . . ." **was undercut** . . . by [trial counsel's] inexplicable decision to elicit defendant's drug conviction . . . Under the circumstances of this case, Mr. Washington would have been acquitted of all counts had [trial counsel] not elicited his drug conviction . . . in front of the jury." App. 86. (emphasis supplied).

[17]App. 30.

or stereotyped as an "animal" to be taken off the street. In short, "but for [trial counsel's] unprofessional errors {in opening the door to the introduction of Washington's drug conviction,} the result of the proceeding would have been different."

Finally, the District Court addressed the effect alcohol had on trial counsel's actions in eliciting Washington's prior drug conviction:

> Finally, and most importantly, there is no evidence in this record that defense counsel's questions regarding Defendant's prior drug conviction . . . were caused by, or associated with, alcohol consumption. . . . No conclusion can be drawn that what appears to be moderate consumption of alcohol in any way contributed to the conviction of Defendant.

App. 54. At bottom, though, if this Court agrees that trial counsel was ineffective in eliciting Washington's drug conviction, the reason for his malfeasance becomes irrelevant. In his capacity as CJA-appointed counsel, trial counsel's alcohol usage at trial was so egregious that even the government, to its credit, felt that it was necessary to hold a hearing on the issue. App. 34. As a result of the hearing, a complete factual record of the ineffective assistance of counsel claim has been presented to this Court for consideration. That trial counsel may have been ineffective for eliciting Washington's drug conviction for some reason other than alcohol consumption at trial is besides the point. The fact remains that Washington was prejudiced by trial counsel eliciting and opening the door to the introduction of Washington's drug conviction irrespective of why he blundered. A new trial should be ordered.

**THE DISTRICT COURT ERRED IN IMPOSING A MANDATORY MINIMUM SENTENCE OF TWENTY YEARS' INCARCERATION IN THIS PHONY STASH HOUSE ROBBERY CASE**

### Standard of Review

"The standard of review for [a defendant's] constitutional challenge to his mandatory minimum sentence is plenary." United States v. Walker, 473 F.3d 71, 75 (3rd Cir. 2007).

Washington objected at sentencing to the imposition of a mandatory minimum sentence of twenty years' incarceration on the Title 21 drug offenses. App. 89-90. Such a sentence, in Washington's view, was unwarranted in a case involving a phony stash house robbery where no drugs existed and the ATF had unfettered discretion to manipulate the drug quantities. Id. The District Court, in overruling the objection, felt "bound" to impose this draconian sentence. App. 92.

The pernicious impact a phony stash house robbery sting has on a defendant's sentencing exposure was explored by the district court in United States v. McLean, 85 F. Supp. 3d 825 (E.D. Pa. 2015) and 2016 WL 4179669 (E.D. Pa. Aug. 8, 2016), a matter in which the court's two opinions came both before and after Washington was sentenced in the instant case. There, the defendant was charged in a phony stash house robbery case involving Special Agent Patrick Edwards, the same agent who operated as the undercover agent in the instant case. The defendant moved for discovery seeking information that would support a claim of racial profiling and selective prosecution. The district court, citing Armstrong and Judge Slomsky's decision in the instant case, denied the motion. McLean, 85 F. Supp. 3d at 828.

The defendant thereafter moved to dismiss the indictment on the grounds of outrageous government conduct. Although the court in McLean ultimately denied the motion to dismiss, it did address the serious due process concerns that arise in a phony stash house prosecution.

> The first element of the controversy surrounding the ATF program stems from the fact that the structure of the sting has profound implications under the Federal Sentencing Guidelines for any defendant who succumbs to temptation. Typically, the amount of hypothetical cocaine to be stolen is posited to exist in a quantity that triggers a mandatory minimum sentence of 10 years, and the need to use firearms to accomplish the heist triggers a separate mandatory minimum of another five years.

Id. at 826.

38

The court went on to quote from the Ninth Circuit's decision in <u>United States v. Briggs</u>, 623 F.3d 724  (9th Cir. 2010), a fictional stash house robbery case in which the defendant plead guilty:

> As observed by the Ninth Circuit:
>
> "In fictional stash house operations like the one at issue here, the government has virtually unfettered ability to inflate the amount of drugs supposedly in the house and thereby obtain a greater sentence for the defendant. In fact, not only is the government free to set the amount of drugs in a fictional stash house at an arbitrarily high level, it can also minimize the obstacles that a defendant must overcome to obtain the drugs. . . "

<u>Id</u>. at 826 (citations and quoted passages omitted).

The defendant in <u>McLean</u> proceeded to trial after the district court denied the motion to dismiss. As in the instant case, the government filed an information under 21 U.S.C. § 851 which increased the defendant's mandatory minimum sentencing exposure from ten to twenty years' incarceration. The defendant was convicted by a jury.

In a second memorandum opinion following and explaining its sentence, the district court ruled "that application of an additional mandatory minimum tied to the quantity of drugs would be inconsistent with principles of 'ordered liberty'" inherent in the due process clause of the Fifth Amendment. <u>United States v. McLean</u>, 2016 WL 4179669, at *12 (E.D. Pa. Aug. 8, 2016). After canvassing the law in this and other circuits pertaining to sentencing manipulation in general, and a due process violation arising from sentencing manipulation inherent in phony stash house robbery cases in particular, the district court concluded that the imposition of a mandatory minimum sentence on the defendant would violate due process. The district court paid particular attention to the inherent tension between the ATF's need to inflate the drug amounts to maintain operational integrity in the sting and the target's actual culpability/ability to deal in the drug

amounts contemplated in the sting:

> By their very nature, stash house sting operations are arbitrary and indiscriminate when it comes to the initial identification of suspects. Essentially, the Government relies upon a confidential informant to troll for individuals who might fall prey to the sting. ATF agents then probe the background of the prospective target to determine whether his or her criminal history warrants further pursuit, <u>but such investigation does not necessarily reveal whether the subject has ever engaged in criminal activity of the magnitude contemplated by the sting.</u> . . . In refusing to dismiss the Indictment, I was persuaded that McLean warranted the attention of law enforcement as someone who has and would deal narcotics and make use of a firearm in pursuit of his activities. <u>In no respect, however, does that analysis elevate McLean to dealing in the quantities proposed by the Government.</u>

<u>Id</u>. at *6 (emphasis supplied).

The district court went on to note that the inflated drug amounts necessary to maintain

operational integrity don't necessarily correlate to the defendant's culpability in conspiring or

possessing with intent to distribute those amounts:

> From my review of reported cases nationwide, I have not identified any investigation where the specified amount of cocaine in the fictional stash house was less than 5 kilograms. . . . . The rationale asserted for specifying such amounts is operational credibility—the notion that the amount must be sufficiently large that the suspects will find it believable, since an amount that is too low might raise the suspicions of the targeted individuals, thereby placing the agent in danger. . . . Consequently, by the Government's reasoning, the very nature of this type of undercover operation necessarily requires, for the safety of its operatives, a scenario that automatically triggers mandatory minimum sentences, even if the target of the sting would otherwise have taken the bait, and regardless of whether the suspect had ever before dealt in quantities of this kind.

<u>Id</u>. at *7 (internal citations to record omitted).

The district court went on to conclude that application of the twenty year mandatory

minimum, as opposed to a ten year mandatory minimum, would deny the defendant substantive

due process.

> . . . it is the following combination of factors that leads me to conclude that enforcing a third mandatory minimum would offend due process: the inherently arbitrary way in which stash house sting cases first ensnare suspects; the immense power delegated

40

to case agents who can pre-ordain a sentence at the outset of the operation; the lack any meaningful way to test the validity of the Government's justification for the amount of narcotics built into the sting; the lack of a genuine nexus between the amount of narcotics proposed and the defendant's culpability; the lack of sufficient evidence here that McLean ever sought to deal at the level proposed by the Government; the lack of a criminal record that unambiguously demonstrates McLean had a propensity for violence, aside from his braggadocio; the risk that the sheer immensity of the sentences that follow from such operations compels guilty pleas; and the disparities in sentencing that are seemingly endemic to all of these prosecutions because the structure of the sting mandates lengthy imprisonment for any non-cooperator. I attribute no wrongful motive to law enforcement or the prosecutor in this case. But in my view, a concentration of power that allows the Government to define both crime and punishment, with no possibility for judicial review of the facts of the individual case, amounts to a structural violation of substantive due process violations. But even if such investigative tactics do not represent an inherent violation of Due Process, on the specific facts of this case I conclude that application of an additional mandatory minimum tied to the quantity of drugs would be inconsistent with principles of "ordered liberty."

Id. at *12 . Based on this reasoning, the court rejected imposition of the enhanced twenty year mandatory minimum sentence and sentenced McLean to fourteen years' incarceration. Id. at *13.

The same denial of due process concerns address by the court in McLean apply with equal force to the instant case. First, Edwards was the undercover agent in both sting operations in which the ATF had unbridled discretion in concocting the quantity of fictitious cocaine involved in the sting. Second, there was no relationship between the quantity of fictitious cocaine—here ten kilograms—and Washington's culpability and capability to conspire or attempt to possess with intent to distribute that amount. Indeed, as recounted by the District Court, Washington is heard in a recorded conversation telling Edwards that "I can't get it moved yo, but I don't like fucking with n-----rs." "See I don't fuck with coke." App. 30, first full paragraph of single space text, line 6 (emphasis supplied). Third, aside from Washington's "braggadocio," there is no evidence that Washington has a serious record for crimes of violence,

a fact relied upon heavily by the District Court in denying his Motion for a New Trial[18]. App. 43-45. In short, the same "concentration of power that allows the Government to define both crime and punishment, with no possibility for judicial review of the facts of the individual case" amounts to the same "structural violation of substantive due process" in Washington's case as it did in <u>McLean</u>. Accordingly, the matter should be remanded to the District Court for re-sentencing.

## CONCLUSION

Washington asks for the following disposition: with respect to issue two, the ineffective assistance of counsel claim, Washington requests that the Court reverse the judgment of conviction and remand for a new trial. Short of that, with respect to the "selective enforcement" discovery issue, Washington asks that the matter be remanded so the District Court can take the "measured steps" necessary to fully evaluate his discovery claim. Finally, Washington asks that the Court remand the matter for re-sentencing on the ground that imposition of the enhanced twenty year mandatory minimum sentence violates due process.


Respectfully submitted,

/s/ Mark S. Greenberg

_____
MARK S. GREENBERG, ESQUIRE
Attorney for Appellant

---

[18]Washington does have a Pennsylvania conviction for aggravated assault, felony of the second degree.

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA            : :

    v.                                     : :      DOCKET NO. 16-2795

ASKIA WASHINGTON a/k/a SKI    (Appellant)

## **CERTIFICATIONS**

1.    <u>CERTIFICATE OF BAR MEMBERSHIP</u>

    Counsel for Appellants certifies that he is a member of the bar of this Court.

2.    <u>IDENTICAL COMPLIANCE OF E-BRIEF AND HARD COPY OF BRIEF</u>

    Counsel for Appellants certifies that the text of the E-brief and the hard copies of the brief
are identical.

3.    <u>VIRUS SCAN CERTIFICATION</u>

    Counsel for Appellant certifies that a virus scan was performed using Microsoft 10
AntiVirus Scan.

4.    <u>WORD COUNT CERTIFICATION</u>
    Counsel for Appellant certifies that there are less than 14,000 words in the instant brief.

5.    <u>CERTIFICATE OF SERVICE</u>
    I HEREBY CERTIFY that a true and correct of the Brief for Appellant and Appendix
(Vol. 1) was served upon I HEREBY CERTIFY that a true and correct copy of the
foregoing Motion was served upon:

Eric Henson, Esquire
Assistant U.S. Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

by ECF-filing on the date below.

/S/Mark Greenberg
MARK S. GREENBERG, ESQUIRE
Attorney for Appellant

DATED: September 7, 2016