No. 16-2795

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,
Appellee

v.

ASKIA WASHINGTON,
a/k/a "Ski,"
Appellant

APPEAL FROM JUDGMENT OF CONVICTION AND SENTENCE
IN CRIMINAL NO. 13-171 IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRIEF FOR APPELLEE UNITED STATES OF AMERICA

ZANE DAVID MEMEGER
United States Attorney

BERNADETTE McKEON
Assistant United States Attorney
Acting Chief of Appeals

ERIC B. HENSON
Assistant United States Attorney

615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
(215) 861-8312

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ................................................................. 1

    I.    Subject Matter Jurisdiction ...................................................... 1

    II.   Appellate Jurisdiction ............................................................. 1

STATEMENT OF ISSUES ........................................................................... 2

STATEMENT OF THE CASE ...................................................................... 3

    I.    Procedural History .................................................................. 3

    II.   Statement of Facts ................................................................... 5

        A.    The Robbery Conspiracy ................................................... 5

        B.    Washington's Motion for New Trial ................................ 13

        C.    Sentencing ..................................................................... 20

STATEMENT OF RELATED CASES .......................................................... 22

SUMMARY OF ARGUMENT .................................................................... 23

ARGUMENT ............................................................................................. 25

    I.    THE DISTRICT COURT DID NOT ABUSE ITS
        DISCRETION IN DENYING WASHINGTON'S
        MOTION FOR DISCOVERY .................................................. 25

    II.   THE DISTRICT COURT PROPERLY
        DENIED WASHINGTON'S INEFFECTIVE
        ASSISTANCE OF COUNSEL CLAIM ...................................... 42

III.    THE DISTRICT COURT PROPERLY IMPOSED
        THE MANDATORY MINIMUM SENTENCE ......................... 52

CONCLUSION............................................................................... 59

# TABLE OF AUTHORITIES

## Cases

*Bivens v. Six Unknown Named Agents of Federal*
*Bureau of Narcotics,*
403 U.S. 388 (1971) .............................................................. 36

*Government of Virgin Islands v. Weatherwax,*
77 F.3d 1425 (3d Cir. 1996) ................................................ 42

*McAleese v. Mazurkiewicz,*
1 F.3d 159 (3d Cir. 1993) .................................................... 43

*McNeil v. Cuyler,*
782 F.2d 443 (3d Cir. 1986) ................................................ 43

*Padilla v. Kentucky,*
559 U.S. 356 (2010) ............................................................ 43

*Strickland v. Washington,*
466 U.S. 668 (1984) ................................................ 4, 18, 19, 23, 42-44

*United States v. Abuhouran,*
161 F.3d 206 (3d Cir. 1998) ................................................ 31

*United States v. Alcaraz-Arellano,*
441 F.3d 1252 (10th Cir. 2006) .......................................... 38

*United States v. Armstrong,*
517 U.S. 456 (1996) ..................................................... passim

*United States v. Barlow,*
310 F.3d 1007 (7th Cir. 2002) ............................................ 39

*United States v. Bass,*
536 U.S. 862 (2002) ..................................................... 32, 34

*United States v. Berrigan*,
    482 F.2d 171 (3d Cir. 1973) ................................................................ 32

*United States v. Boggi*,
    74 F.3d 470 (3d Cir. 1996) ................................................................ 55

*United States v. Davis*,
    793 F.3d 712 (7th Cir. 2015) ........................................................ 39-41

*United States v. Dixon*,
    486 F. Supp. 2d 40 (D.D.C. 2007) .................................................... 38

*United States v. Fulford*,
    825 F.2d 3 (3d Cir. 1987) ................................................................ 43

*United States v. Grober*,
    624 F.3d 592 (3d Cir. 2010) ............................................................ 56

*United States v. Gunter*,
    462 F.3d 237 (3d Cir. 2006) ............................................................ 55

*United States v. Headley*,
    923 F.2d 1079 (3d Cir. 1991) ........................................................... 42

*United States v. Hedaithy*,
    392 F.3d 580 (3d Cir. 2004) ............................................................ 31

*United States v. Kellum*,
    356 F.3d 285 (3d Cir. 2004) ............................................................ 56

*United States v. McLean*,
    85 F. Supp. 3d 825 (E.D. Pa. 2015) ................................................. 57

*United States v. Reevey*,
    631 F.3d 110 (3d Cir. 2010) ............................................................ 56

*United States v. Santiago*,
    201 F.3d 185 (3d Cir. 1999) ............................................................ 56

*United States v. Taylor,*
    686 F.3d 182 (3d Cir. 2012) ............................................................... 25

*United States v. Viera,*
    2015 WL 3833797 (S.D.N.Y. 2015) ................................................... 38

*United States v. Walker,*
    473 F.3d 71 (3d Cir. 2007) ................................................................. 52

*United States v. Whitfield,*
    649 F. App'x 192 (3d Cir. 2016) .................................................. 37, 38

*United States v. Winebarger,*
    664 F.3d 388 (3d Cir. 2011) ............................................................... 56

*Wayte v. United States,*
    470 U.S. 598 (1985) ..................................................................... 28, 37

*Yick Wo v. Hopkins,*
    118 U.S. 356 (1886) ........................................................................... 37

## Statutes and Rules

18 U.S.C. § 922(g)(1) ................................................................................. 3

18 U.S.C. § 924(c)(1)(A) ............................................................................. 3

18 U.S.C. § 1791 ........................................................................................ 32

18 U.S.C. § 1951 .......................................................................................... 3

18 U.S.C. § 3231 .......................................................................................... 1

18 U.S.C. § 3553 ................................................................................... 56, 57

18 U.S.C. § 3742 .......................................................................................... 1

21 U.S.C. § 841(b)(1) ................................................................................. 55

21 U.S.C. § 846 ............................................................................................ 3

21 U.S.C. § 851 .................................................................................... 20, 24

28 U.S.C. § 1291 .......................................................................................... 1

# JURISDICTIONAL STATEMENT

## I. Subject Matter Jurisdiction

Because the defendant was charged in an indictment with violations of federal criminal law, the district court had subject matter jurisdiction over the case pursuant to 18 U.S.C. § 3231.

## II. Appellate Jurisdiction

Based upon the timely filing of a notice of appeal from the order of judgment in a criminal case entered on entered on June 13, 2016, this Court has jurisdiction over this matter under 28 U.S.C. § 1291. In addition, this Court has jurisdiction pursuant to 18 U.S.C. § 3742 to review the sentence imposed on the appellant.

## STATEMENT OF ISSUES

1. Did the district court correctly apply the "selective prosecution" standards set forth in *United States v. Armstrong*, 517 U.S. 456 (1996), in denying Washington's discovery motion?

2. Did the district court correctly conclude that, given the overwhelming evidence of his guilt, Washington was not prejudiced by trial counsel's elicitation of the fact that Washington previously had been convicted of a drug offense?

3. Did the district court correctly impose a mandatory minimum sentence of 20 years' incarceration on Counts Three and Four of the Superseding Indictment?

## STATEMENT OF THE CASE

### I. Procedural History

On February 19, 2015, a grand jury returned a superseding indictment charging defendant/appellant Askia Washington and co-defendants Dwight Berry, Antonio Ellis, and Jermau Johnston with conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count One); attempted Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count Two); conspiracy to possess with the intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846 (Count Three); attempted possession of five kilograms or more of cocaine with intent to distribute, in violation of 21 U.S.C. § 846 (Count Four); carrying a firearm during and in relation to a crime of violence and a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Five); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count Six).

Before trial, Washington moved for a hearing and discovery on the issue of racial profiling and selective prosecution, alleging that he had been targeted for prosecution by the government based on his race. In a memorandum opinion issued on June 30, 2014, the district court denied the motion, finding that Washington had failed to make the requisite

threshold showing for such discovery. App. 9-21. Although he was represented by counsel, Washington filed a pro se motion for reconsideration of this order. On August 7, 2014, the district court denied the motion for reconsideration. App 22-26.

Washington was the only defendant who proceeded to trial. His trial began on June 1, 2015. On June 9, 2015, the jury returned a verdict finding Washington guilty of the charges in Counts One, Two, Three, and Four. The jury acquitted Washington on Count Five, and the government chose not to proceed on Count Six.

After he was convicted, Washington sought the appointment of new counsel. The district court granted his request and appointed new counsel. Through his new attorney, Washington filed a motion for a new trial alleging his trial counsel was ineffective. On November 9, 2015, the district court held a hearing on the motion. On April 12, 2016, the district court denied the motion. On May 3, 2016, the district court filed a superseding opinion. The district court found that Washington had failed to satisfy the two-pronged test for ineffective assistance of counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). App. 27-56.

On June 13, 2016, Washington was sentenced to 22 years' imprisonment, consisting of two years' imprisonment on Counts One and

- 4 -

Two and a consecutive 20-year mandatory minimum sentence of incarceration on Counts Three and Four. Washington was also sentenced to a ten-year period of supervised release, and ordered to pay a fine of $1,500 and a special assessment of $400. Washington filed a timely appeal.

## II. Statement of Facts

### A.    The Robbery Conspiracy.

In 2012, a confidential informant known as "Roc" alerted agents of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") that a person named Dwight Berry had asked Roc if he knew anyone Berry could rob for drugs.[1] ATF began an investigation of Berry. App. 28.

On February 18, 2013, Roc met with co-conspirator Berry to discuss robbing a drug stash house. Unknown to Berry, the meeting was electronically recorded. During the meeting, Roc and Berry discussed plans to carry out a home invasion robbery of a drug stash house. Roc told Berry that he knew a drug courier who frequently traveled from New York to Philadelphia to pick up kilograms of cocaine from a drug supplier's

---

[1] In his brief, Washington acknowledged that the record supported the detailed findings of fact in the district court's superseding opinion denying Washington's motion for new trial. Br. 7 n.4. Accordingly, this statement of facts is based on the district court's findings.

stash house. This drug courier was, in reality, Special Agent Patrick Edwards acting in an undercover capacity. Berry expressed interest in robbing the stash house and discussed plans to divide the money and kilograms of cocaine that they would steal during the robbery. App. 29.

On February 20, 2013, during another recorded meeting, Berry, Roc, and the undercover agent posing as the drug courier further discussed the stash house robbery. The undercover agent told Berry that, while picking up cocaine from the stash house, he had seen over ten kilograms of cocaine inside a cooler. During the conversation, Berry expressed a willingness to shoot the intended robbery victims if necessary, and stated that he knew others who would participate in the robbery. *Id.*

On March 4, 2013, Roc and the undercover agent met with Berry, appellant Washington, and an unidentified man. Again, the meeting was electronically recorded. Berry, Washington, and the unidentified man arrived at the meeting together. Berry introduced the two men, without giving their names, as the individuals who would commit the robbery with Berry, that is, as the robbery team he had boasted about in an earlier meeting. Washington and the unidentified man emphatically expressed their desire to take part in the robbery. As the undercover agent provided details about the stash house, Washington was heard repeatedly in the

recording stating, "mm-hmm," affirming each detail of the discussion. When the undercover agent finished describing the layout and the scenario, Washington asked, "Being that jawn is so safe like that, what about the outside? Like you know, nobody going to be watching the jawn from the outside or nothing?" Interestingly, this was the same question that Berry had asked during a previous meeting. When the undercover agent told Washington that he never saw anyone outside the home, Washington replied, "That's good. Alright, well we got it."

Washington continued to ask for details of the robbery plan. He asked, "Alright, so on the tip, you walking in there . . . we walking in behind you?"; "When you go in there, you lock the door behind yourself?"; "So you want me to be in there with you . . . when you go in there, you want us to come in there?"; and "How many guns you think is in that joint?" During this conversation, the robbery team discussed the details of the robbery, including their willingness to harm the men guarding the supposed stash house if necessary. Washington stated, "I ain't gonna hit you [referring to the undercover agent], but say if I come there . . . I hit him from the rip. I ain't gonna kill him, but I hit him just to make him to know that I ain't fucking playing no games." Later, Washington also stated, "I'm walking in with my gun out," and "[y]eah 'cause I'm gonna hit him

'cause I know he got a gun. So I got no choice. But I'm not gonna just play. I don't play with them when it comes to this shit." Washington also made the following statements demonstrating his willing participation in the conspiracy: "Everybody should be love at the end of the day. The way you explained it . . . I shouldn't even have to hit this n----r. 'Cause I'm so sharp on the draw." "Once you open the door, I got you." "We are just gonna be shooting the fuck out of this joint, but you got to be out of the way." "You know what I'm saying? We trying to make it as safe as possible for you." "I'm walking in with my gun out." "So I got him and he ain't going to risk getting his head blew off and start shooting on everybody." App. 29-30.

During the meeting, the undercover agent explained to Berry, Washington, and the unknown man that they would have to divide the kilograms of cocaine for distribution after the robbery. The undercover agent explained that he "can't take the cocaine to NY." Washington agreed, stating, "Yeah you can't take the shit back." Washington offered to help to sell the undercover agent's portion of the stolen cocaine, stating, "So what, you want it sold or what . . .?" "I can't get it moved yo, but I don't like fucking with n-----rs." "See I don't fuck with coke." . . . "They got to be somebody I really trust. Like all right buy this jawn I just came up on." "Buy this jawn real quick so. . . you can most likely, you can get your shit

out before you leave. You know what I'm saying?" As the conversation ended, Berry told the undercover agent that "it's gonna get done," referring to the home invasion robbery. Berry added, "However it go down, that shit's gotta go down." Washington agreed and added, "I know we can do it. That shit sounds super sweet." *Id.* at 30.

Recorded phone calls from March 4 to March 15, 2013, showed that Berry and Washington spoke frequently about the plan to rob the stash house. In these calls, they planned the robbery for March 15, 2013, and decided to use a van that had doors on both sides. During this time, Berry continued to meet with Roc and the undercover agent to discuss the details of the robbery.

On March 15, 2013, the day began with a text message between Washington and Berry, both saying that they were "[r]eady for work." Shortly thereafter, the men met at Berry's mother's home, where Berry retrieved two guns, secreted them in an Eggo waffle box, and handed them to Jermau Johnston, who had joined the conspiracy and was seated in Berry's car. Berry and Johnston then drove to a grocery store with Washington and Antonio Ellis following in a rented Chrysler driven by

Washington's girlfriend.[2] At the grocery store, Johnston and Ellis bought gloves to use in the robbery. From there, everyone went to the Hilton Hotel on Island Avenue, in Philadelphia, Pennsylvania. As previously requested by Berry and Washington, the undercover agent was driving a minivan. Washington traveled to the hotel in the rented Chrysler with his girlfriend. App. 31.

The purpose of this final meeting was for the undercover agent to review the plan once again and to provide the robbers with the address of the house to be robbed. This was the first time Ellis and Johnston participated in a meeting with Roc or the undercover agent. Prior to this date, the government was not aware of either Ellis or Johnston. Once in the Hilton parking lot, Washington, Ellis, Johnston, Berry, and the undercover agent got into the minivan with Roc in the driver's seat. Their conversation was recorded. Washington immediately complained about Johnston and Ellis going to the grocery store because they could have been observed on videotape purchasing the gloves.[3] Washington said, "If y'all

---

[2] Washington's girlfriend was not charged.

[3] Washington was right. The men were caught on the store's surveillance system and the video was played for the jury at trial.

would have told me you ain't had that shit [referring to the gloves], I would have got it already." App. 31.

Inside the van, Berry instructed the undercover agent to review the details of the planned robbery with everyone. At Berry's direction, the undercover agent explained, again, that the target of the robbery was a house at which 10 kilograms of cocaine would be found; that the building would be guarded by a man at the door, who carried a firearm; that a second man inside the home would also be armed; that the second man would have control of the drugs; that the drugs would be stored in a white cooler; and that there would be no money found in the house. App. 31. The men then discussed their plan of action: that they would all drive to a staging area closer to the target location; that when they made their assault on the drug house, two of them would be the first to enter the house; that they would be armed; that they would likely bind the people inside the house; and that they would treat the undercover agent, who would be in the house, as if he were another victim to evade suspicion by the drug dealers. *Id.* During the conversation, Washington asked the undercover agent if he had the address yet and requested that the undercover agent text the address to Washington and the other robbers when he did get the address, so they could circle the block before the robbery. App. 31-32.

A search of Washington's iPhone revealed that on March 15, 2013, at 3:00 a.m., he downloaded a police scanner app. App. 32. Inside the minivan at the hotel, Washington stated, "I got the scanner pumping." *Id.* In addition, at trial the government introduced an extensive analysis of phone records obtained during the course of the investigation. These records showed communications among the coconspirators, including Washington and Berry, at critical times during their planning and execution of the robbery scheme. Supp. App. 153-169.

From the hotel, the undercover agent and the five-member robbery crew drove to a parking lot in southwest Philadelphia, where the robbery conspirators were arrested. Washington, Ellis, and Johnston were immediately taken into custody, but Berry fled on foot and was found hiding in an attempt to evade apprehension. He was removed from his hiding place and placed under arrest. App. 32.

Inside the minivan, agents found the Eggo waffle box, which proved to contain two firearms. Agents also found ammunition, gloves, and zip ties. From the Chrysler, agents recovered a backpack, gloves, a mask, a lighter, and lighter fluid. According to the testimony of Washington's coconspirator, Washington intended to burn down the stash house if things went bad. *Id.*

### B.    Washington's Motion for New Trial.

On September 17, 2015, after his conviction, Washington wrote a letter to the district court requesting the appointment of new counsel, alleging, in part, that trial counsel "has an alcohol problem and needs help." The district court granted Washington's request and appointed present counsel to represent Washington at sentencing. At defense counsel's request, the district court scheduled an evidentiary hearing on Washington's allegations relating to trial counsel's performance. Trial counsel declined an invitation to testify at the hearing. App. 34.

The evidentiary hearing was held on November 9, 2015. At the hearing, the trial prosecutor, Assistant United States Attorney Salvatore L. Astolfi, testified that defense counsel's conduct at trial was unusual in that trial counsel checked each microphone in the courtroom, a task normally performed by courtroom personnel. Astolfi also testified that he smelled alcohol on trial counsel's breath on the morning of June 3, 2015, the first day evidence was presented at trial. During the lunch break that day, Astolfi asked trial counsel whether he had consumed alcohol. Trial counsel responded that he had had "one" at lunch. Astolfi testified that he did not smell alcohol on trial counsel's breath again. App. 35.

Washington testified that trial counsel had "liquor on his breath" at least three times during pretrial visits with Washington at the Federal Detention Center. When Washington asked trial counsel about the smell, he replied that "a shot after work ain't gonna hurt nothing." Washington testified that he saw trial counsel eat peppermint candies, which Washington believed were used to cover up the smell. Washington testified that, at one point during trial, trial counsel "snapped" at a deputy marshal regarding what Washington was allowed to wear at trial. Like Astolfi, Washington testified that the only day that he smelled alcohol and peppermints was on June 3, and after that he did not smell them again. App. 34-35.

Following the hearing, Washington filed a motion for a new trial alleging ineffective assistance of counsel. In addition to relating the evidence regarding trial counsel's consumption of alcohol prior to and during trial, Washington specifically alleged that trial counsel was ineffective in asking Agent Bowman, on cross-examination, whether Washington had a prior drug conviction. Although Bowman testified that he did not recall, defense counsel's question opened the door for the prosecutor to elicit testimony on redirect that Washington had previously been convicted of an unspecified drug offense. According to Washington,

had his counsel not allowed the jury to learn of Washington's prior drug conviction, the jury would have acquitted Washington on all counts.[4] App. 86.

The district court denied Washington's motion. In its opinion, the district court reviewed trial counsel's performance in detail and noted numerous actions by trial counsel that were helpful to appellant's defense and demonstrated a sound trial strategy. App. 32-34. The district court observed that at the beginning of trial, defense counsel successfully persuaded the district court to order the government to produce portions of ATF guidelines on conducting sting operations, despite the district court's pretrial order denying defense counsel's request for these documents. App. 32.

The district court found that defense counsel made effective use of these materials at trial. The district court noted that "[d]efense counsel's theory of defense was that ATF created stash house robbery setups in order

---

[4] In his motion for new trial, Washington also alleged that his counsel was ineffective in eliciting testimony from Agent Edwards that the confidential informant had been deactivated and relocated because he had received numerous threats. *See* App. 42 n.3, 47-50. The district court was not persuaded that counsel's questions about the confidential informant were not part of a sound trial strategy. App. 54. Washington does not challenge this conclusion on appeal.

to target poor, unintelligent, and desperate African Americans who otherwise were not involved in criminal activity." App. 33. At trial, the defense focused on alleged government misconduct, including violations of ATF policies that prohibited race-based investigations and prosecutions. Defense counsel also argued that the agents had violated the ATF guidelines for sting operations, because Washington did not fit the criteria for targets of sting investigations, and that agents had misused the confidential informant. In addition, defense counsel argued that the ATF investigation was defective and that the whole crime was "created by the Government, for the Government." Defense counsel criticized ATF for creating a fake stash house scenario, when there were plenty of real crimes in Philadelphia that could have been investigated. App. 33; Supp. App. 39. Further, defense counsel argued that because the cocaine to be taken during the robbery did not actually exist, the government could not prove the essential element that the product had moved in interstate commerce. *Id.;* Supp. App. 39-40.

Both the case agent, Special Agent John Bowman, and undercover agent Patrick Edwards testified for the government at trial. On cross-examination, defense counsel impeached the agents by eliciting admissions that although ATF guidelines prohibit targeting individuals

based on race, all of the targets of both agents' stash house robbery investigations were African-American. Supp. App. 174-176, 121-125.

Defense counsel also used the ATF guidelines to suggest that the agents had committed other violations of ATF policies and procedures. Supp. App. 104-120, 121-122, 125-126). In particular, defense counsel accused the agents of violating ATF's policy regarding the selection of targets for sting operations. He quoted the statement in the ATF policy manuals that "[i]nvestigations should only be pursued that target individuals who show a propensity of doing harm to the public through violent behavior, armed robberies and whose activities have been documented either through criminal history, criminal reputation or self-incrimination." App 32-33. Defense counsel then argued to the jury that Washington was improperly targeted in the sting operation because Washington had no criminal history for violent crimes. *Id.*

Defense counsel also made several attacks on Roc, the confidential informant. He established through cross-examination that Roc was a paid informant, but was later deactivated. He elicited evidence that Roc was previously incarcerated and that Roc met Berry, the principal conspirator, in prison. Supp. App. 128-129, 130-132, 177-178. Counsel even suggested that it was Roc who "trolled" the target by approaching Berry and soliciting

him to do the robbery because Roc was interested in making money as a paid informant. Supp. App. 208).

In denying Washington's motion for new trial, the district court noted that "[a]lcohol use by an attorney does not, by itself, indicate ineffective assistance of counsel," and proceeded to analyze Washington's ineffective assistance claim under the two-prong test of *Strickland.* App. 37-38. Washington claimed that his trial counsel was constitutionally ineffective because, during the cross-examination of Agent Bowman, counsel asked Bowman if Washington had a criminal "history for drugs."[5] App. 40; Supp. App. 176-177. Although Bowman initially responded that he did not recall, on redirect examination the prosecutor was permitted to refresh Bowman's memory that Washington did have a prior drug conviction. App. 40-41. The jury was not informed of any details of the prior conviction.

---

[5] During the cross-examination of Bowman, defense counsel was laying a foundation for his argument that ATF violated its own policies by targeting Washington, because Washington had no criminal history for violent offenses. Defense counsel elicited testimony from Bowman that Washington did not have any prior robbery convictions. App. 40; Supp. App. 176-177. Apparently, defense counsel mistakenly believed that Washington also had no drug convictions; counsel stated, "[a]nd I have his record, I didn't see a drug conviction." *Id.*

Rather than making a formal finding on whether defense counsel's question about whether Washington had a drug conviction "fell below an objective standard of reasonableness" under the first prong of *Strickland*, the district court analyzed Washington's ineffectiveness claim under *Strickland*'s prejudice prong.[6] App. 42. The court found that "the error of defense counsel in opening the door to allowing the Government to elicit the prior drug conviction did not create a situation where there was a reasonable probability that the result of the proceeding would have been different," and therefore found that Washington had failed to establish prejudice as required by *Strickland.* App. 43.

In reaching this conclusion, the district court observed that the accidental disclosure of Washington's drug conviction did not damage the defense's argument that Washington was improperly targeted, because the ATF guidelines called for targeting individuals with a history of violent behavior, and a drug conviction did not indicate a propensity to commit violent offenses. *Id.* The district court further noted that the kind of drug conviction was not disclosed, that Bowman testified that during the

---

[6] The district court stated, however, that "it does not appear on this record that defense counsel's conduct with respect to Defendant's prior drug conviction was based on sound trial strategy." App. 43 n.4.

investigation he was not aware that Washington had a drug conviction, and that the prosecutor did not refer to the drug conviction after the fact of the conviction had been disclosed. Finally, the district court found that "the evidence was so overwhelming against Defendant that testimony about the prior drug conviction by itself did not create a situation where there was a reasonable probability that the result of the trial would have been different." *Id.* Thus, because the district court found that Washington had not met his burden of showing prejudice, the court denied Washington's motion for new trial.

### C.     Sentencing.

On June 13, 2016, the district court held a sentencing hearing. On each of Counts One and Two, which charged conspiracy to commit Hobbs Act robbery and attempted Hobbs Act robbery, Washington faced a maximum statutory sentence of 20 years' imprisonment. Because Washington had a prior drug trafficking conviction, and the government filed notice of that under 21 U.S.C. § 851, on the drug charges in Counts Three and Four he faced a mandatory minimum of 20 years' imprisonment and a statutory maximum of life imprisonment. Supp. App. 211.

The district court found that Washington's offense level was 37 and that he was in criminal history category VI. Supp. App. 212-213. The

resulting sentencing guidelines range was 360 months' imprisonment to life imprisonment. *Id.* The district court sentenced Washington to two years' imprisonment on Counts One and Two, to be served concurrently, and to a consecutive 20-year sentence of incarceration on Counts Three and Four, for a total of 22 years' (264 months') imprisonment. Thus, the sentence was below the advisory guideline range, but more than the mandatory minimum to which the court could have varied if it so chose. The district court also sentenced Washington to 10 years' supervised release, a fine of $1,500, and a special assessment of $400. Supp. App. 214-218.

## STATEMENT OF RELATED CASES

Codefendants Berry, Ellis, and Johnston pled guilty to Counts One through Five of the indictment. All three have been sentenced and none filed an appeal. The government is not aware of any other related case or proceeding that is completed, pending, or about to be presented before this Court or any other court or agency, state or federal.

## SUMMARY OF ARGUMENT

1. The district court did not err in denying Washington's motion for discovery on his selective prosecution/selective enforcement claim. Whether a defendant is entitled to discovery is governed by the stringent standard set forth by the Supreme Court in *United States v. Armstrong*, 517 U.S. 456 (1996). The same standard applies whether the movant claims selective prosecution or selective enforcement. *Armstrong* requires that a party seeking discovery present "some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent." 517 U.S. at 468. With respect to the discriminatory effect element, the movant must make a "credible showing" that similarly situated defendants of other races could have been prosecuted but were not. *Id.* at 469-70. Because Washington produced no evidence that similarly situated persons of other races could have been, but were not, targeted for investigation or prosecution through stash house sting operations, he failed to satisfy the requirements of *Armstrong.*

2. The district court was correct in finding that Washington failed to show that he was prejudiced by his counsel's alleged ineffectiveness. Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), a defendant alleging ineffective assistance of counsel must establish both that his counsel's

performance was deficient, and that counsel's deficient performance prejudiced the defense. In this case, the evidence of Washington's guilt was overwhelming. The district court did not err in finding that Washington failed to show that, absent his counsel's alleged error, the result of the proceeding would have been different.

3. The district court acted lawfully in imposing the mandatory minimum penalties on Counts Three and Four, which charged conspiracy to possess, and attempt to possess, five kilograms or more of cocaine with intent to distribute. The jury found, in response to special interrogatories, that Washington was responsible for five kilograms of cocaine or more on each count. The government properly filed an information under 21 U.S.C. § 851 alleging Washington's prior drug felony conviction. No exceptions to the mandatory minimum penalties applied here. Therefore, the district court was required to impose the mandatory minimum sentences in accordance with law.

**ARGUMENT**

## I. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING WASHINGTON'S MOTION FOR DISCOVERY.

### Standard of Review

A district court's decision regarding discovery on a claim of selective prosecution is reviewed for abuse of discretion. *United States v. Taylor*, 686 F.3d 182, 197 (3d Cir. 2012).

### Discussion

Defendant/appellant Askia Washington argues that the district court abused its discretion in denying his motion for discovery on the issue of racial profiling and selective prosecution. Adopting the district court's characterization of his claim as a "selective enforcement" claim, rather than "selective prosecution," he asserts that the district court erred in applying the standard set forth in *United States v. Armstrong*, 517 U.S. 456 (1996). Washington is wrong.

Washington argues that he was specifically targeted by the government because of his race. In the district court, he referred to his claim as one of "racial profiling/selective prosecution." App. 9-10. He sought extensive discovery from the government. In denying his motion for discovery, the district court termed the defendant's argument as one

alleging selective enforcement, rather than selective prosecution. The district court held, however, that the same standard applied regardless of whether the claim was one of selective enforcement or selective prosecution. App. 13-14 n.2.

Although he was represented by counsel, Washington filed a pro se motion for reconsideration. In most of his arguments in that motion, Washington referred to his claim as "selective prosecution or selective enforcement." Supp. App. 219-236. However, he also argued that the district court had erred in "recharacterizing" his claim as selective enforcement without soliciting his views on whether he wanted his claim to be considered as selective enforcement.[7] App. 26 n.1; Supp. App. 236. The district court denied the motion for reconsideration. App. 22.

Despite his prior insistence that his claim was one of selective prosecution, on appeal Washington does an about-face, characterizing his motion as one based solely on selective enforcement. However, the very discovery request at issue belies that recharacterization, because it seeks materials obviously related to the prosecution of crimes. For example, in

---

[7] Washington also made the interesting claim that, by accepting his pro se filings, the district court denied him his right to counsel. Supp. App. 232-235.

his motion for discovery Washington sought to compel the government to

produce the following materials relating to prosecutorial decision-making:

- A list by case name, number and the race of each defendant of all
  phony stash house robbery cases brought by the United States
  Attorney's Office for the Eastern District of Pennsylvania [and the
  District of New Jersey] from 2009 to the present based on
  investigations conducted by ATF or any other federal law
  enforcement agency . . . .

- The statutory or regulatory authority for ATF or any other federal
  law enforcement agency to instigate and/or pursue fictitious stash
  house robbery cases involving any pretext of illegal drugs (e.g.
  heroin, cocaine, crack, ecstasy, methamphetamine, etc.), *or any
  decision by any federal agency, the Justice Department or the White
  House to authorize ATF or any other federal law enforcement
  agency to pursue such cases in the Eastern District of Pennsylvania
  [and the District of New Jersey].*

  . . . .

- All documents containing instructions given to Assistant United
  States Attorneys since 2009 regarding the responsibilities of
  Assistant United States Attorney to ensure that defendants in cases
  brought by the Office of the United States Attorney for the Eastern
  District of Pennsylvania [and the District of New Jersey] have not
  been targeted due to their race, color, ancestry or national origin and
  specifically that those persons who are defendants in phony stash
  house cases in which ATF was the investigatory agency have not been
  targeted due to their race, color, ancestry or national origin and that
  such prosecutions have not been brought with any discriminatory
  intent on the basis of the defendant's race, color, ancestry or national
  origin.

- All documents that contain information . . . regarding all duties and
  responsibilities of Assistant United States Attorneys for the Eastern
  District of Pennsylvania [and the District of New Jersey] to ensure
  and/or check to determine that defendants . . . have not been
  targeted due to their race, color, ancestry or national origin and . . .

> that [phony stash house cases] have not been brought with any
> discriminatory intent on the basis of the defendant's race, color,
> ancestry or national origin.

Br. 9-10; App. 12-13 (emphasis added). Washington's motion also includes requests less blatantly seeking prosecutorial materials, but still implicating prosecutorial decisions, such as "any decision by any federal agency, the Justice Department or the White House to authorize ATF or any other federal law enforcement agency to pursue such cases in the Eastern District of Pennsylvania [and the District of New Jersey]." App. 12. In light of these explicit and implicit demands for materials related to the prosecutorial process, Washington cannot credibly claim that he intended to claim only selective enforcement, not selective prosecution.[8]

In *Armstrong,* the Supreme Court held that, to succeed on a selective prosecution claim, a defendant "must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" 517 U.S. at 465, quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985). In keeping with this "rigorous standard"

---

[8] The district court held that under *Armstrong,* the standard for what a defendant must show to merit discovery was the same, regardless of whether the claim was selective prosecution or selective enforcement. That determination was correct. If different standards applied, however, given the extensive quantity of prosecutorial materials that Washington sought, he would have to be held to the standard for selective prosecution claims.

for proving a selective prosecution claim, the Court required "a correspondingly rigorous standard for discovery in aid of such a claim," and required the defendant to present "some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent." *Armstrong,* 517 U.S. at 468. With respect to the discriminatory effect element, the Court held that a defendant must make a "credible showing" that similarly situated defendants of other races could have been prosecuted but were not. *Id.* at 469-70. The Court stated that the standard for a selective prosecution claim "is a demanding one," and "the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims." *Id.* at 463-64.

In *Armstrong*, defendants charged with crack cocaine offenses asserted that they were selectively prosecuted by federal authorities on the basis of their race. They presented an affidavit attesting that all 24 defendants charged in their district with trafficking in cocaine or crack during the preceding year were black, and also offered anecdotal claims that Caucasian offenders were not federally charged. The district court ordered further discovery. After the district court denied the government's motion for reconsideration of the discovery order, the government refused

to comply with the discovery order, and the court dismissed the case. The en banc Ninth Circuit Court of Appeals affirmed the order of dismissal.

The Supreme Court reversed, holding that the defendants' showing was insufficient to justify a discovery order in the absence of specific proof that similarly situated persons were not prosecuted. "The study failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted." 517 U.S. at 470. The Court held that the trial court therefore erred when it required the government to devote its resources to providing any information.

Washington's proffer in the present case is no better than the showing found insufficient in *Armstrong.* As Washington correctly recounts, he "asserted that from 2009 to the date the motion was filed, the government had brought at least four phony stash house cases against twenty individuals, all of whom were African American." Br. 10. Like the *Armstrong* defendants, however, Washington failed to show that there were any persons of other races who could have been charged with the same offense, or targeted for investigation using the same strategy, but were not. In the absence of any showing that similarly situated persons of

other races were not charged or targeted for a similar investigation, Washington's presentation was insufficient to merit a discovery order.

Like the Supreme Court, this Court has been reluctant to permit discovery into the government's investigatory and prosecutorial practices without a substantial showing by the defendant. In fact, neither the Supreme Court nor this Court has ever found sufficient evidence to permit discovery of a prosecutor's decision-making policies and practices. *See, e.g.*, *United States v. Hedaithy*, 392 F.3d 580, 607-08 (3d Cir. 2004) (district court properly declined discovery regarding the government's decision to charge a group of Arab-Americans with offenses related to cheating on a standardized exam, where the defendants made no showing that similarly situated persons were not prosecuted); *United States v. Abuhouran*, 161 F.3d 206, 216 (3d Cir. 1998) (rejecting the proposition that a court may examine, absent proof of constitutional wrongdoing, the government's decision not to file a 5K motion, as the information the government would need to produce "is precisely the sort of confidential information concerning ongoing investigations that the government convincingly asserts it should not have to give up."). This reflects the general deference afforded to decisions of the Executive Branch regarding whether and whom to prosecute.

These principles are long-settled. For example, in *United States v. Berrigan*, 482 F.2d 171, 180 (3d Cir. 1973), the defendants were charged with sending letters into and out of a federal prison, without permission of the warden, in violation of 18 U.S.C. § 1791. The defendants claimed selective prosecution and sought discovery from the government. The district court refused the request for discovery, citing "a long accepted intolerance toward judicial inquisition into the process whereby prosecutorial decisions are formulated." *Id.* at 181. This Court affirmed, finding no abuse of discretion.

More recently, in *United States v. Bass*, 536 U.S. 862 (2002) (per curiam), the Supreme Court reaffirmed its unwavering antipathy toward examination of prosecutorial files. A federal grand jury had charged Bass with the intentional killing of two individuals, and the government filed a notice of intent to seek the death penalty. Bass, an African-American, raised a selective prosecution claim and sought discovery regarding racial bias in the government's death penalty decision process. In support of his claim of selective prosecution, Bass presented a Department of Justice report that showed a significant difference between the percentage of white and black prisoners charged by the United States with death eligible crimes. The DOJ report also showed that the United States entered into a

plea bargain with 48 percent of white defendants against whom it sought the death penalty, but only 25 percent of black defendants. In addition to the statistical evidence, Bass introduced evidence of statements by high-ranking Justice Department officials, including former Attorney General Reno and then-Deputy Attorney General Holder, who expressed concern over the significant racial disparities uncovered by the Justice Department's own report.

The district court found that Bass had presented sufficient evidence of racial bias in the death penalty process and granted his motion for further discovery. When the government refused to comply with the discovery order, the district court dismissed the government's notice of intent to seek the death penalty. The Sixth Circuit affirmed.

Relying on *Armstrong*, the Supreme Court summarily reversed, holding that the discovery order was unjustified because of the lack of any showing of discrimination in particular cases. The *Bass* Court explained that statistical data alone was insufficient, in the absence of proof regarding particular similarly situated persons who were treated differently than the defendant. The Court concluded: "Under *Armstrong*, therefore, because respondent failed to submit relevant evidence that similarly situated persons were treated differently, he was not entitled to

discovery . . . . The Sixth Circuit's decision is contrary to *Armstrong* and threatens the 'performance of a core executive constitutional function.' *Armstrong, supra*, at 465[]. For that reason, we reverse." *Bass*, 536 U.S. at 863-64.

Without question, Washington failed to meet the *Armstrong* standard. He did not identify any other case in which persons similarly situated to him were investigated but not prosecuted. He did not identify anyone of a different race who was known to the government and predisposed to commit similar crimes who was not targeted for prosecution. Indeed, the sum total of all evidence provided by Washington was a list of three other stash house sting cases involving African-American defendants,[9] and a USA Today article claiming that out of 635 stash house defendants, 91% were minorities. Washington did not identify a single person of a different race who engaged in conduct similar to his and whom the government could have investigated and prosecuted but did not. As in *Armstrong* and *Bass*, Washington's request for discovery failed because he

---

[9] The fourth case in Washington's list was his own.

did not present any evidence that any similarly situated person of a different race had not been investigated or prosecuted.[10]

Washington argues, however, that *Armstrong* should not apply to this case, because he seeks to challenge a law enforcement agency's initial investigation, not a prosecutor's decision to bring charges at the completion of an investigation. Br. 23-24. He claims that *Armstrong* only applies to cases involving prosecutorial discretion. Br. 23-32. Washington's assertion that his motion related solely to investigatory conduct, and that it was completely divorced from any prosecutorial matters, ignores the fact that the relief he hoped to obtain, and in aid of which he sought the discovery materials, was dismissal of the indictment against him. Seeking and obtaining an indictment from a grand jury is, of course, a

---

[10] It bears noting that the undisputed evidence showed that the government did not actually select or target any of the defendants. The government did not seek out the defendant and his cohorts. This matter began when co-defendant Berry asked his acquaintance "Roc" if Roc knew of any stash houses Berry could rob. Supp. App. 152. Unbeknownst to Berry, Roc happened to be a confidential informant for ATF, and passed on the information about Berry's inquiry. The government had nothing to do with targeting or selecting Washington or his co-defendants; Berry, not ATF, brought them into the scheme. Any suggestion that the appellant or his conspirators were selected on the basis of race was readily defeated by the fact that they were not targeted by the government at all. Thus, although it was unnecessary for the district court to reach the issue, appellant also failed to satisfy the *Armstrong* standard because he did not produce any evidence of discriminatory intent.

prosecutorial act resulting from decisions made at the prosecutorial level. This is not a *Bivens* action;[11] Washington is not suing the investigating agents for damages for allegedly violating his constitutional rights. He is trying to overturn charges brought against him by the prosecution, while claiming that his action has to do only with the agency, not the prosecutors.

The logical disconnect between Washington's newly minted assertion that he is pursuing only a selective enforcement claim, and the fact that he ultimately seeks relief from a prosecutorial action, demonstrates the untenability of his position that selective enforcement claims are so different from selective prosecution claims that different discovery standards should apply. In reality, investigative considerations and prosecutorial considerations tend to intertwine. A prosecution is, of course, the intended result of any criminal investigation, and frequently agents and prosecutors consult during the course of an investigation, long before the final decision on seeking a criminal complaint or indictment is made. A separation of the sort Washington urges, between selective prosecution claims subject to a higher standard for discovery and selective

---

[11] *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

enforcement claims subject to a lower standard, would be artificial, unwarranted, and generally unworkable. It would also invade the function of the executive branch to investigate and prosecute criminal activity in the same manner as any relief sought in *Armstrong* and its progeny.

Notably, in reaching its ruling, the *Armstrong* Court applied "ordinary equal protection standards," *Armstrong*, 517 U.S. at 465, quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985), relying on precedent such as the seminal decision in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), which involved not criminal investigation or prosecution but discriminatory licensing by a municipality of public laundries. There is thus no doctrinal basis for suggesting that the conduct of law enforcement agents in carrying out the directives of the Executive is subject to any different constitutional test.

Although this Court has not ruled on the issue,[12] other courts have held that the *Armstrong* standard for discovery applies both to selective

---

[12] The question of the applicable standard for a discovery motion in a selective enforcement case was raised in *United States v. Whitfield*, 649 F. App'x 192 (3d Cir. 2016) (not precedential), *petition for cert. filed*, No. 16-5769 (August 30, 2016). However, this Court held that the issue had been forfeited. This Court stated that "[w]hile we need not reach the issue, we also think the District Court did not abuse its discretion in applying the *Armstrong* standard to deny defendants' discovery request." 649 F. App'x at 196 n.11. The *Whitfield* Court noted that "the prima facie elements for

prosecution and selective enforcement claims. In *United States v. Alcaraz-Arellano*, 441 F.3d 1252 (10th Cir. 2006), the Tenth Circuit held that the *Armstrong* standard applied to both selective enforcement and selective prosecution claims. 441 F.3d at 1264. The court stated, "the standard for proving a selective-enforcement claim should be, as with selective-prosecution claims, 'a demanding one.'" *Id.*, quoting *Armstrong*, 517 U.S. at 463. The court further held that "[f]or similar reasons discovery is limited . . . . Although defendants seeking discovery need not establish a prima facie case of selective prosecution, they must satisfy a 'rigorous standard.' They must produce 'some evidence' of both discriminatory effect and discriminatory intent." 441 F.3d at 1264 (citations omitted), quoting *Armstrong*, 517 U.S. at 468, 470. *See also United States v. Viera*, 2015 WL 3833797 (S.D.N.Y. 2015) (applying *Armstrong* to motion for discovery in selective enforcement case); *United States v. Dixon,* 486 F. Supp. 2d 40, 45 (D.D.C. 2007) ("a defendant seeking discovery on a selective

---

both selective prosecution and selective enforcement are the same: discriminatory effect and discriminatory intent," and stated, "[t]hus, it is unsurprising that other courts have used the Armstrong discovery standard in analyzing discovery requests related to selective enforcement." *Id.*

enforcement claim must meet the same 'ordinary equal protection standards' that *Armstrong* outlines for selective prosecution claims.").[13]

Washington's argument that his rechristened selective enforcement claim should have been held to a lower standard for discovery purposes relies on *United States v. Davis*, 793 F.3d 712 (7th Cir. 2015) (en banc). The *Davis* court held that *Armstrong* does not control where the contention is not that the United States Attorney engaged in selective prosecution, but that "agents of the FBI or ATF engaged in racial discrimination when selecting targets for sting operations, or when deciding which suspects to refer for prosecution." *Id.* at 721. The court determined that the particular discovery sought by the *Davis* defendants was "vastly overbroad." *Id.* at 722. But it observed that the defendants claimed to have additional evidence "that the FBI and the ATF would not

---

[13] In holding that the *Armstrong* standards applied to both selective prosecution and selective enforcement claims, the district court cited *United States v. Barlow*, 310 F.3d 1007 (7th Cir. 2002). In *Barlow,* the Seventh Circuit held that "the same analysis governs both types of claims: a defendant seeking discovery on a selective enforcement claim must meet the same 'ordinary equal protection standards' that *Armstrong* outlines for selective prosecution claims." 310 F.3d at 1010. Subsequently, the Seventh Circuit decided *United States v. Davis*, 793 F.3d 712 (7th Cir. 2015) (en banc), in which, without acknowledging *Barlow,* it applied a lesser standard to selective enforcement claims. The government maintains that the *Davis* court erred, and that the position expressed in *Barlow* was correct.

have pursued this investigation had Davis been white." *Id.* In that context, the court held that the trial "judge should receive this evidence and then decide whether to make limited inquiries, perhaps including affidavits or testimony of the case agents, to determine whether forbidden selectivity occurred or plausibly could have occurred. If not, there would not be a basis to attribute this prosecution to the defendants' race, and the district court could turn to the substance of the charges." *Id.* The government does not agree that the limitations imposed by *Armstrong* may so be evaded, but that need not be resolved, given that unlike the *Davis* defendants, the defendant in this case has never claimed to have any evidence of discriminatory conduct. He has exclusively relied on the race of the defendants in four cases (including his own), and on nothing else.

Even using the procedure endorsed by *Davis,* the showing made by the defendant here was inadequate to justify further proceedings by the district court. *Davis* said that the district court should "proceed in measured steps" and that "[l]ogically the first question is whether there is any reason to believe that race played a role in the investigation" of the defendants. 793 F.3d at 722. In *Davis,* the court believed that there might have been such a reason, because the defendants claimed to have additional evidence that the investigation would not have proceeded if the

defendants had been white. *Id.* at 723. The *Davis* court of appeals found that the district court should have received that additional evidence, decided whether it constituted a "reason to believe that race played a role in the investigation," and, if it did, proceeded to determine what discovery, if any, was appropriate.

In this case, by contrast, there was no additional evidence, and therefore no need for additional proceedings. Washington put before the district court everything he had, which consisted of a four-item list of stash house cases involving African-American defendants, without any indication of whether persons of other races were or could have been prosecuted on similar charges. The district court found Washington's evidence inadequate to justify imposing the burdens of discovery on the government. That determination was not an abuse of discretion and should be affirmed.

## II. THE DISTRICT COURT PROPERLY DENIED WASHINGTON'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

### Standard of Review

An ineffective assistance of counsel claim may be entertained on direct appeal where, as here, the record is sufficient to allow determination of the claim. *United States v. Headley*, 923 F.2d 1079, 1083 (3d Cir. 1991).

The district court's findings of fact are reviewed for clear error. This Court makes an independent judgment whether the facts thus found constitute constitutionally ineffective assistance of counsel. *Government of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1430-31 (3d Cir. 1996).

### Discussion

Washington claims that his trial counsel rendered ineffective assistance of counsel by asking a question on cross-examination of an agent that allowed the government, on redirect, to elicit evidence that Washington had a prior drug conviction. The district court found that Washington had failed to show that counsel's mistake prejudiced him. The district court did not err.

To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy the two-part test set forth in *Strickland v. Washington*, 466

U.S. 668, 687 (1984). Under the *Strickland* standard, a defendant must establish both that counsel's performance was deficient, and that counsel's deficient performance prejudiced the defense. *Id.*, citing *Strickland*, 466 U.S. at 687. The district court may consider the two prongs of the test in any order. *See McAleese v. Mazurkiewicz*, 1 F.3d 159 (3d Cir. 1993); *United States v. Fulford*, 825 F.2d 3 (3d Cir. 1987); *McNeil v. Cuyler*, 782 F.2d 443 (3d Cir. 1986).

The burden upon the defendant to prove ineffective assistance of counsel is a heavy one. As the Supreme Court stated in *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), "[s]urmounting *Strickland*'s high bar is never an easy task." The defendant must show both that counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment and that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 668.

The *Strickland* Court has directed that "[j]udicial scrutiny of an attorney's performance must be highly deferential." *Id.* at 689. Attorney performance is to be measured by "reasonableness under prevailing professional norms." *Id.* at 688. The Court elaborated on this standard:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to

- 43 -

> reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Id.* at 689.

In addition to establishing that his counsel was ineffective, a defendant seeking to meet the *Strickland* standard must further demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Washington rests his ineffective assistance claim on a single alleged error.[14] At trial, defense counsel cross-examined ATF agent Bowman about whether ATF had violated its own protocols in this investigation. With an eye toward establishing that the agents had violated the policy directing that targets of stash house stings should be persons with violent criminal

---

[14] In the district court, Washington contended that his counsel had also erred by eliciting testimony that the confidential informant, Roc, had been terminated as an informant and relocated due to concerns for his safety. Washington does not assert this ground on appeal.

histories, defense counsel asked the agent if Washington had any prior convictions for robbery. After receiving the expected response that Washington did not, counsel asked the agent if Washington had any prior convictions for drug offenses. The agent responded that he did not recall. On redirect examination, however, government counsel refreshed the agent's memory that Washington did have a conviction for a drug offense. The agent said nothing about the nature or severity of the offense or when it occurred. Neither counsel made any further reference to the prior drug conviction.[15]

---

[15] The inquiry into trial counsel's performance was complicated by evidence that counsel had consumed alcohol during the trial. At a hearing on the issue, both the prosecutor and Washington testified that on the first day of trial, they had smelled alcohol on defense counsel's breath. There was no evidence that defense counsel had consumed alcohol on any other day during the trial, including the day on which he cross-examined the case agent. The district court found that there was no reason to believe that alcohol played any role in trial counsel's alleged errors, stating:

> Finally, and most importantly, there is no evidence in this record that defense counsel's questions regarding Defendant's prior drug conviction and Roc's relocation due to threats and safety concerns were caused by, or associated with, alcohol consumption. With the one exception relating to the drug conviction, defense counsel's advocacy in this case was within the bounds of professional responsibility. Defense counsel was a zealous advocate on behalf of Defendant, even to the point where the jury acquitted Defendant on a serious gun charge that carried a mandatory minimum sentence that would have run consecutive to sentences imposed on other Counts. No conclusion can be drawn that what appears to be

In ruling on Washington's motion for new trial based on ineffective assistance of counsel, the district court commented that defense counsel's asking the agent whether Washington had a prior drug conviction was not sound trial strategy. The district court made no finding on whether this mistake was sufficiently serious to meet the standard for ineffective assistance of counsel. Instead, the district court considered the second prong of *Strickland*'s test, and found that the mistake had not prejudiced Washington. The court found that the "[d]efendant has failed to meet his burden of showing defense counsel was constitutionally ineffective." App. 46, 54. The district court explained its finding:

> There is no prejudice as formulated under *Strickland* for the following reasons: (1) the ATF guidelines on sting operations require that investigations only target individuals who show a propensity of doing harm to the public through violent behavior, and a drug conviction does not indicate such a propensity; (2) the kind of drug conviction was not disclosed and Agent Bowman testified that "during the investigation," he did not know whether Defendant had a criminal record; (3) [the prosecutor] did not refer to the prior drug conviction at trial after it was introduced; and (4) the evidence was so overwhelming against Defendant that testimony about the prior

---

moderate consumption of alcohol in any way contributed to the conviction of Defendant.

App 54. Washington does not seek reversal on appeal based on the alcohol issue, focusing exclusively on the reference to the drug conviction. *See* Br. 37 ("At bottom, though, if this Court agrees that trial counsel was ineffective in eliciting Washington's drug conviction, the reason for his malfeasance becomes irrelevant.").

> drug conviction by itself did not create a situation where there was a reasonable probability that the result of the trial would have been different.

App. 43. The district court's findings were correct, and fully support the court's determination that Washington had not carried his burden of proving prejudice.

As the district court found, there was overwhelming evidence of Washington's guilt. The undercover agent testified that Washington met with him and co-defendant Berry on a number of occasions to discuss plans for the robbery. Those conversations were recorded. In the recorded conversations, Berry laid out the plan to carry out an armed robbery of a drug stash house, steal 10 kilograms of cocaine, and sell the cocaine for profit. As details of the robbery were discussed, Washington acknowledged what was said and affirmed those details. App. 29-30. He asked acute questions that demonstrated his understanding of and commitment to the armed robbery scheme. *Id.* He asked about security outside the stash house. He confirmed that the undercover agent would go in first and that Washington and the other robbers would follow. *Id.* He asked how many guns were inside the stash house. He said that he was going to enter the stash house with his gun out. He offered to sell the undercover agent's share of the stolen cocaine for him. App. 30.

On the day of the planned robbery, Washington sent a text message saying that he was "ready for work." App. 31. He met the conspirators at Berry's mother's house, drove to a grocery store so two of the robbers could buy gloves, then drove to the parking lot of a Hilton Hotel. In the parking lot, Washington got into a minivan with the rest of the robbers. Washington berated the robbers who had bought the gloves because they could have been (and actually were) caught on camera by the store's security system. Washington said that if the robbers had told him they needed gloves, he would have obtained them already. *Id.*

Berry reviewed the full plan for the robbery with the conspirators. Washington asked the undercover agent for the address of the stash house, so they could circle the block before the robbery. A search of Washington's iPhone showed that he had downloaded a police scanner application for his phone so he could monitor police communications.

Not only did testimony of law enforcement agents, audio recordings, and Washington's own iPhone establish Washington's knowing and intentional participation in the robbery conspiracy, Washington's co-defendant testified against him. The co-defendant stated that Washington intended to burn down the stash house "if things went bad." Agents recovered lighter fluid, a lighter, a backpack, gloves, and a mask from the

Chrysler in which Washington had traveled to the meeting locations. App. 32.

Based on this overwhelming evidence, there is no reasonable probability that the jury would have acquitted Washington if his prior drug conviction had not been mentioned. The district court's finding that trial counsel's mistake did not prejudice Washington is correct.

The district court's finding that the error did not undermine defense counsel's strategy is also well supported by the record. At trial, defense counsel labored to portray the ATF investigators as rogue agents who would stop at nothing to target anyone who would fall for their fake drug stash house scenario. Defense counsel argued that, in doing so, the agents targeted young African-American men, including Washington, regardless of whether the targets fit the criteria set forth in the ATF policy manual. At the beginning of trial, defense counsel persuaded the court to require the government to disclose portions of the ATF policy manual concerning "sting" operations, although the court had denied that request twice previously. Supp. App. 1-29, 31-38. Defense counsel made extensive use of the ATF policy manual during his cross-examination of the agents, suggesting that the agents conducted the investigation in disregard of the required procedures. In particular, counsel accused the agents of

improperly targeting Washington despite his lack of "propensity of doing harm to the public through violent behavior, including home invasion robberies . . . ." Supp. App. 116. To this end, counsel forced the agent to admit that the appellant did not have a prior conviction for robbery. Counsel, who apparently believed that Washington did not have a prior drug conviction either, then mistakenly opened the door to the evidence of Washington's prior drug conviction. The district court found, correctly, that this evidence did not undermine defense counsel's strategy; because the ATF policy on sting operations referred to targets with histories of violent crimes, not drug offenses, defense counsel's argument that the ATF agents violated their agency's policy in targeting Washington was unaffected by the error.

Moreover, as the district court observed, the evidence of the drug conviction was unspecific, and neither counsel nor the witnesses suggested that Washington's drug conviction was important to the investigation. Initially, Agent Bowman did not even recall whether or not Washington had a drug conviction, indicating that it was not a matter to which the agents assigned importance. When, on redirect, the prosecutor refreshed Bowman's memory about the conviction, nothing but the bare fact of the conviction was mentioned. The prosecutor did not follow up with any

questions about the conviction, and did not refer to it in closing argument. There was no suggestion at any time that Washington was more likely to participate in a conspiracy to commit a violent armed robbery because he had, at some unknown time, been convicted of a drug offense of unknown nature and severity. No one suggested that the agents targeted Washington because of his prior drug conviction; in fact, as discussed above, the evidence showed plainly that the agents did not target Washington at all, but simply accepted his participation when he was brought into the conspiracy by Berry.

To prove that he was prejudiced by his counsel's mistake, Washington had to prove that there was a reasonable probability that without the error, the result of his case would have been different – in other words, that he would have been acquitted. The district court found that Washington did not carry his burden of showing that his counsel's mistake was so serious that it undermined confidence in the outcome of the case. The district court's denial of Washington's motion for new trial was correct and should be affirmed.

## III. THE DISTRICT COURT PROPERLY IMPOSED
## THE MANDATORY MINIMUM SENTENCE.

### Standard of Review

"The standard of review for [a defendant's] constitutional challenge to his mandatory minimum sentence is plenary." *United States v. Walker*, 473 F.3d 71, 75 (3d Cir. 2007).

### Discussion

Washington argues that the district court's imposition of the mandatory minimum sentence of 20 years' imprisonment on Counts Three and Four violated his right to due process. He is wrong.

Count Three of the Superseding Indictment charged that Washington and his associates "conspired and agreed to knowingly and intentionally possess with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine . . . ." App. 65. Count Four of the Superseding Indictment charged that Washington and his associates "knowingly and intentionally attempted to possess with the intent to distribute, and aided and abetted the attempted possession with intent to distribute, five kilograms or more of a mixture and substance containing a detectable amount of cocaine . . . ." App. 66. The jury found Washington guilty on both counts. Moreover, the jury was

asked in special interrogatories to find the amount of cocaine for which Washington should be held responsible on Counts Three and Four. The jury unanimously found, beyond a reasonable doubt, that Washington conspired to possess, and attempted to possess, five kilograms or more of cocaine with intent to distribute. App. 92.

Washington argues that it was unconstitutional to sentence him in accordance with the jury's finding. He claims that the government "had unfettered discretion" to manipulate the quantity of cocaine in order to increase the defendants' sentences, and asserts that "there was no relationship between the quantity of fictitious cocaine – here ten kilograms – and Washington's culpability and capability to conspire or attempt to possess with intent to distribute that amount." Br. 41. He cites a recorded conversation in which Washington told the undercover agent that Washington could not "get it moved" and that Washington did not "fuck with coke," implying that Washington was unwilling to be involved with cocaine and that Washington was incapable of dealing with large quantities of cocaine. *Id.*

These are arguments for the jury, not for the sentencing judge or the court of appeals. The jury had the task of finding, beyond a reasonable doubt, the quantity of cocaine that Washington had attempted and

conspired to possess. In closing, defense counsel could have argued, as appellate counsel does here, that Washington would never have become involved with the amount of cocaine at issue here were it not for the so-called "manipulation" by the investigating agents, and that Washington did not truly undertake to possess the alleged five kilograms or more of cocaine, because Washington lacked the ability to distribute such large quantities.

In fact, trial counsel did make these arguments. Counsel pointed out that despite having been told that there were 10 kilograms of cocaine in the stash house, Washington brought a single backpack. Because the backpack would have been woefully inadequate to carry 10 kilograms of cocaine, counsel insinuated that Washington either was not committed to going through with the robbery, or had no conception of the quantity of cocaine he had allegedly agreed to steal. Supp. App. 203-204. Counsel also argued to the jury that it should find that "there was zero kilos, because there's no cocaine involved in this case." Supp. App. 201. Counsel told the jury, "[y]ou are the judges of the facts. You can tell me, [the prosecutor] and others whether there was ten kilos of cocaine, a hundred kilos of cocaine, or zero kilos of cocaine. That's your role." *Id.* Later, counsel argued, "our position

is that there's zero cocaine on the table, and you should so find." Supp.
App. 208.

Thus, Washington's trial counsel made the same arguments to the
jury that his subsequent counsel advanced at sentencing: that the cocaine
was only an illusory quantity manipulated by ATF agents to maximize
defendants' sentences, and that Washington was inexperienced with
cocaine and therefore could not have undertaken to deal with quantities as
large as five or 10 kilograms. The jury disagreed, and returned its verdict
finding that Washington was responsible for at least five kilograms of
cocaine. Under our system of justice, the jury was the proper entity to
make that determination. The district court was bound to impose sentence
in accordance with the jury's finding and the laws passed by Congress. *See*
*United States v. Boggi*, 74 F.3d 470, 478-79 (3d Cir. 1996) ("a guilty
verdict, not set aside, binds the sentencing court to accept the facts
necessarily implicit in the verdict") (quotation marks omitted).

The district court had no discretion to ignore the mandatory
minimum penalties. The "statutory minimum drug trafficking penalty in 21
U.S.C. § 841(b)(1) is mandatory." *United States v. Gunter*, 462 F.3d 237,
248 (3d Cir. 2006). "When Congress establishes a minimum sentence for a
particular crime, district courts are required to sentence defendants guilty

of that crime to a term of imprisonment no less than the Congressionally prescribed minimum, unless an explicit exception to the minimum sentence applies." *United States v. Winebarger*, 664 F.3d 388, 392 (3d Cir. 2011); *see United States v. Grober*, 624 F.3d 592, 611 (3d Cir. 2010) (rejecting argument "that a district court is not obligated to impose a mandatory minimum sentence that it concludes is greater than necessary to comport with the purposes of sentencing").

Congress has authorized only two ways in which a district court can disregard a mandatory minimum in a drug case: through a substantial assistance motion by the government under 18 U.S.C. § 3553(e), or, for qualifying defendants, through "safety valve" relief under 18 U.S.C. § 3553(f). *See, e.g., United States v. Kellum*, 356 F.3d 285, 289 (3d Cir. 2004). "These two narrow exceptions are the only authority a district court has to depart below a mandatory minimum." *United States v. Reevey*, 631 F.3d 110, 113 (3d Cir. 2010), *quoting Kellum*, 356 F.3d at 289; *United States v. Santiago*, 201 F.3d 185, 187 (3d Cir. 1999) ("Any deviation from the statutory minimum sentence can only be had through the specific procedures established through" Sections 3553(e) and (f)).

The government filed no motions under Section 3553(e), and Washington is not eligible for safety valve relief under Section 3553(f).

Accordingly, the district court was required, as it did, to impose a mandatory minimum term of imprisonment of at least 20 years on the drug counts.

Washington relies on *United States v. McLean*, 85 F. Supp. 3d 825 (E.D. Pa. 2015), in support of his argument that the district court erred when it imposed a 20-year mandatory minimum sentence. This case has no weight in this appeal. In fact, longstanding precedent demonstrates that the sentence in *McLean* below the mandatory minimum was improper. Therefore, this court should reject outright its outcome and the reasoning upon which it was based.

Further, and decisively, in *McLean* the district court elected to ignore the 20-year mandatory minimum and impose a total sentence of 14 years' imprisonment, believing that imposition of the higher mandatory sentence violated due process, whereas here the court elected to impose a sentence *higher* than the 20-year term. In this case, the statutory maximum was life imprisonment, and the Sentencing Guidelines recommended a term within the range of 360 months to life.[16] The court, upon considering the 3553(a)

---

[16]  Based on the jury's finding that the quantity was five kilograms or more of cocaine, the mandatory minimum was 10 years, the maximum was life, and the guideline range was 360 months to life. The mandatory

factors, settled on a total sentence of 264 months, significantly below the guideline range. The issue whether a sentence of 240 months would violate due process, and whether the court should instead be allowed to impose a lower sentence, is not presented.

For these reasons, the defendant's sentence should be affirmed.

---

minimum increased to 20 years based on the government's 851 notice of a prior drug conviction, but that ultimately did not impact the sentence.

## IV. CONCLUSION

For the reasons stated above, the government respectfully requests

that the judgment of the district court be affirmed.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


*/s Bernadette McKeon*
BERNADETTE McKEON
Assistant United States Attorney
Acting Chief of Appeals
Pa. Bar No. 45258


*/s Eric B. Henson*
ERIC B. HENSON
Assistant United States Attorney
Pa. Bar No. 8312


United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
(215) 861-8312

# CERTIFICATION

1. The undersigned certifies that this brief contains 12,011 words, exclusive of the table of contents, table of authorities, and certifications, and therefore complies with the limitation on length of a brief stated in Federal Rule of Appellate Procedure 32(a)(7)(B).

2. I hereby certify that the electronic version of this brief filed with the Court was automatically scanned by OfficeScan Real-Time Scan Monitor, version 10.5, by Trend Micro, and found to contain no known viruses. I further certify that the text in the electronic copy of the brief is identical to the text in the paper copies of the brief filed with the Court.

/s Eric B. Henson
ERIC B. HENSON
Assistant United States Attorney

# CERTIFICATE OF SERVICE

I hereby certify that this brief has been served on the Filing User

identified below through the Electronic Case Filing (ECF) system:

Mark S. Greenberg, Esquire
920 Lenmar Drive
Blue Bell, PA  19422

*/s Eric B. Henson*
ERIC B. HENSON
Assistant United States Attorney

DATED:  November 28, 2016.