

SPORTS    BREAKING    HOY    MOST POPULAR    OPINION    SUBURBS    ENTERTAINMENT    ADVERTISING    74°

News / Local news / Breaking News

# ATF sting operation accused of using racial bias in finding targets, with majority being minorities



ATF accused of discrimination in 'stash house' stings

**FANTASY FAN VOTE**    Who's the best quarterback in fantasy football? Vote now and you could win a free fuboTV subscription.

University of Chicago law students are working on a legal effort to have a dozen Chicago "Stash House Sting" cases dismissed that involve more than 40 defendants. In support of that effort, a recently unsealed study concluded the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives showed a clear pattern of racial bias. (Abel Uribe / Chicago Tribune)

By **Jason Meisner and Annie Sweeney** · **Contact Reporters**
Chicago Tribune

MARCH 3, 2017, 7:22 AM

Leslie Mayfield was handcuffed in the back of a police wagon when he realized the plan to rob a drug stash house was a setup.

For four years, Mayfield had been struggling to turn his life around after more than a decade in prison. To escape the street life, he moved to Naperville with his fiancee's family and managed to find a full-time job at a suburban electronics facility that paid 12 bucks an hour. It was there that a co-worker lured him into the robbery after weeks of effort, promising a big score.

Now, inside the police vehicle, the sounds of flash-bang grenades still ringing in his ears, Mayfield started to piece it all together. There was no stash house, no cartel drugs or associates to rob. It was a crime dreamed up by federal authorities and carried out with the help of Mayfield's co-worker to reel him in when he was at his most vulnerable.

Eight years later, Mayfield, 48, and dozens of others are at the center of a brewing legal battle in Chicago's federal court over whether the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives' signature sting operation used racial bias in finding its many targets.

A team of lawyers led by the University of Chicago Law School is seeking to dismiss charges against more than 40 defendants in Chicago. The undercover probes, a staple of the ATF since the mid-1990s, have ensnared hundreds of defendants across the country.

**Related**



Chicago prosecutors quietly drop charges tied to drug stash house stings

A recently unsealed study by a nationally renowned expert concluded that ATF showed a clear pattern of racial bias in picking its targets for the drug stings. The disparity between minority and white defendants was so large that there was "a zero percent likelihood" it happened by chance, the study found.

The vast majority of those swept up in the stings in Chicago were minorities, and a close examination of the criminal backgrounds of some of those targeted raises questions about whether they were truly the most dangerous gun offenders whom ATF was aiming to remove from the street.

Some had trouble even coming up with guns to do the job — including one crew that after months of preparation managed to find only one World War I-era pistol with a broken handle that could barely fire a round. Others had no history of carrying out high-risk armed robberies — a key provision in the ATF playbook designed to make sure targets were legitimate, defense lawyers argued in recent court filings.

Mayfield, for one, talked on undercover recordings about his experience robbing stash houses, but in reality he had no arrests for robbing drug dealers. The fact that he was lured into the sting while working a full-time job has also been heavily criticized by the appellate courts.

"Criminals do sometimes change and get their lives back on track, and we don't want the government pushing them back into a life of crime," Judge Richard Posner of the 7th Circuit U.S. Court of Appeals in Chicago wrote in an opinion supporting Mayfield's argument that he had been entrapped by authorities.

Case: 16-2795    Document: 003112713759    Page: 4    Date Filed: 08/28/2017

The controversy comes amid a national debate over the treatment of minorities by law enforcement and a scathing report by the U.S. Department of Justice just weeks ago that found that Chicago police routinely violate the civil rights of citizens, particularly African-Americans and Hispanics living on the city's impoverished South and West sides.



Judith Miller, left, and Alison Siegler of the Federal Criminal Justice Clinic, which represents most of the defendants in the dozen cases they are seeking to be dismissed. (Abel Uribe / Chicago Tribune)

It could put the Justice Department in the uncomfortable position of defending its own stash house prosecutions against allegations of racist practices while at the same time pushing Chicago police for reforms of similar accusations.

Earlier this month, federal prosecutors filed a lengthy motion vehemently disputing that minorities were unfairly targeted in the stash house cases, saying the expert report filed by the defense was "riddled with false assumptions that were designed to manufacture a racial disparity where none exists."

The dispute sets up what could be an unprecedented hearing at the Dirksen U.S. Courthouse in the coming months involving a panel of district judges hearing the multiple criminal cases at once.

"It's almost like a criminal class action," said Alison Siegler, director of the Federal Criminal Justice Clinic at the University of Chicago Law School, which represents most of

the defendants in the dozen cases they are seeking to be dismissed. "Judges are seeing this as a coordinated litigation. It's a very unusual situation."

## Out of answers

When Mayfield landed a job in May 2009 at LG Electronics, a sprawling, warehouse-like facility just off 115th Street in Bolingbrook, it seemed to be a stroke of luck. Still on parole for an attempted murder conviction, he checked for defects in cellphones imported from Asia.

Several weeks into his employment, Mayfield was approached by a woman who was one of the only other African-Americans who worked in his group, he said. She flirted with him, he said, on lunch breaks, confiding in him that she wasn't happy in her marriage.

It wasn't long before she introduced him to her husband, Jeffrey Potts, a burly ex-con who worked in another group at LG. Mayfield said he tried to keep his distance, uneasy that Potts' wife was so flirtatious around him, especially since Potts was white. But Potts persisted, and soon they were talking regularly, he said.

"Obviously, he had an objective," Mayfield, who is serving a 27-year sentence, said in an interview at the Metropolitan Correctional Center in the Loop. "When I think back about it now, he immediately started trying to find out about me, about my background."

**Related**



**Naperville man convicted in stash house scheme gets new trial**

Potts, who had done prison time for drug distribution and robbery, was secretly working as a federal informant, helping an ATF agent search for possible targets for sting operations, court records show. He was paid for the effort, but not much. Potts later told a private investigator working for Mayfield's defense team that he earned just $200 from ATF for bringing the agency Mayfield's case, according to court records.

A man who claimed to be Potts returned a recent call from a Tribune reporter but said he was too busy to talk and never called

back.

Mayfield said that as the weeks wore on, Potts began dropping references to drugs into their conversations. He told Mayfield he had a new drug connection and was making a lot of money and would often ask him if he was looking to get out of the day-to-day drudgery of working at LG, Mayfield said.

"Every day at work he began to make comments such as, 'Cuz, I know you tired of working for this chump change,'" Mayfield wrote in a letter filed in federal court. "'I know you need this money.'"

Mayfield said he told Potts he didn't sell drugs, but Potts "kept on me on a daily basis, saying, 'You're missing out.'"

Captured by the Third Circuit Libraries on 8/29/2017

After awhile, Potts' talk turned to robberies. One day, the two were having a smoke by the parking lot when Potts pointed to his new pickup truck — a red Dodge Ram 1500 with fancy rims, Mayfield said. He told Mayfield he'd made tens of thousands of dollars robbing drug dealers and could bring Mayfield in on an upcoming score.

"He said, 'Man, I hit this lick — 40K and two kilos of cocaine. That's how I got this truck,'" Mayfield said. "I kept saying I wasn't interested. Believe me, there was nothing I wanted less than to go back to jail."

In mid-June 2009, Mayfield suffered a setback that left him desperate. The van he depended on to get to work died on a Chicago-area expressway, leaving him with a huge bill for towing and repairs that he couldn't afford. He missed several days of work before he was able to arrange a ride. When Potts asked him where he had been, Mayfield told

him about his car troubles. The next day, Potts walked up to him in the bathroom at LG and slipped him $180 in cash.

"I tried not to take it, but I did need it," Mayfield said. "I felt at the time like he was genuine."

Later, Mayfield said, Potts offered to forgive the debt if he went along with the robbery plan. Flat broke and out of answers, Mayfield finally caved. He told Potts to set up the meeting with his contact, records show.

Potts called his ATF handler, who approved Mayfield as a target, according to court records.

**Race and law enforcement**

According to the ATF, stash house stings are a key part of the agency's national effort to target people who "show a propensity of doing harm to the public through violent behavior."

Launched in Miami during the cocaine-war days of the early 1990s, the stings have been honed over the years and are run by experienced agents who use a tightly controlled playbook.

They typically begin when an informant provides the ATF information about a potential target who has expressed interest in taking part in a robbery. The informant then introduces the target to an undercover agent who poses as a disgruntled courier for a drug cartel and offers an opportunity to steal large quantities of drugs from a stash house guarded by men with guns.



**Related**

In a series of conversations captured on undercover wire, the target is told if he is interested he must assemble an armed team to commit the robbery. The target and his crew are arrested after they show up on the day of the supposed crime.

"At the time of arrest, the home invasion defendants are poised, at any moment, to invade a stash house, steal kilograms

**ATF official wants looser gun restrictions, end to ban on imported assault weapons**

of cocaine guarded by armed cartel members, and in the process, kill or be killed," prosecutors wrote in their recent court filing.

In order to avoid arguments of entrapment in court, the stings are supposed to target only established robbery groups. ATF criteria also require that at least two of the participants have violent backgrounds and that all must be criminally active at the time the investigation is launched.

Not only were the operations a boon for the ATF but the resulting prosecutions also netted eye-popping sentences — sometimes up to life in prison — in part because defendants were criminally liable for the amount of imaginary drugs they believed they were stealing. It didn't matter that the robbery was fake or that no drugs actually existed.

"The reason this scenario exists is because it's realistic," Assistant U.S. Attorney Jeffrey Perconte argued at Mayfield's sentencing in 2011 while seeking up to 37 years in prison. "It certainly was real to Mr. Mayfield."

Spokesmen for both the ATF and the U.S. attorney's office declined to comment for this story, citing the ongoing litigation.

The lengthy sentences were just one pattern that raised red flags for the criminal defense bar. In case after case, the ATF stings seemed to be targeting only minorities.

In early 2013, a handful of private attorneys and assistant federal defenders, all veterans at the Dirksen U.S. Courthouse, were so troubled by a stash house case they were defending that they asked the U.S. attorney's office for a complete list of all the defendants in similar cases sorted by race. Prosecutors rebuffed this admittedly unorthodox request.

"ATF does not maintain statistics on the nature in question at either the local or national level," Assistant U.S. Attorney Philip Fluhr wrote in response, court records show.

The defense lawyers then asked the judge overseeing the case to order prosecutors to turn over detailed information on how the stash house stings are run and the race of the defendants who had been charged so far. They included their own research showing more minorities were targeted.

Prosecutors strenuously objected. But a few months later, U.S. District Chief Judge Ruben Castillo allowed the discovery to go forward.



**Related**

More stories: Chicago's Cop Crisis

"History has shown a continuing difficult intersection between the issue of race and the enforcement of our nation's criminal laws," wrote Castillo, concluding that the defense team had "made a strong showing of potential bias."

Similar motions in other stash house cases soon followed, but the effort to prove racial bias was being made case-by-case with no coordination. Then in 2014, the University of Chicago's Federal Criminal Justice Clinic agreed to focus all its efforts on the 12 stash house cases and their 43 defendants.

This allowed the defense attorneys to address the alleged racial bias in a coordinated effort, a critical undertaking given the government's massive resources, the attorneys said.

"It's a giant power imbalance if one person decides to go against the government," said Adam Davidson, one of seven U. of C. law students who helped the clinic's three law professors coordinate the cases.

### 'The real Leslie Mayfield'

On July 23, 2009, Mayfield climbed into a black Cadillac Escalade parked in a Naperville lot to meet with Potts and a purportedly disgruntled cartel drug courier. In a conversation captured on undercover recording, the courier, an undercover ATF agent, laid out the robbery plot, warning that up to 30 kilograms of cocaine would be protected by as many as four armed guards.

When the undercover agent asked if he had ever done a stash house robbery before, Mayfield replied, "Yes, sir," according to a transcript of the recording in court records. Later in the conversation, Mayfield talked about other home invasions he had

committed, noting his preference to scout out locations in advance and hit them under the cover of darkness.

Mayfield also told the agent the people he would recruit were experienced and would be excited about the plan once they knew the quantity of drugs involved. It would be enough for everyone to make "a nice li'l piece o' change," Mayfield said, according to the transcript.

Two weeks later, Mayfield brought the crew he'd assembled to meet with the undercover agent and go over the plan. The crew assured the agent that they were up for the danger of the operation and talked about what to do with the armed guards, including killing everyone inside if necessary, according to transcripts of the conversation. Mayfield stressed that their biggest advantage was "the element of surprise."

**Related**



Seven Baltimore Police officers indicted on federal racketeering charges

The next night, Mayfield got the call that the robbery was on. He and his crew drove to Aurora in a brown van to meet with the undercover agent, who took them to a nearby storage facility where they would supposedly hide the drugs after the heist, court records show. In a conversation outside the storage facility that was caught on undercover video, the agent gave the crew one more chance to back out, asking them if they felt they were up for the job.

Case: 16-2795    Document: 003112713759    Page: 11    Date Filed: 08/28/2017

"Yeah, bro!" exclaimed Montreece Kindle, Mayfield's cousin, who stuck out an arm to shake the agent's hand.

As the crew got ready, the video showed Mayfield throw a loaded .357 Magnum handgun into a rear cargo area of the vehicle. Seconds later, the boom of flash-bang grenades and shouting could be heard as a special operations team of agents stormed out of the storage facility to make the arrest.

Records show Mayfield's crew had brought an arsenal to the scene. In addition to the .357, agents found a loaded sawed-off shotgun, a .44-caliber revolver, a semi-automatic pistol, ski masks, bulletproof vests and latex gloves.

Mayfield and all three of his accomplices were convicted at trial. At Mayfield's sentencing hearing in 2011, prosecutors highlighted his previous convictions for burglary and unlawful restraint and incorrectly told the judge that he had been the shooter in the 1994 attempted murder that had landed him in prison for 11 years.

After his release in 2005, Mayfield had picked up a new charge in Lake County after state police stopped a car he was riding in and found him with a loaded gun, prosecutors said.

"That's the real Leslie Mayfield," Perconte told U.S. District Judge Harry Leinenweber, who imposed a 27-year prison sentence. "From the time he was 18 ... he has added nothing to society but danger."

**Exaggerated capabilities**

Born and raised in Zion, Mayfield had an unstable childhood. He never knew his father, and his mother struggled to make ends meet. In court statements, Mayfield recalled being homeless for long stretches. He spoke of memories of his mother making them bologna sandwiches in the front seat of their car and washing him up in gas station bathrooms because they had nowhere else to go.

Mayfield graduated from eighth grade but never attended high school. In 1994, when he was 26, Mayfield and several others were arrested after the carjacking and shooting of a motorist in Waukegan.

Lake County prosecutors conceded that Mayfield wasn't the gunman, but under the state's "accountability" law, a jury convicted him at trial of attempted murder, armed

robbery, armed violence and aggravated battery with a firearm. He was sentenced to 40 years in prison.

An appeals court later reversed the attempted murder conviction, ruling in 1997 that the jury was improperly barred from hearing Mayfield's statement to police that he was angry that his co-defendant had opened fire because he had "no good reason to shoot" the victim.

**Related**



Prosecutors investigating if corrupt Chicago cop tainted other convictions

After his case was sent back to Lake County Circuit Court, Mayfield pleaded guilty to attempted murder in exchange for a seven-year sentence to run consecutive to a 15-year term for the armed violence count, records show. With good behavior, he wound up serving 11 years.

In his interview with the Tribune, Mayfield said he decided to use his time in prison to turn his life around. He earned his high school equivalency certificate and later an associate degree in general college studies. He got a cosmetology license and became a certified tutor. Although he said he never affiliated with a gang on the street, he joined the Gangster Disciples to avoid conflicts in prison. "I did everything I could to remain positive," he said.

After he was released on parole in 2005, Mayfield went back home to Waukegan, but staying away from the violence of the streets proved difficult. A couple years after his release, Mayfield was in a home when a shooting occurred and a family member was wounded in the head, he said.

To protect himself, he started carrying a gun, but that, he acknowledged, turned out to be a huge mistake. That August, state police stopped the car Mayfield was riding in, and he took off running before they could pat him down. After a foot chase, he was ordered to the ground at gunpoint. Police found a loaded .40-caliber pistol in his waistband.

Despite that setback, Mayfield said he was determined to stay on course. He moved with

his girlfriend to Naperville, where they lived in a tiny, two-bedroom house with her four teenage children and one grandchild.

Struggling at LG Electronics on $12 an hour, Mayfield described in court records how the family relied on one car and had no money for cellphones or other luxuries. Every Tuesday, Mayfield would stand in line at a local food pantry to make sure the kids had enough to eat.

In his interview with the Tribune, Mayfield said he was coached by Potts to boast to the purported drug courier about past stickups and robberies. At his sentencing six years ago, he denied ever selling or stealing drugs and said he had never shot anyone in his life. Mayfield owned up to his role in the stash house robbery but insisted in a long and emotional plea to the court that the government had exaggerated his capabilities.

"They say I had a drug crew? We couldn't even afford a cellphone," Mayfield told the judge, according to a transcript. "We didn't even have a car when the agent came across me. I tried everything I could to be a better person."

**'Absurdly overbroad'**

As the movement to fight the stash house cases gathered steam among defense attorneys, the judiciary also weighed in with some key decisions.

In November 2014, the full 7th Circuit U.S. Court of Appeals granted Mayfield a new trial in a rare decision that concluded Potts had "targeted Mayfield at a moment of acute financial need and against a backdrop of prolonged difficulty finding permanent, family-supporting work."

In a 2012 dissenting opinion as the case was winding through the court, appellate Judge Richard Posner had put an even finer point on it, referring to the stings as a "disreputable tactic" that used government informants to target people at a vulnerable time in their lives.

Meanwhile, another ruling in July 2015 by the appellate court in Chicago resulted in the government turning over more data on the stash house stings sought by the defense. The ruling allowed the defendants to move ahead with what is believed to be the most thorough analysis of the stings anywhere in the country.

To examine the data, the University of Chicago team hired Jeffrey Fagan, a nationally known specialist in police practices who also examined the New York Police Department's stop-and-frisk program.

Fagan examined 94 defendants in 24 separate stings conducted between 2006 and 2013 and found that 74 of the defendants were black. Fagan also ran three statistical analyses to figure out the likelihood that the proportion of stash house defendants would, by chance, be African-American.

To do that, Fagan created a control group by using ATF criteria for their defendants — having one or more convictions for specific violent offenses identified by the ATF or for narcotics or firearms offenses. The offenses also had to occur in the same geographic area and around the same time the stash house plan arose.

When Fagan compared the two groups, he concluded that minorities were "substantially more likely" than similarly situated whites to be targeted by ATF in the stash house stings, according court filings.

"Each test showed the same pattern: Being black significantly increased a person's chance of being targeted by the ATF," lawyers for the defendants wrote in their filing.



**Related**

But an expert hired by the U.S. attorney's office concluded that Fagan had used an "absurdly overbroad" group to compare to stash house defendants, including people with only minor criminal convictions such as simple drug possession and misdemeanor assault,

**2 Chicago cops still sidelined a decade after police scandal**

according to the recent court filing by prosecutors. In all, Fagan's "eligible list" included nearly 300,000 people — a number that equals 10 percent of all males ages 14-49 in the Chicago area, their filing said.

Using such a broad swath of the public in a statistical analysis ignores the realities of how the stash house stings work, prosecutors said.

"ATF agents do not compile a list of citizens with criminal records throughout the district, select people from the list at random, and then cold-call those people and offer them a chance to rob a stash house," prosecutors wrote. "There is no reason the home invasion defendants should resemble Professor Fagan's fantasy home invasion lottery."

Echoing an argument sometimes made by Chicago police, federal prosecutors also said Fagan's report failed to account for the fact that many of the stash house investigations took place in neighborhoods that are more than 90 percent black, naturally leading to targets who are black as well.

The debate is now potentially headed for a court hearing involving all defendants. The outcome could set precedent for judges in other states.

"Courts tend to give law enforcement a lot of leeway," said University of California-Irvine law professor Katharine Tinto, a criminal law expert who has written extensively about the stash house stings. "... The fact that an expert is saying a federal law enforcement agency is discriminating on the basis of race is something everybody should be watching."

### 'Sentenced with him'

Sharonnette Sholaja first met Mayfield in 2006 when he was doing odd jobs for his cousin after his release from prison. Despite Mayfield's background, she fell for him in part because of his efforts to put his past behind him.

"He was really trying to get himself together," Sholaja said in a recent interview. "I was getting up at 4 or 5 a.m. driving him for all kinds of job interviews because he was determined. He didn't let anything stop him."

Captured by the Third Circuit Libraries on 8/29/2017

Within two years they had moved to Naperville, crammed into a small apartment with her kids and a grandchild, so Sholoja could be close to her work in Woodridge. Mayfield found the job at LG, but money was still tight, she said. For their first holiday in Naperville, they couldn't afford a Christmas tree. With their money going to rent and food, they relied on a food pantry to get by, she said.

**Related**



**Old police 'street files' raise question: Did Chicago cops hide evidence?**

When the family car broke down — the event that ultimately drew Mayfield into the stash house sting — they had to borrow $300 from her mom to cover the tow, Sholaja said.

Despite the financial hardships, Mayfield never spoke of violence, carried guns or kept one in the house, Sholaja said. The news that he had agreed to rob a drug stash house shocked and angered her. She lost the apartment after he was locked up, and eventually the stress ripped them apart.

Sholoja, 44, said they still consider each other friends and remain in touch. But she's moved to Arizona to start over.

"I told him I felt like l was sentenced with him," she said. "You know, we would be married had this not happened."

*jmeisner@chicagotribune.com*

*asweeney@chicagotribune.com*

Twitter @jmetr22b

Twitter @annie1221

Copyright © 2017, Chicago Tribune

**This article is related to:** Crime, Theft, Drug Trafficking, Homicide, University of Chicago, U.S. Department of

**BE THE FIRST TO COMMENT**

Captured by the Third Circuit Libraries on 8/29/2017

**Internet Sources Cited in Opinions**

In order to preserve information for research purposes, websites cited in precedential and nonprecedential opinions for the United States Court of Appeals for the Third Circuit are captured when possible. Because some URLs cited in opinions may change over time or disappear altogether, an attempt is made to capture, as closely as possible, the material cited in an opinion at the time of its release. However, capture dates may not match the "as visited" date contained in an opinion's citation to that material. **Any use of captured website information is the sole responsibility of the user.**  All captured information is provided in good faith for research purposes. The Third Circuit Court of Appeals and its employees shall have no responsibility for the accuracy, content, completeness, legality, or reliability of captured information and cannot be held liable for any loss, damage, or expense which arises as a result of use. The content of a capture may be protected by copyright and/or related rights. Use of captured information may require permission from the rights holder(s).

