*Chapter 12*

# CONCLUSIONS AND RECOMMENDATIONS

## A.    INTRODUCTION

The statutory directive for this report requires the Commission to assess the compatibility of mandatory minimum penalties with the federal guideline system established under the Sentencing Reform Act and as modified by the Supreme Court's decision in *Booker v. United States*, and to discuss mechanisms other than mandatory minimum sentencing laws by which Congress may take action with respect to sentencing policy. To fulfill this part of the statutory directive, this chapter first provides general findings and conclusions regarding mandatory minimum penalties and the federal sentencing guidelines and then provides specific recommendations regarding the four major offense types studied in this report.

## B.    GENERAL CONCLUSIONS AND RECOMMENDATIONS

Mandatory minimum penalties have existed in varying number and severity throughout the nation's history,[821] and their role in the federal criminal justice system has long been debated by members of Congress, judges, prosecutors, defense attorneys, academics, and the public. Stakeholders in the federal criminal justice system continue to hold a range of views regarding mandatory minimum penalties.[822] While there is a spectrum of views among members of the Commission regarding mandatory minimum penalties, the Commission uniformly believes, consistent with the general findings of the *1991 Commission Report*, that a strong and effective sentencing guidelines system best serves the purposes of the Sentencing Reform Act. However, if Congress decides to exercise its power to direct sentencing policy by enacting mandatory minimum penalties, the Commission believes such penalties should (1) not be excessively severe, (2) be narrowly tailored to apply only to those offenders who warrant such punishment, and (3) be applied consistently. Guided by these general principles, the Commission believes that the current system of mandatory minimum penalties can be improved.

As discussed in more detail below, certain mandatory minimum provisions apply too broadly, are set too high, or both, to warrant the prescribed minimum penalty for the full range of offenders who could be prosecuted under the particular criminal statute. This has led to inconsistencies in application of certain mandatory minimum penalties, as shown by the Commission's data analyses and confirmed by interviews of prosecutors and defense attorneys who practice in 13 district courts.[823] These analyses and interviews indicate that different charging and plea practices have developed in various districts that result in the disparate

---

[821]  Chapter 2 provides an overview of the history of mandatory minimum penalties.

[822]  Chapter 5 provides an overview of the views held by stakeholders in the federal criminal justice system with respect to mandatory minimum penalties. Appendix G and Appendix J summarize testimony before the Commission pertaining to mandatory minimum penalties.

[823]  Chapter 6 summarizes the results of field interviews conducted with federal prosecutors and defense attorneys, which included discussions of charging and plea practices in their respective districts.

application of certain mandatory minimum penalties, particularly those provisions that require substantial increases in sentence length.

The Commission believes that these findings can largely be traced to the structure and severity of mandatory minimum penalties. Mandatory minimum provisions typically use a limited number of aggravating factors to trigger the prescribed penalty, without regard to the possibility that mitigating circumstances surrounding the offense or the offender may justify a lower sentence. For such a sentence to be reasonable in every case, the factors triggering the mandatory minimum penalty must *always* warrant the prescribed mandatory minimum penalty, regardless of the individualized circumstances of the offense or the offender. This cannot necessarily be said for all cases subject to certain mandatory minimum penalties. For this reason, Congress should consider whether a statutory "safety valve" mechanism similar to the one available for certain drug trafficking offenders at 18 U.S.C. § 3553(f) may be appropriately tailored for low-level, non-violent offenders convicted of other offenses carrying mandatory minimum penalties.[824]

In contrast to mandatory minimum penalties, the guidelines prescribe proportional individualized sentences based on many factors relating to the seriousness of the offense, the harms associated with the commission of the offense, the culpability of the offender, and the criminal history and other characteristics of the offender.[825] This multi-dimensional approach to sentencing seeks to avoid the problems inherent in the structure of mandatory minimum penalties and, for this reason, best serves the purposes of the Sentencing Reform Act.

The Commission, however, recognizes that Supreme Court decisions rendering the guidelines advisory and establishing a deferential appellate standard of review[826] have increased inconsistencies in sentencing practices. Since *Booker*, the national rate of offenders receiving a government sponsored below range sentence has been relatively stable, with 25.4 percent of offenders receiving government sponsored below range sentences in fiscal year 2010[827] compared to 24.6 percent in fiscal year 2006.[828] In contrast, the national rate of offenders

---

[824] Expansion of the safety valve would be consistent with the intent of 28 U.S.C. § 994(j), which directs the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense . . . ." Expansion of the safety valve may also conserve prosecutorial and judicial resources by increasing the number of offenders who plead guilty rather than proceed to trial. Drug offenders who were eligible for the safety valve pleaded guilty at a higher rate (99.6%) than all drug offenders convicted of an offense carrying a mandatory minimum penalty (95.5%) and drug offenders not convicted of an offense carrying a mandatory minimum penalty (98.4%). *See supra* Chapter 8(C)(2).

[825] Chapter 3 discusses the structural differences in how mandatory minimum penalties and the guidelines determine sentences.

[826] *See* Booker v. United States, 543 U.S. 220 (2005); Gall v. United States, 552 U.S. 38 (2007); Kimbrough v. United States, 552 U.S. 85 (2007); Rita v. United States, 551 U.S. 338 (2007); Spears v. United States, 555 U.S. 261 (2009); Pepper v. United States, 131 S. Ct. 1229 (2011).

[827] *See* Commission, *2010 Sourcebook of Federal Sentencing Statistics* 50 (2010).

[828] *See* Commission, *2006 Sourcebook of Federal Sentencing Statistics* 52 (2006). The composition of government sponsored below range sentences has changed somewhat since fiscal year 2006. The percent of offenders receiving

receiving a non-government sponsored below range sentence has increased from 12.1 percent in fiscal year 2006 to 17.8 percent in fiscal year 2010.[829]  Geographical variations also have increased since *Booker*.  In fiscal year 2010, the rate of non-government sponsored below range sentences ranged from 12.0 percent (Tenth Circuit) to 37.3 percent (Second Circuit), a difference of 25.3 percentage points.[830]  By comparison, in fiscal year 2006, the rate of non-government sponsored below range sentences ranged from 7.3 percent (Fifth Circuit) to 24.1 percent (Second Circuit), a difference of 16.8 percentage points.[831]  Similar variations occur at the district level.

Recent analyses also indicate that some sentencing differences may be associated with specific demographic characteristics, and these differences may be increasing post-*Booker*.[832]  For example, a recent Commission analysis found that, after controlling for relevant factors, Black male offenders received longer sentences than White male offenders, and that those differences in sentence length have increased steadily since *Booker*.[833]  Female offenders of all races received shorter sentences than male offenders, and non-citizen offenders received longer sentences than offenders who were United States citizens, after controlling for relevant factors.[834]  The Commission is concerned about these developments and stands ready to work with Congress on possible legislative reforms to strengthen and improve the sentencing guidelines system.

Despite these developments, the Supreme Court's decisions and the Commission's sentencing data make clear that the guidelines continue to play a central role in federal sentencing.  The Supreme Court has stated that "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" in sentencing.[835]  Sentencing data show that the guidelines continue to play this role.  The

---

a government sponsored below range sentence pursuant to an Early Disposition Program authorized by the Attorney General of the United States and the United States Attorney for the district in which the court resides has increased from 10.1 percent in fiscal year 2006 to 13.8 percent in fiscal year 2010, which reflects the increasing immigration caseload in the federal docket.  The percent of offenders receiving a government sponsored below range sentence for providing substantial assistance to the government has decreased from 14.4 percent to 11.5 percent during the same time period.  *See* Commission, *2010 Sourcebook of Federal Sentencing Statistics* 63 (2010).

[829]  *See* Commission, *2010 Sourcebook of Federal Sentencing Statistics* 63 (2010).

[830]  *See id.* at 50–62.

[831]  *See* Commission, *2006 Sourcebook of Federal Sentencing Statistics* 52–64 (2006).

[832]  *See* Commission, *Demographic Differences in Federal Sentencing Practices:  An Update of the Booker Report's Multivariate Regression Analysis* 1–2 (2010).

[833]  *Id.* at 2.

[834]  *Id.*

[835]  *Gall,* 552 U.S. at 49.  Accordingly, district courts are required to properly calculate and consider the guidelines and the grounds for departure provided in the policy statements when sentencing, even though after such consideration courts may impose non-guidelines sentences, or "variances."  *See* 18 U.S.C. § 3553(a)(4), (a)(5); *Booker,* 543 U.S. at 264 ("The district courts, while not bound to apply the Guidelines, must . . . take them into account when sentencing."); *Rita,* 551 U.S. at 351 (stating that a district court should begin all sentencing proceedings by correctly calculating the applicable guideline range).

overwhelming majority of offenders — 80.4 percent in fiscal year 2010 — still receive a sentence either within the guideline sentencing range or below the guideline sentencing range for a reason sponsored by the government (most often congressionally authorized reductions for substantial assistance to the government or an expedited guilty plea pursuant to an Early Disposition Program approved by the Attorney General).[836]

Furthermore, average sentences for all major offense types continue to parallel the average guideline minimum across time periods, including post-*Booker*.[837]  This ongoing trend shows how changes in offense severity and offender culpability, as measured by the guidelines, affect sentencing decisions over time and demonstrates that the guidelines continue to have a strong gravitational pull on federal sentencing practices.  Thus, although increasing differences in sentencing practices suggest the need to strengthen the current guidelines system, effective guidelines may provide a viable alternative to mandatory minimum penalties.

## C.    SPECIFIC CONCLUSIONS AND RECOMMENDATIONS

Consistent with the general conclusions and recommendations set forth above, the Commission provides specific conclusions and recommendations with respect to each of the major offense types studied in this report:  drug offenses, firearms offenses, sex offenses, and identity theft offenses.[838]

The Commission makes these recommendations cognizant of its responsibility to "take into account the nature and capacity of the penal, correctional, and other facilities available,"[839] and notes that 208,188 inmates were in the custody of the BOP as of December 31, 2009.  This figure is almost triple the number of inmates in the custody of BOP on December 31, 1991, and is 35 percent over the BOP's rated capacity for its 116 facilities.[840]  While mandatory minimum penalties are only one of a myriad of factors that have contributed to the increased number of inmates in the custody of the BOP and its corresponding budget of over $6 billion in fiscal year 2010,[841] the Commission recommends that Congress request prison impact analyses from the Commission as early as possible in its legislative process whenever it considers enacting or

---

[836]  *See* USSG §§5K1.1, 5K3.1; Commission, *2010 Sourcebook of Federal Sentencing Statistics* 50 (2010).

[837]  *See* Figure 4-4 and accompanying text in Chapter 4 (All Offenses); Figures 8-6 to 8-7 and accompanying text in Chapter 8 (Drug Offenses); Figures 10-8 to 10-11 and accompanying text in Chapter 10 (Sex Offenses); *see also* Commission, *Preliminary Quarterly Data Report:  2nd Quarter Release* 32–37 (2011) (comparing average sentence and average guideline minimum over time for multiple offense types).

[838]  Many of the 195 statutes carrying mandatory minimum penalties listed in Appendix A are rarely, if ever, used. *Compare* Table A-1 (Current Statutory Provisions Requiring Mandatory Minimum Terms of Imprisonment) in Appendix A, *with* Table D-3 (Number of Convictions and Mean Sentence for Mandatory Minimum Statutes) in Appendix D.  Congress may wish to consider whether such penalties should be revised in light of their infrequent use.

[839]  28 U.S.C. § 994(g).

[840]  *See* Figure 4-8, note 456, and accompanying text in Chapter 4.

[841]  *See* text accompanying note 455 in Chapter 4.

amending criminal penalties.  These analyses may assist Congress in focusing increasingly strained federal prison resources on the offenders who commit the most serious offenses.

1.    *Drug Offenses*

a.    <u>Importance of drug quantity and other factors</u>

As discussed in Chapter 2, the Anti-Drug Abuse Act of 1986[842] established the basic framework of mandatory minimum penalties currently applicable to federal drug trafficking offenses.  The drug quantities triggering those mandatory minimum penalties, which range from five years to life imprisonment, differ for various drugs and in some cases different forms of the same drug.  The available legislative history indicates that Congress intended to create a two-tiered penalty structure under which "serious" traffickers would be subject to five-year mandatory minimum penalties and "major" traffickers would be subject to ten-year mandatory minimum penalties.[843]  Congress determined that drug quantity would serve as the proxy to identify those categories of traffickers.[844]  The Commission responded to the mandatory minimum penalties by establishing base offense levels in the Drug Quantity Table at §2D1.1(c) that correspond to the first range on the sentencing table that exceeds the mandatory minimum (*i.e.*, levels 26 and 32, respectively, for the commonly applied five- and ten-year mandatory minimums) and extrapolating upward and downward to set guidelines sentencing ranges for all drug quantities.[845]

Drug quantity, however, is just one of many important factors in determining the appropriate sentence for drug offenders.  In addition to the guideline adjustments that apply to all offense types, such as aggravating role,[846] mitigating role,[847] and acceptance of responsibility,[848] the Commission has amended §2D1.1 numerous times over the years — many times in response

---

[842]  Pub. L. No. 99–570, 100 Stat. 3207.

[843]  *See* H.R. Rep. No. 99–845, pt. 1, at 11-12 (1986); 132 Cong. Rec. 27,193–194 (Sept. 30, 1986) (statement of Sen. Byrd); 132 Cong. Rec. 22,993 (Sept. 11, 1986) (statement of Rep. LaFalce).

[844]  *See* Cong. Rec. 27,193–194 (Sept. 30, 1986) (statement of Sen. Byrd).  For more discussion of the enactment of the Anti-Drug Abuse Act of 1986, *see supra* Chapter 2(F)(2).

[845]  As explained in Chapter 3, incorporating the mandatory minimum penalties in this manner serves multiple purposes.  First, it fulfills the Commission's statutory requirements to promulgate guidelines that are "consistent with all pertinent provisions" of federal law, 28 U.S.C. § 994(a) & (b)(1), and to consider "the community view of the gravity of the offense," 28 U.S.C. § 994(c)(4), to the extent that mandatory minimum penalties reflect Congress's expression of the community view of such offenses.  Second, it provides for graduated, proportional increases based on drug quantity for the full range of possible drug types and quantities.  Third, it reflects the Commission's concurrence with Congress's judgment that the quantity of drug involved in an offense is an important measure of the seriousness of the offense and the culpability of the offender.  *See supra* Chapter 3(C).

[846]  USSG §3B1.1.

[847]  USSG §3B1.2.

[848]  USSG §3E1.1.

to congressional directives — to account for a variety of aggravating and mitigating factors. Section 2D1.1 as initially promulgated in 1987 contained three alternative base offense levels and one specific offense characteristic.[849]  Today, §2D1.1 contains five alternative base offense levels and 16 specific offense characteristics to account for factors such as meeting the statutory safety valve criteria, death or serious bodily injury resulting from the use of a drug, possession of a dangerous weapon, use of certain aircrafts and submersible vessels, distribution in a prison or correctional facility, distribution through mass-marketing, importation and manufacture of amphetamine and methamphetamine, and environmental risks and risks of harm to people created by certain methamphetamine offenses.[850]

Most recently, in response to congressional directives in the Fair Sentencing Act of 2010,[851] the Commission amended §2D1.1 to expand upon the previously existing "mitigating role cap" at subsection (a)(5) to provide a more lenient "minimal role cap" and added five specific offense characteristics to account for the use or threat of violence, bribery of a law enforcement officer to facilitate the commission of the offense, maintenance of a premises for the purpose of manufacturing or distributing a controlled substance, certain specified aggravating conduct by offenders who receive the aggravating role adjustment, and certain specified mitigating conduct by offenders who receive the 4-level minimal participant adjustment.[852]

      b.    Relationship between current mandatory minimum penalties and offender function

Commission analysis indicates that the quantity of drugs involved in an offense is not as closely related to the offender's function in the offense as perhaps Congress expected.  As discussed in Chapter 8, the Commission studied a 15-percent sample of drug cases reported to the Commission in fiscal year 2009 and assigned each offender to one of 21 separate offense functions by reviewing the offense conduct section of the presentence report.  The functions ranged from higher-level functions such as High-Level Supplier/Importers to lower-level functions such as Couriers and Mules.  Offenders performing higher-level functions tended to be convicted of a drug offense carrying a mandatory minimum penalty more often than offenders performing lower-level functions.  For example, offenders who acted as Managers, Supervisors, and High-Level Suppliers/Importers were convicted of drug offenses carrying mandatory minimum penalties in the overwhelming majority of their cases (92.3%, 84.2%, and 82.8%, respectively).[853]  However, offenders who performed lower-level functions such as Couriers and Mules also were convicted of drug offenses carrying a mandatory minimum penalty in a significant proportion of their cases (49.6% and 43.1%, respectively).[854]  For *every* function, the

---

[849]  USSG §2D1.1 (Nov. 1987).

[850]  USSG §2D1.1 (Nov. 2011).

[851]  Pub. L. No. 111–220, 124 Stat. 2372.

[852]  *See* USSG App. C, amend. 748 (effective Nov. 1, 2010).

[853]  *See* Figure 8-9 and accompanying text in Chapter 8.

[854]  *See id.*

quantity of drugs involved in the offense on average resulted in a median base offense level that included or exceeded the five-year mandatory minimum penalty.[855]

While the current mandatory minimum penalties for drug offenses may apply more broadly than originally intended by Congress, the impact of such penalties on certain drug offenders who perform lower-level functions is significantly ameliorated by the combined effect of the safety valve and downward guideline adjustments.[856] The Commission's analysis shows that offenders who performed lower-level functions were more likely to qualify for the safety valve than offenders who performed higher-level functions. For example, offenders acting as Mules and Couriers who were convicted of a drug offense carrying a mandatory minimum penalty qualified for the safety valve (either by itself or in combination with substantial assistance) in 79.2 percent and 67.9 percent of their cases, respectively, compared to offenders who performed higher-level functions such as High-Level Suppliers/Importers (26.7%), Organizer/Leaders (11.6%), Wholesalers (19.4%), and Managers (13.9%).[857]

The high rate of safety valve relief for offenders who performed lower-level functions has enabled downward adjustments in the guidelines to differentiate these least serious drug offenders from the more serious drug offenders in many cases. For example, offenders convicted of a statute carrying a mandatory minimum penalty who acted as Mules and Couriers received a mitigating role adjustment under §3B1.2 in 51.4 percent and 39.8 percent of their cases, respectively. Conversely, offenders convicted of a statute carrying a mandatory minimum penalty who acted as Organizer/Leaders, Managers, and Supervisors received an aggravating role adjustment under §3B1.1 in 74.7 percent, 52.8 percent, and 37.5 percent of their cases, respectively. As a result of these and other guideline adjustments, such as the "mitigating role cap" in §2D1.1(a), offenders who performed lower-level functions received significantly lower final offense levels than offenders who performed higher-level functions.[858] For example, the median final offense level for Mules (level 20) and Couriers (level 21) was significantly lower than for High-Level Suppliers/Importers (level 29), Organizer/Leaders (level 34), Managers (level 33), and Supervisors (level 28).[859]

---

[855] *See* Figure 8-10 and accompanying text in Chapter 8.

[856] *See supra* Chapter 8(C)(7); *see also supra* Chapter 2(H)(3) (detailing the enactment of the statutory safety valve in 1994) and notes 116-127 and accompanying text in Appendix E (describing case law interpreting and applying the safety valve).

[857] *See* Figure 8-11 and accompanying text in Chapter 8. In contrast, offenders performing lower-level functions tended to receive relief for substantial assistance (either by itself or in combination with the safety valve) at lower rates than offenders performing higher-level functions. Managers (50.0%), Organizers/Leaders (39.1%), and Wholesalers (33.8%), for example, received relief for substantial assistance significantly more often than Couriers (27.1%) and Mules (19.5%). *See id.*

[858] *See* Figures D-3 and D-4 in Appendix D.

[859] *See* Figure 8-10 in Chapter 8.

As a result of the combined effect of the safety valve and applicable guideline adjustments, offenders who performed lower-level functions received significantly shorter average sentences than offenders who performed higher-level functions. For example, the average sentences for Mules (29 months) and Couriers (39 months) were significantly shorter than for High Level Suppliers/Importers (101 months), Organizer/Leaders (154 months), Wholesalers (103 months), and Managers (147 months).[860]

c.      Cumulative impact of criminal history

Criminal history can have a disproportionate and excessively severe cumulative sentencing impact on certain drug offenders. The impact of criminal history on drug sentences is in part a function of the minimum term of imprisonment required by statute, and in part a function of the interaction between the mandatory minimum penalties, the safety valve, and the guidelines. For this reason, a single criminal history event can have a three-fold impact on the sentence of certain drug offenders. First, the mandatory minimum penalties provided by 21 U.S.C. §§ 841 or 960 double from five to ten years of imprisonment, and from ten to 20 years of imprisonment if the offender has a prior conviction for a "felony drug offense."[861] An offender with two or more prior drug felonies is subject to a mandatory minimum term of life imprisonment under section 841.[862] The statute also defines the term "felony drug offense" broadly to mean an offense that is "punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances."[863] Second, the guidelines provide graduated sentencing increases for criminal history along the Criminal History axis of the Sentencing Table. Third, an offender with more than one criminal history point under the guidelines is ineligible for the statutory safety valve[864] and its guideline counterparts.[865]

These cumulative impacts[866] can result in disproportionate and excessively severe sentences in certain cases. Commission data show inconsistent application of certain mandatory

---

[860]  *See* Figure 8-12 in Chapter 8.

[861]  21 U.S.C. §§ 841(b)(1)(A)–(B), 960(b)(1)–(2).

[862]  21 U.S.C. §§ 841(b)(1)(A).

[863]  21 U.S.C. § 802(44).

[864]  *See* 18 U.S.C. § 3553(f)(1).

[865]  *See* USSG §§2D1.1(b)(16), 5C1.2.

[866]  Weapon involvement has a similar cumulative impact on certain drug offenders. If the offender is convicted of violating 18 U.S.C. § 924(c), a mandatory minimum penalty ranging from five years to life imprisonment applies. Alternatively, if the offender is not convicted under 18 U.S.C. § 924(c) but a dangerous weapon was possessed during the offense, USSG §2D1.1 provides an enhancement of two levels (an approximate 25% increase in sentence length). In either case, an offender who possesses a firearm or other dangerous weapon (or induces another participant to do so) in connection with the offense is excluded from safety valve eligibility under 18 U.S.C. § 3553(f)(2).

minimum penalties, particularly in cases in which 21 U.S.C. § 851 could apply.[867]  Interviews of prosecutors and defense attorneys in 13 districts confirm that different districts have adopted different practices with respect to filing the necessary information required to seek an enhanced penalty under 21 U.S.C. § 851 in part because of its severity.[868]

The structure of the recidivist provisions in 21 U.S.C. §§ 841 and 960 fosters inconsistent application, in part, because their applicability turns on the varying statutory maximum penalties for state drug offenses.  The term "felony drug offense" as used in sections 841 and 960 "means an offense that is punishable by imprisonment for more than one year under any law of the United States or of a state . . . that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances."[869]  States have adopted differing punishments for drug offenses, so that conduct qualifying as a "felony drug offense" in one state may not qualify as such an offense in another state.  Furthermore, the recidivist provisions apply to a broad range of offenders, which vary depending on the state in which the prior conviction occurred.  For example, states have adopted differing approaches with respect to the punishment of simple possession of controlled substances.  As a result, some offenders with prior convictions for simple possession may be subject to the enhanced penalties under sections 841 and 960 even though other offenders with prior state or federal convictions for simple possession may not.[870]  Some states also classify offenses as misdemeanors even though the crime is punishable by more than one year of imprisonment.  These offenses are considered "felony drug offenses" under federal law despite the state's classification of the offense as a misdemeanor.[871]

     d.    Demographic effects

Notable differences exist in the application of drug mandatory minimum penalties among various demographic groups, but these differences are largely attributable to the cumulative effects of criminal history and weapon involvement.  While these differences are attributable to

---

[867]  *See supra* Chapter 8(I).  Mandatory minimum penalties for drug offenses typically increase the applicable mandatory minimum penalty when the drug offender is convicted of a second or subsequent felony drug offense. *See* 21 U.S.C. § 841(b).  For these increased penalties to apply, the government must affirmatively seek the enhanced penalties by filing an information with the court before trial, or before a guilty plea is entered, pursuant to 21 U.S.C. § 851(a).  *See supra* Chapter 8(I)(1).

[868]  For further discussion of the different practices adopted with respect to the filing of information required under section 851, *see supra* Chapter 6(D)(1) and Chapter 8(I).

[869]  21 U.S.C. § 802(44); *see also* 21 U.S.C. § 951(b).

[870]  *See* Lopez v. Gonzalez, 549 U.S. 47, 54 & n.4 (2006) (noting the states' different approaches to classifying simple possession offenses); Michael M. O'Hear, *Statutory Interpretation and Direct Democracy: Lessons from the Drug Treatment Initiatives*, 40 HARV. J. ON LEGIS. 281, 288–89 (2003) (same); *see also* United States v. Brown, 383 F. App'x 543, 546 (7th Cir. 2010) ("We are not aware of any court holding that a state felony drug conviction for possession does not trigger the increased mandatory minimum in 21 U.S.C. § 841(b)(1)(B) because simple possession is not a felony in the federal system.").

[871]  *See* Burgess v. United States, 553 U.S. 124, 127 (2008) ("A state drug offense punishable by more than one year . . . qualifies as a 'felony drug offense,' even if state law classifies the offense as a misdemeanor.").

legally relevant factors, they may create perceptions of unfairness and unwarranted disparity that cause concern insofar as they may foster disrespect for and lack of confidence in the federal criminal justice system.[872]

The cumulative sentencing impacts of criminal history and weapon involvement appear to be particularly acute for Black drug offenders. Three-quarters (75.6%) of Black drug offenders convicted of an offense carrying a mandatory minimum penalty in fiscal year 2010 were excluded from safety valve eligibility due to criminal history scores of more than one point.[873] Black drug offenders in Criminal History Category I who were convicted under 18 U.S.C. § 924(c) or who received the weapon involvement enhancement in the drug guideline constituted an additional 2.4 percent and 3.3 percent, respectively, of Black drug offenders sentenced in fiscal year 2010. These figures largely explain why only 14.4 percent of Black offenders convicted of a drug offense carrying a mandatory minimum penalty received safety valve relief (either by itself or in combination with substantial assistance), compared to 48.4 percent of Other Race offenders, 46.3 percent of Hispanic offenders, and 39.5 percent of White offenders.[874]

These differences in safety valve eligibility in turn drive differences in the application of mandatory minimum penalties among the various racial groups. Blacks account for 30.3 percent of drug offenders convicted of an offense carrying a mandatory minimum penalty. However, Blacks account for a higher percentage — 40.4 percent — of drug offenders subject to a mandatory minimum penalty at sentencing, even though they receive relief for substantial assistance more often than offenders in any other racial group.[875] This result occurs because Black drug offenders qualify for the safety valve less often than any other racial group.[876] In contrast, Hispanics account for 44.0 percent of drug offenders convicted of an offense carrying a mandatory minimum penalty, and 46.3 percent of those Hispanic offenders qualify for the safety valve. As a result, Hispanics account for only 39.6 percent of drug offenders subject to a mandatory minimum penalty at sentencing.[877]

---

[872] *See* Commission, *Report to the Congress: Cocaine and Federal Sentencing Policy* 102-03 (2002) ("Perceived improper racial disparity fosters disrespect for and lack of confidence in the criminal justice system . . . ."); *see also Mandatory Minimums and Unintended Consequences: Hearing on H.R. 2934, H.R. 834, and H.R. 1466 Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 111th Cong. 38 (prepared statement of Chief Judge Julie E. Carnes on behalf of the Judicial Conference of the United States) ("To function successfully, our judicial system must enjoy the respect of the public. The robotic imposition of sentences that are viewed as unfair or irrational greatly undermines that respect.").

[873] *See supra* Chapter 8(C)(4).

[874] *See* Figure 8-4 and accompanying text in Chapter 8.

[875] *See* Table 8-1, Figure 8-4, and accompanying text in Chapter 8.

[876] *See* Figure 8-4 in Chapter 8.

[877] *See* Table 8-1, Figure 8-4, and accompanying text in Chapter 8.

United States citizens account for 70.0 percent of drug offenders convicted of an offense carrying a mandatory minimum penalty. However, United States citizens account for a higher percentage — 79.9 percent — of drug offenders subject to a mandatory minimum penalty at sentencing, even though they receive relief for substantial assistance more often than non-citizens, because they qualify for the safety valve significantly less often than non-citizens (24.6% for United States citizens compared to 59.7% for non-citizens).[878] The difference in the rates of safety valve application is attributable to the fact that non-citizen offenders tend to have fewer criminal history points than United States citizen offenders, which may in part be due to the exclusion of sentences resulting from foreign convictions from criminal history calculations under Chapter Four of the *Guidelines Manual*.[879]

Male offenders also account for a higher percentage (94.0%) of drug offenders subject to a mandatory minimum penalty at sentencing than their proportion (89.8%) of drug offenders convicted of an offense carrying a mandatory minimum penalty. This difference is attributable to male offenders qualifying for the safety valve less often than female offenders.[880]

e.     Recommendations for drug offenses

In light of these findings and observations, the Commission recommends that Congress consider the following suggestions for amending the mandatory minimum penalties for drug offenses.

i.     *Safety valve eligibility*

Congress should consider expanding the safety valve at 18 U.S.C. § 3553(f) to include certain offenders who receive two, or perhaps three, criminal history points under the guidelines. Although further study would be needed before considering any specific proposals (for example, study of the type of prior offenses committed by offenders who receive two and three criminal history points), the Commission's review of available data for fiscal year 2010 indicates that 1,127 offenders convicted of a drug offense carrying a mandatory minimum penalty would have been eligible for the safety valve if it had included non-violent drug offenders in Criminal History Category II (offenders who receive two or three criminal history points).[881] Of these

---

[878] *See* Table 8-1, Figure 8-4, and accompanying text in Chapter 8.

[879] *See* USSG §4A1.2(h). Foreign convictions are excluded because of uncertainty regarding whether the offender received adequate due process. Furthermore, it may be uncertain whether the defendant in fact has any such convictions because "[i]t is often difficult to obtain the foreign defendant's criminal history from the foreign jurisdiction." *See* Michael Edmond O'Neill et al., *Past as Prologue: Reconciling Recidivism and Culpability*, 73 FORDHAM L. REV. 245, 253 n.49 (2004). A court, however, may consider prior foreign convictions in determining the adequacy of the defendant's criminal history category, *see* USSG §4A1.2(h).

[880] *See* Table 8-1, Figure 8-4, and accompanying text in Chapter 8.

[881] *See* Table D-20 (Offenders Affected by Expansion of Safety Valve to Criminal History Category II by Race and Drug Type) in Appendix D. The breakdown of the type of drug involved in the offense for these 1,127 offenders is methamphetamine (305), powder cocaine (301), crack cocaine (236), marijuana (206), heroin (62), and other drugs (17).

1,127 offenders, 260 (23.1%) offenders received three points pursuant to §4A1.1(a) for a prior sentence of imprisonment exceeding one year and one month, and 190 (16.9%) offenders received two points pursuant to §4A1.1(b) for a prior sentence of imprisonment of at least 60 days.[882] An expansion of the safety valve would mitigate the cumulative impact of criminal history for certain less serious offenders as measured by their criminal history score under the guidelines.

It is important to note that an expansion of the safety valve to include certain offenders in Criminal History Category II likely would have little effect on the demographic differences observed in the application of mandatory minimum penalties to drug offenders. The lack of significant effect is because the demographic characteristics of offenders who are estimated to become eligible if the safety valve were expanded to include Criminal History Category II are similar to the demographic characteristics of offenders who are currently eligible under 18 U.S.C. § 3553(f).

### ii.    *Recidivist provisions at 21 U.S.C. §§ 841 and 960*

Congress should mitigate the cumulative impact of criminal history by reassessing both the scope and severity of the recidivist provisions at 21 U.S.C. §§ 841 and 960. The mandatory minimum penalties provided in those provisions are doubled (from five to ten years of imprisonment, and from ten to 20 years of imprisonment) if the offender has a prior conviction for a "felony drug offense." An offender with two or more prior drug felonies is subject to a mandatory minimum term of life imprisonment. This doubling of the mandatory minimum penalties, and the mandatory minimum term of life imprisonment, are sometimes viewed as disproportionate and excessively severe in individual cases and far exceed the more graduated, proportional increases provided by the guidelines for such prior conduct.

In addition, Congress should more finely tailor their scope to reduce inconsistent application of these provisions. This could be accomplished by amending the current definition of "felony drug offenses" that triggers the heightened mandatory minimum penalties. Among other possible changes, Congress might consider incorporating the particular state's classification of an offense as a "felony" or "misdemeanor" to better reflect the state's judgment concerning the seriousness of the prior offense, or by excluding simple possession offenses from the definition of "prior drug offense."

### 2.    *Firearm Offenses*

The firearm offenses to which mandatory minimum penalties most commonly apply are serious crimes that can result in violence and bodily injury. The penalties established at 18 U.S.C. § 924(c) reflect Congress's judgment that when a firearm is involved, crimes of violence and drug trafficking offenses are more serious and deserving of lengthier sentences. Similarly, the penalties established in the Armed Career Criminal Act, 18 U.S.C. § 924(e), reflect Congress's judgment that offenders with prior violent felony and drug trafficking offense convictions who illegally possess firearms should receive greater punishment than other

---

[882] *See supra* Chapter 3(B)(3) for a discussion of how criminal history is calculated under the guidelines.

offenders.  Consistent with these policy determinations, the Commission has established guideline enhancements for conduct involving firearms and other dangerous weapons,[883] as well as enhancements based on a firearm offender's history of convictions for crimes of violence and controlled substance offenses.[884]

There are important differences, however, in how the statutes and the guidelines account for similar conduct, particularly with respect to enhancements for firearm involvement.  Section 924(c) establishes mandatory minimum penalties that range from five years to life imprisonment for conduct involving a firearm in the commission of a broadly defined "crime of violence" or "drug trafficking crime.  The length of the applicable mandatory minimum penalty depends on how the weapon was used,[885] the type of firearm,[886] and whether the offender committed other violations of section 924(c).[887]  The statute defines a "crime of violence" as any felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another," or "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."[888]  A "drug trafficking crime" is any felony that is punishable under the Controlled Substances Act, codified at 21 U.S.C. § 801 *et seq.*, or the Controlled Substances Import and Export Act, codified at 21 U.S.C. § 951 *et seq.*[889]  The sentence imposed for violating section 924(c) must be served consecutively to any other sentences imposed on the offender, including sentences for other violations of section 924(c).[890]

---

[883]  *See* USSG §§2B3.1(b)(2), 2D1.1(b)(1).

[884]  *See* USSG §2K2.1(a)(2), (a)(4).

[885]  Section 924(c) establishes a five-year mandatory minimum penalty for an offender who "during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm."  18 U.S.C. § 924(c)(1)(A)(i).  The mandatory minimum penalty increases to seven years of imprisonment if the firearm was "brandished" and to ten years of imprisonment if the firearm was "discharged." *See id.* § 924(c)(1)(A)(ii) – (iii).

[886]  The statute establishes a ten-year mandatory minimum penalty if the firearm was "a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon" and a 30-year mandatory minimum if the firearm was "a machinegun or a destructive device, or [was] equipped with a firearm silencer or firearm muffler."  18 U.S.C. § 924(c)(1)(B).

[887]  A 25-year mandatory minimum penalty applies to offenders convicted of a "second or subsequent" violation of section 924(c), and mandatory life imprisonment applies to offenders convicted of a "second or subsequent" violation of section 924(c) when the firearm involved was "a machinegun or a destructive device, or [was] equipped with a firearm silencer or firearm muffler." 18 U.S.C. § 924(c)(1)(C).  The "second or subsequent" violation of section 924(c) may be charged in the same indictment and may be part of a single series of events as the predicate section 924(c) offense.  *See Deal v. United States*, 508 U.S. 129 (1993).

[888]  18 U.S.C. § 924(c)(3).

[889]  18 U.S.C. § 924(c)(2).

[890]  18 U.S.C. § 924(c)(1)(D).

In contrast, the guidelines enhance sentences based on firearms in a more graduated manner, also depending on the circumstances of the underlying offense and the individual offender. Most offenders convicted of an offense under section 924(c) are convicted of robbery and drug trafficking offenses referenced under §§2B1.3 and 2D1.1, respectively. Sections 2B1.3 and 2D1.1 each contain enhancements for conduct involving a firearm.[891]  USSG §2B1.3 provides for enhancements ranging from 5 to 7 levels for possessing, brandishing, using, or discharging a firearm,[892] which approximately doubles the otherwise applicable guideline range. USSG §2D1.1 provides for a 2-level enhancement "[i]f a dangerous weapon (including a firearm) was possessed,"[893] which increases the otherwise applicable guideline range by approximately 25 percent. Because the guideline enhancements operate through offense levels rather than prescribing particular lengths of imprisonment, the amount of the increase based on weapon involvement changes in proportion to the seriousness of the offense and the characteristics of the offender.

The guidelines further consider the involvement of a firearm in the context of the various offense- and offender-specific factors that determine the sentencing range. For example, the guidelines provide enhancements for certain aggravating circumstances in addition to firearm involvement, such as death and bodily injury,[894] the abduction or restraint of a person,[895] risks to minors,[896] the offender's aggravating role in the offense,[897] and the offender's criminal history.[898] The guidelines also account for certain mitigating circumstances, such as the offender's minor or minimal role in the offense[899] and acceptance of responsibility.[900]  By viewing weapon involvement as one of many relevant factors and not requiring a specific sentence in addition to the sentence for the underlying offense, the guidelines provide a proportionally higher sentence.

---

[891]  If an offender is convicted of an offense under section 924(c) and an underlying offense for which the applicable guideline provision contains an enhancement for firearm involvement, the guideline enhancement does not apply. *See* USSG §2K2.4 comment. (n.4) ("If a sentence under this guideline [for violations of section 924(c)] is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristics for possession, brandishing, use, or discharge of an explosive or firearm when determining the sentence for the underlying offense.").

[892]  *See* USSG §2B3.1(b)(2).

[893]  USSG §2D1.1(b)(1).

[894]  *See* USSG §§2B3.1(b)(3), 2D1.1(a)(1)–(4).

[895]  *See* USSG §2B3.1(b)(4).

[896]  *See* USSG §2D1.1(b)(13).

[897]  *See* USSG §3B1.1.

[898]  *See* USSG Ch.4, Pt.A.

[899]  *See* USSG §3B1.2.

[900]  *See* USSG §3E1.1.

With those general observations, the Commission offers the following specific findings and recommendations with respect to mandatory minimum penalties for firearm offenses.

a.    "Stacking" mandatory minimum penalties under section 924(c)

Unlike other statutes and sentencing enhancements that apply based on an offender's prior convictions, section 924(c) requires the "stacking" of its mandatory minimum penalties based on multiple offenses charged in the same indictment.[901]  Thus, an offender convicted of an underlying offense and two counts of an offense under section 924(c) will receive consecutive mandatory minimum penalties of at least 5 years and 25 years of imprisonment, in addition to any term of imprisonment imposed for the underlying offense and other counts of conviction. An offender charged with three counts of an offense under section 924(c) will face another consecutive 25-year mandatory minimum penalty.  Such a result may occur even if the offender has no prior record.

The "stacking" of mandatory minimum penalties for multiple violations of section 924(c) results in excessively severe and unjust sentences in some cases.  The sentences for offenders convicted of multiple counts of an offense under section 924(c) were the highest average sentences for any offenders convicted of an offense carrying a mandatory minimum penalty in fiscal year 2010.  Offenders convicted of multiple counts of an offense under section 924(c) received an average sentence of 351 months of imprisonment, which was more than twice the length of the average sentence of 151 months of imprisonment received by offenders convicted of only a single count of an offense under section 924(c).[902]  The underlying offenses committed by these offenders were primarily robbery and drug trafficking offenses.  There are some circumstances where such a long sentence may be appropriate (*e.g.,* in the eight cases in fiscal year 2010 in which the offender's primary guideline was §2A1.1, which covers first degree murder), but there are other circumstances in which the offender received such a long sentence even though the offense did not involve any physical harm or threat of physical harm to a person. This severity mismatch can lead to sentences that are excessively severe and disproportionate to the offense committed.[903]

---

[901]  *See* Deal v. United States, 508 U.S. 129 (1993).

[902]  *See supra* Chapter 9(C)(5).  The Commission further notes that offenders convicted of multiple counts of an offense under section 924(c) received below-range sentences at a higher rate than offenders convicted of an offense carrying a mandatory minimum penalty in drug offenses or sex offenses.  *See* Table 9-3 in Chapter 9.  This high rate of below-range sentences suggests that the courts viewed the guideline range sentence, as it incorporated the mandatory minimum penalties, as too severe.

[903]  The case of Weldon Angelos illustrates the unduly severe sentences that stacking mandatory minimum penalties under section 924(c) produces.  The Judicial Conference of the United States has twice cited Angelos's case in opposition to stacking section 924(c) penalties in its testimony before Congress, and has similarly cited the case in testimony before the Commission.  Angelos was a 24-year-old first-time offender convicted of three counts of an offense under section 924(c), among other offenses, in the District of Utah.  His offense conduct was not extraordinary among drug offenses; he was the target of "controlled buys" in which a governmental informant purchased eight ounces of marijuana from Angelos on three occasions.  On two of those occasions, Angelos was known to have possessed a firearm.  A subsequent search of Angelos's residence revealed three pounds of marijuana and three additional firearms.  Angelos's three convictions of an offense under section 924(c) were based on the two transactions at which he possessed a firearm, and the additional firearms found at his residence.  The district court sentenced Angelos to the mandatory minimum penalty of 55 years of imprisonment for violating section 924(c) (five

While only 147 cases sentenced in fiscal year 2010 involved multiple violations of section 924(c), many stakeholders agree that Congress should address the excessively severe sentences that stacking produces in some cases. The Commission conducted hearings on mandatory minimum sentencing, at which witnesses from a variety of perspectives — including judges,[904] prosecutors[905] and defense counsel[906] — identified the stacking of penalties under section 924(c) as potentially producing unjustly severe sentences. In district interviews with Commission staff, many representatives of the FPD and CJA panels, and some prosecutors, stated that the mandatory minimum penalties for committing multiple violations of section 924(c) are particularly harsh.[907]

The Judicial Conference of the United States has historically opposed mandatory minimum penalties, but it has rarely articulated a policy position with respect to particular mandatory minimum sentencing provisions. Evidencing the strength of its opposition to the stacking of mandatory minimum penalties under section 924(c), the Judicial Conference has urged Congress on at least two occasions to amend the "draconian" penalties established at

---

years for the first section 924(c) offense and consecutive terms of 25 years of imprisonment for the second and third offenses), in addition to a one-day term of imprisonment imposed for the underlying and other offenses. Assuming Angelos receives good-time reductions, he can expect to be eligible for release from prison when he is 78 years old. The sentencing judge concluded that this sentence, though constitutional and required by the statute, was "unjust, cruel, and even irrational," and he further noted that had Angelos been sentenced under the guidelines, his guideline range would have been 97 to 121 months, still a substantial sentence. *See* United States v. Angelos, 345 F. Supp. 2d 1227, 1230-31, 1241 (D. Utah 2004), *aff'd*, 433 F.3d 738 (10th Cir. 2006).

[904] *See* Testimony of Chief Judge Robert J. Conrad, Jr., U.S. District Court for the Western District of North Carolina, to the Commission, at 130 (Feb. 11, 2009) ("Mandatory minimums have the most potential for disproportionate sentencing in the stacking of Title 18 U.S.C. Section 924(c) charges."); *see also Mandatory Minimums and Unintended Consequences: Hearing on H.R. 2934, H.R. 834, and H.R. 1466 Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 111th Cong. 60–61 (2009) (statement of Chief Judge Julie E. Carnes on behalf of the Judicial Conference of the United States) (identifying the stacking of penalties under section 924(c) as among the "most egregious mandatory minimum provisions that produce the unfairest, harshest, and most irrational results"); *Mandatory Minimum Sentencing Laws – The Issues: Hearing Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 110th Cong. 43–101 (2007) (testimony and statement of Judge Paul G. Cassell on behalf of the Judicial Conference of the United States) (criticizing the lengthy sentences produced by stacking section 924(c) penalties).

[905] *See* Testimony of Sally Quillian Yates, U.S. Attorney, Northern District of Georgia, to the Commission, at 59–60 (May 27, 2010) (explaining her personal view that "there are criticisms and concerns about the stacking of 924(c)[ penalties], particularly in a scenario where you have an individual who is charged with multiple 924(c) counts in the same indictment. And so consequently, while the purpose of 924(c) may have originally been as a recidivist statute, where you have an individual who goes out on a spree and robs three banks is now looking at life as a result of that, . . . that might not necessarily be the most appropriate use of the sentencing structure.").

[906] *See* Prepared Statement of Michael S. Nachmanoff, Federal Public Defender for the Eastern District of Virginia, to the Commission, at 25–26, 29 (May 27, 2010) (explaining that "[t]he flat mandatory minimum statutory enhancements for possession or use of a firearm under 18 U.S.C. § 924(c) are among the worst sources of disparity," that the "[s]tacking of § 924(c) counts result in the most egregiously severe sentences," and that the stacking of penalties under section 924(c) "has led to extreme abuses").

[907] *See supra* Chapter 6(C) and (D)(2).

section 924(c) by making it a "true recidivist statute, if not rescinding it all together."[908]  The Judicial Conference has supported its position by observing that the sentences resulting from stacking section 924(c) mandatory minimum penalties are "greater by many years" than the guideline sentences for offenders who commit the most serious, violent crimes.[909]

The Department of Justice has issued policies that allow prosecutors to refrain from charging multiple section 924(c) counts because of the particularly long sentences that stacking can produce.  In September 2003, for example, then-Attorney General John Ashcroft instructed federal prosecutors to "charge and pursue the most serious, readily provable offense or offenses that are supported by the facts of the case."  The memorandum defined the "most serious" offense as the count "that generate[s] the most substantial sentence under the Sentencing Guidelines, unless a mandatory minimum sentence or count requiring a consecutive sentence would generate a longer sentence."[910]  The memorandum instructed prosecutors to charge the first readily provable violation of section 924(c), but it permitted prosecutors not to charge a second violation of section 924(c).  The memorandum recognized that multiple violations of section 924(c) "[i]n many cases . . . will mean that the statutory sentence exceeds the applicable Sentencing Guidelines range, thereby ensuring that the defendant will not receive any credit for acceptance of responsibility and will have no incentive to plead guilty.[911]  Similarly, recent policies implemented by current Attorney General Eric Holder instruct prosecutors to continue to charge the most serious offense but to do so in accordance with an "individualized assessment" of the offender and the circumstances of the particular case.[912]

b.    Inconsistencies in the application of stacked section 924(c) penalties

The severity of the mandatory minimum penalties for violating section 924(c), particularly the penalties for committing multiple violations of section 924(c), has produced inconsistencies in the application of the penalties among judicial districts.  The Commission's sentencing data show that cases involving multiple violations of section 924(c) are concentrated in only a few districts.[913]  The Commission has identified no evidence that those offenses occur more frequently in those districts than in others, and the Commission therefore believes that this

---

[908] *See Mandatory Minimums and Unintended Consequences:  Hearing on H.R. 2934, H.R. 834, and H.R. 1466 Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 111th Cong. 35 (2009) (testimony of Chief Judge Julie E. Carnes on behalf of the Judicial Conference of the United States).

[909] *See id.*

[910] *See* Memorandum from John Ashcroft, Attorney General, to all Federal Prosecutors dated September 22, 2003, regarding Department Policy Concerning Charging Criminal Offenses, Disposition of Charges, and Sentencing, *available at* http://www.justice.gov/opa/pr/2003/September/03_ag_516.htm.

[911] *See id.*

[912] *See* Memorandum from Eric H. Holder, Jr., Attorney General, to all Federal Prosecutors dated May 19, 2010, regarding Department Policy on Charging and Sentencing, *available at* http://www.justice.gov/oip/holder-memo-charging-sentencing.pdf.

[913] *See* Figure 9-2, Figure 9-3, and accompanying text in Chapter 9.

geographic concentration is attributable to inconsistencies in the charging of multiple violations of section 924(c).  Accordingly, in the context of multiple violations of section 924(c), offenders who commit similar offenses are treated differently — resulting in dramatically different sentencing outcomes — based largely on the judicial district in which they are charged.

In interviews conducted with federal prosecutors, most U.S. Attorney's offices stated that they consistently charge the first, readily provable violation of section 924(c). [914]  There was, however, at least one exception to this general practice.  One office acknowledged that it frequently exercised its discretion not to immediately charge the first violation of section 924(c) where the underlying offense was a drug trafficking offense rather than a crime of violence.  In those circumstances, the office waited to charge the first violation of section 924(c) until it appeared that the case would proceed to trial.  In another district, according to defense counsel, even though the first section 924(c) violation was consistently charged, in drug trafficking cases the government was frequently willing to dismiss that count and instead seek application of the 2-level dangerous weapon guideline enhancement in exchange for a guilty plea. [915]

The Commission's interviews with prosecutors and defense attorneys confirmed that there are divergent practices among U.S. Attorney's offices with respect to charging multiple violations of section 924(c).  The interviews further confirmed that some of the inconsistencies in the charging of multiple section 924(c) counts are attributable to the severity of stacking the mandatory minimum penalties.  Prosecutors in some districts reported that they always charge multiple violations of section 924(c) when supported by the facts, while prosecutors in other districts reported that they "rarely" charge multiple violations of section 924(c).  Other prosecutors reported that they charge multiple violations of section 924(c) only when the facts of the particular case warrant the severe penalties, as in the case of violent crimes.  Defense attorneys in those districts generally confirmed the local practices with respect to charging multiple violations of section 924(c). [916]

c.    Definitions of underlying and predicate offenses

The statutory definitions of "violent felony" and "serious drug offense" in 18 U.S.C § 924(e)(2) may contribute to inconsistent application of the Armed Career Criminal Act's 15-year mandatory minimum penalty.  Those statutory definitions depend, in part, on the varying statutory maximum penalties for offenses provided by the states.  The 15-year mandatory minimum applies to an offender convicted of an offense under 18 U.S.C. § 922(g) if the offender also "has three previous convictions by any court . . . for a violent felony or a serious drug offense, or both." [917] The definitions of "violent felony" and "serious drug offense" require only that the prior offense be punishable by a maximum term of more than one year or at least ten

---

[914]  *See supra* Chapter 6(D)(2).

[915]  *See id.*

[916]  *See id.*

[917]  *See* 18 U.S.C. § 924(e)(1).

years of imprisonment, respectively.[918]  As a result, the Armed Career Criminal Act's mandatory minimum penalty can apply to offenders who served no or minimal terms of imprisonment for their predicate offenses, further increasing the potential for inconsistent application insofar as the penalty may be viewed as excessively severe in those cases.

The Commission further notes that ongoing uncertainty exists as to which crimes qualify as underlying and predicate offenses for purposes of section 924(c) and the Armed Career Criminal Act.  This uncertainty stems from the difficulty in applying the statutory definitions of "crime of violence," "drug trafficking crime," "violent felony," and "serious drug offense," as evidenced by the substantial litigation and criticisms these definitions have generated.[919]  Uncertainty in applying these statutory definitions increases the potential for inconsistent application of the mandatory minimum penalties and burdens limited judicial and prosecutorial resources.

      d.    <u>Demographic effects</u>

There are notable demographic differences in the application of mandatory minimum penalties for firearm offenses.  Black offenders constitute the majority of offenders convicted of an offense under section 924(c) (55.9%) and the majority of offenders who remain subject to its mandatory minimum penalties at sentencing (55.7%).  Black offenders constitute an even greater proportion (61.0%) of offenders convicted of multiple counts of an offense under section 924(c).  By contrast, White and Hispanic offenders constitute only 15.1 and 21.2 percent of offenders convicted of multiple counts of an offense under section 924(c), respectively.[920]

Similarly, Black offenders constitute a majority of offenders who qualify for the Armed Career Criminal Act's 15-year mandatory minimum penalty (63.7%) and of offenders who remain subject to its mandatory minimum penalty at sentencing (63.9%).  White and Hispanic offenders, by comparison, constitute only 29.5 percent and 5.2 percent of offenders who qualify for the Armed Career Criminal Act's 15-year mandatory minimum penalty, respectively.[921]

The effects of these demographic differences are two-fold.  First, to the extent the mandatory minimum penalties for firearm offenses are unduly severe, these effects fall on Black offenders to a greater degree than on offenders in other racial groups.  Second, as in drug

---

[918] *See* 18 U.S.C. § 924(e)(2).

[919] *See, e.g.,* Chambers v. United States, 555 U.S. 122, 133-34 (2009) (Alito, J., concurring) ("After almost two decades with *Taylor*'s 'categorical approach,' only one thing is clear: ACCA's residual clause is nearly impossible to apply consistently.  Indeed, the 'categorical approach' to predicate offenses has created numerous splits among the lower federal courts, the resolution of which could occupy this Court for years."); James v. United States, 550 U.S. 192, 216 (2007) (Scalia, J., dissenting) ("Years of prison hinge on the scope of ACCA's residual provision, yet its boundaries are ill defined.").

[920] *See* Table 9-1 in Chapter 9.

[921] *See* Table 9-4 in Chapter 9.

offenses, demographic differences in the application of mandatory minimum penalties for firearm offenses create perceptions of unfairness and unwarranted disparity.[922]

### e.    Recommendations for firearm offenses

In light of these findings and observations, the Commission recommends that Congress consider amending the mandatory minimum penalties established at 18 U.S.C. § 924(c) to ameliorate the problems associated with mandatory minimum penalties for firearm offenses. Congress could do so in a number of ways.

#### i.    *Amend the length of section 924(c) penalties*

Congress should consider amending the mandatory minimum penalties established at section 924(c), particularly the penalties for "second or subsequent" violations of the statute, to lesser terms. Section 924(c), for example, requires a 25-year mandatory minimum penalty for offenders convicted of a "second or subsequent" violation of the statute. Reducing the length of the mandatory minimum penalty would reduce the risk of excessive severity, permit the guidelines to better account for the variety of mitigating and aggravating factors that may be present in the particular case, and mitigate the inconsistencies in application produced by the severity of the existing mandatory minimum penalties.

#### ii.    *Make section 924(c) a "true" recidivist statute*

Congress should consider amending section 924(c) so that the increased mandatory minimum penalties for a "second or subsequent" offense apply only to *prior* convictions. In those circumstances, the mandatory minimum penalties for multiple violations of section 924(c) charged in the same indictment would continue to apply consecutively, but would require significantly shorter sentences for offenders who do not have a prior conviction under section 924(c). This would reduce the potential for overly severe sentences for offenders who have not previously been convicted of an offense under section 924(c), and ameliorate some of the demographic impacts resulting from stacking.

#### iii.    *Give discretion to impose concurrent sentences for multiple section 924(c) violations*

Congress should consider amending section 924(c) to give the sentencing court limited discretion to impose sentences for multiple violations of section 924(c) concurrently. Congress has recently used this approach in enacting the offense of aggravated identity theft and the accompanying mandatory penalty at 18 U.S.C. § 1028A. This limited discretion would provide the flexibility to impose sentences that appropriately reflect the gravity of the offense and reduce the risk that an offender will receive an excessively severe punishment.

---

[922]  It should be noted that Blacks also are victims of violent crime at a higher rate than members all other racial groups except Native American/Alaska Natives, and Blacks are the victims of violent crimes involving a firearm more often than members of all other racial groups. *See* Erika Harrell, Bureau of Justice Statistics, U.S. Department of Justice, *Black Victims of Violent Crime* 3–5 (2007).

### iv.    *Amend statutory definitions*

Congress should consider clarifying the statutory definitions of the underlying and predicate offenses that trigger mandatory minimum penalties under section 924(c) and the Armed Career Criminal Act to reduce the risk of inconsistent application and the litigation that those definitions have fostered.  To further reduce the risk of inconsistent application, Congress also should consider more finely tailoring the definitions of the predicate offenses that trigger the Armed Career Criminal Act's mandatory minimum penalty.

### 3.    *Sex Offenses*

As discussed in Chapter 10, there are two types of federal sex offenses — sexual abuse (or "contact") offenses and child pornography offenses (other than an offense related to the production of pornography depicting an actual child, which is deemed a "contact" offense). Many of these offenses carry mandatory minimum penalties.

The Commission's review of available sentencing data indicates that further study of these penalties is needed before it can offer specific recommendations in this area.  However, preliminary review of the available sentencing data suggests that the mandatory minimum penalties for certain child pornography offenses and the resulting guidelines sentencing ranges may be excessively severe and as a result are being applied inconsistently.  For example, in fiscal year 2010, 41.9 percent of the offenders convicted of a child pornography offense carrying a mandatory minimum sentence received a sentence below the guidelines range for a reason not sponsored by the government, a higher rate than for any other major offense type.[923]  This high non-government sponsored below range rate is consistent with the views of federal district judges expressed in the Commission's 2010 survey in which almost three-quarters (71%) of judges surveyed stated that the mandatory minimum penalty for receipt of child pornography is too high, and over one-third (37%) stated the mandatory minimum penalty for distribution of child pornography is too high.[924]

Sentencing data for fiscal year 2010 also suggests that prosecutors may believe the mandatory minimum penalties for certain child pornography offenses, and the resulting guidelines sentencing range, are excessive in individual cases.  The Commission reviewed sentencing data for a 20-percent sample (336 of 1,669) of offenders sentenced under §2G2.2, the guideline that covers trafficking, receipt, and possession of child pornography.  This review revealed that over half (53.0%) of offenders convicted of possession of child pornography, which does not carry a mandatory minimum penalty, engaged in distribution conduct that could have been prosecuted under a statute carrying a mandatory minimum penalty.[925]  In addition, in 9.2 percent of all child pornography cases sentenced in fiscal year 2010, the offender received a

---

[923] *See* Table 10-6 in Chapter 10.

[924] *See* Commission, *Results of Survey of United States District Judges:  January 2010 through March 2010*, at 5 (2010).  In contrast, 23% and 26% of respondents stated that the mandatory minimum penalties for production of child pornography and "other child exploitation offenses" are too high.  *Id.*

[925] *See* Figure 10-13 in Chapter 10.

sentence below the guidelines range for reasons sponsored by the government other than substantial assistance.[926]

The current structure of the statutory penalties for certain child pornography offenses may be causing inconsistent practices.  In particular, there does not seem to be a significant practical difference in the offense conduct that constitutes simple possession of child pornography, which does not carry a mandatory minimum penalty, and offense conduct that constitutes receipt of child pornography, which carries a five-year mandatory minimum penalty.  Although it is technically possible for an offender to knowingly possess child pornography without having knowingly received it,[927] in the vast majority of child pornography cases the offender in fact knowingly received the child pornography that was possessed.[928]  The Commission believes that further study of both the manner in which offenders receive child pornography and how child pornography cases are charged is necessary in order to assess whether the significant differences in the statutory penalties for simple possession and receipt of child pornography are warranted.

In response to concerns raised about the guidelines pertaining to child pornography offenses generally and the preliminary findings contained in this report, the Commission is undertaking a more comprehensive study of child pornography offenses and expects to issue a report in the near future.

### 4.    Identity Theft Offenses

Section 1028A establishes the offense of aggravated identity theft and carries a two-year mandatory penalty.[929]  The aggravated identity theft offense, established in 2004, is relatively new and there is continuing uncertainty regarding the proof required to show a violation of the statute.[930]  Prosecutions of aggravated identity theft offenses are heavily concentrated in only a handful of districts,[931] and identity theft offenses are still emerging as a federal law enforcement priority.[932]  These factors make it difficult to issue specific findings and recommendations

---

[926]  *See* Table 10-6 in Chapter 10.

[927]  *See, e.g.*, United States v. Myers, 355 F.3d 1040, 1042 (7th Cir. 2004); United States v. Ehle, 640 F.3d 689, 698 (6th Cir. 2011).

[928]  *Cf.* United States v. Richardson, 238 F.3d 837, 839-40 (7th Cir. 2001) (Posner, J.) (finding the distinction between possession and receipt of child pornography to be "tenuous" and "puzzl[ing]"); *see also* Stephen L. Bacon, *A Distinction without a Difference: "Receipt" and "Possession" of Child Pornography and the Double Jeopardy Problem*, 65 U. MIAMI L. REV. 1027 (2011).

[929]  18 U.S.C. § 1028A.

[930]  The Supreme Court only recently clarified the *mens rea* required to commit an offense under section 1028A, *see* Flores-Figueroa v. United States, 129 S. Ct. 1886 (2009), and the Commission's field interviews with prosecutors revealed some differences in prosecutors' views regarding the difficulty of establishing violations of section 1028A, *see supra* Chapter 6(D)(4).

[931]  *See* Figure 11-3 and accompanying text in Chapter 11.

[932]  *See* notes 812–813 and accompanying text in Chapter 11.

regarding the operation of section 1028A at this time.  However, the Commission offers the following general observations with respect to section 1028A.

The Commission notes that section 1028A differs from other, more commonly used mandatory minimum penalties in several respects.  Unlike other mandatory minimum penalties, section 1028A establishes a fixed, definite mandatory penalty that requires a relatively short term of imprisonment.  As a result, the sentences for committing aggravated identity theft are comparable to sentences that might be imposed for violating the general identity theft statute or for receiving guideline enhancements for identity theft conduct.  Although the mandatory penalty must be imposed consecutively to any term of imprisonment received for the underlying offense, section 1028A also gives the court discretion to impose the terms of imprisonment for multiple violations of section 1028A concurrently to each other, rather than consecutively.  Finally, section 1028A does not include graduated penalties for subsequent violations, and its application does not depend on weapon involvement or criminal history.

The Commission believes that those differences may explain why some of the problems associated with mandatory minimum penalties for other offenses are not observed, or are not as pronounced, in identity theft offenses.  Like other mandatory minimum penalties, section 1028A imposes a sentence based on a narrow set of facts without considering the multitude of mitigating and aggravating circumstances that the guidelines take into account.  The relatively short length of the two-year mandatory penalty, however, ameliorates to some extent the risk of excessive severity that other mandatory minimum provisions present.  Similarly, the court's discretion to impose penalties for multiple violations of section 1028A concurrently further reduces the risk of over severity, while also allowing the court to impose longer terms of imprisonment when warranted by the circumstances of a particular case.

Unlike other mandatory minimum penalties, there are no notable demographic differences in the application of section 1028A.  In particular, the mandatory penalty for violating section 1028A does not appear to fall more heavily on some racial groups than on others,[933] perhaps in part because its application does not depend on weapon involvement or criminal history.

Finally, although there may be some inconsistencies in the application of section 1028A among judicial districts, the Commission believes these inconsistencies may be attributable to the interpretation of the relatively new section 1028A offense[934] and, in any event, the penalty's relatively short length mitigates the problems associated with its inconsistent application.

## D.    SUMMARY OF RECOMMENDATIONS

The Commission makes the following specific recommendations for congressional consideration:

---

[933]  *See* Table 11-2 in Chapter 11.

[934]  *See* Chapter 6(D)(4).

*General Recommendations*

- A strong and effective sentencing guidelines system best serves the purposes of the Sentencing Reform Act. Although the continued importance and influence of the guidelines on sentencing decisions is evident from both Supreme Court decisions and sentencing data, the Commission has observed increasing inconsistencies in sentencing practices since *Booker*. The Commission is concerned about these developments and stands ready to work with Congress on possible legislative reforms to strengthen and improve the sentencing guidelines system.

- If Congress decides to exercise its power to direct sentencing policy by enacting mandatory minimum penalties, the Commission believes that such penalties should (1) not be excessively severe, (2) be narrowly tailored to apply only to those offenders who warrant such punishment, and (3) be applied consistently. Sentencing data and interviews with prosecutors and defense attorneys indicate that mandatory minimum penalties that are considered excessively severe tend to be applied inconsistently.

- Congress should consider whether a statutory "safety valve" mechanism similar to the one available for certain drug trafficking offenders at 18 U.S.C. § 3553(f) may be appropriately tailored for low-level, non-violent offenders convicted of other offenses carrying mandatory minimum penalties.

- Congress should request prison impact analyses from the Commission as early as possible in its legislative process whenever it considers enacting or amending criminal penalties. The Commission believes that early analyses of prison impact may assist Congress in focusing increasingly strained federal prison resources on offenders who commit the most serious offenses.

*Drug offenses*

- Congress should consider marginally expanding the safety valve at 18 U.S.C. § 3553(f) to include certain non-violent offenders who receive two, or perhaps three, criminal history points under the guidelines.

- Congress should reassess both the severity and scope of the recidivist provisions at 21 U.S.C. §§ 841 and 960.

*Firearms offenses*

- Congress should consider amending 18 U.S.C. § 924(c) so that the enhanced mandatory minimum penalties for a "second or subsequent" offense apply only to prior convictions, and should consider amending the penalties for such offenses to lesser terms.

- Congress should eliminate the "stacking" requirement and amend 18 U.S.C. § 924(c) to give the sentencing court discretion to impose sentences for multiple violations of section 924(c) concurrently with each other.

- Congress should consider clarifying the statutory definitions of the underlying and predicate offenses that trigger mandatory penalties under 18 U.S.C § 924(c) and the Armed Career Criminal Act to reduce the risk of inconsistent application and litigation that those definitions have fostered. To further reduce the risk of inconsistent application, Congress should also consider more finely tailoring the definitions of the predicate offenses that trigger the Armed Career Criminal Act's mandatory minimum penalty.

*Sex offenses*

- The Commission's preliminary review of the available sentencing data suggests that the mandatory minimum penalties for certain non-contact child pornography offenses may be excessively severe and as a result are being applied inconsistently. The Commission is undertaking a more comprehensive study of child pornography offenses and expects to issue a report in the near future.

*Identity theft offenses*

- The problems associated with certain mandatory minimum penalties are not observed, or are not as pronounced, in identity theft offenses. The Commission believes this is due, in part, to 18 U.S.C. § 1028A requiring a relatively short mandatory penalty and not requiring stacking of penalties for multiple counts. The statute is relatively new and is used in only a handful of districts, however, so specific findings are difficult to make at this time.

## E.    CONCLUSION

The Commission intends for the information contained in this report to contribute to the ongoing assessment of mandatory minimum penalties by Congress and others in the federal criminal justice system. While there is a spectrum of views among members of the Commission regarding mandatory minimum penalties, the Commission continues to believe that a strong and effective sentencing guidelines system best serves the purposes of the Sentencing Reform Act. The Commission stands ready to work with Congress on measures that can be taken to enhance the strength and effectiveness of the current guidelines system and address the problems with certain mandatory minimum penalties identified in this report. To that end, as required by the Sentencing Reform Act, the Commission will continue providing timely and objective sentencing data, information, and analysis to assist the efficient and effective exercise of congressional power to direct sentencing policy.

**Internet Sources Cited in Opinions**

In order to preserve information for research purposes, websites cited in precedential and nonprecedential opinions for the United States Court of Appeals for the Third Circuit are captured when possible. Because some URLs cited in opinions may change over time or disappear altogether, an attempt is made to capture, as closely as possible, the material cited in an opinion at the time of its release. However, capture dates may not match the "as visited" date contained in an opinion's citation to that material. **<u>Any use of captured website information is the sole responsibility of the user.</u>**  All captured information is provided in good faith for research purposes. The Third Circuit Court of Appeals and its employees shall have no responsibility for the accuracy, content, completeness, legality, or reliability of captured information and cannot be held liable for any loss, damage, or expense which arises as a result of use. The content of a capture may be protected by copyright and/or related rights. Use of captured information may require permission from the rights holder(s).

