**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 16-2795
_____

UNITED STATES OF AMERICA

v.

ASKIA WASHINGTON,
a/k/a SKI

Askia Washington,
Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal No. 2:13-cr-00171-002)
District Judge: Honorable Joel H. Slomsky
_____

Argued on February 7, 2017

Before: MCKEE, COWEN, and FUENTES, *Circuit Judges*

(Opinion Filed: August 28, 2017)

Mark S. Greenberg, Esq. **[Argued]**
920 Lenmar Drive
Blue Bell, PA 19422
        *Counsel for Appellant*

Eric B. Henson, Esq. **[Argued]**
Bernadette McKeon, Esq.
Zane David Memeger, Esq.
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
        *Counsel for the Appellee*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*.

Defendant-appellant Askia Washington was ensnared by a "stash house reverse sting" operation—one which hit many of the by-now-familiar beats.[1]    Acting on what appeared to be insider information from a drug courier, Washington and his three co-conspirators planned to rob a Philadelphia property where they thought 10 kilograms of cocaine were being stored for distribution.    But as they discovered on the day of the robbery, the "stash house" was a

---

[1] *See United States v. Pedrin*, 797 F.3d 792, 794 (9th Cir. 2015) (explaining the basic framework of stash house reverse sting operations), *cert. denied*, 136 S. Ct. 2401 (2016).

trap set by law enforcement. Their "courier" was an undercover federal agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), which had developed the scenario from the ground up. The cocaine did not exist.

Under federal law on conspiracy and attempt, the government could, and did, prosecute the crew as if fantasy had been reality. Washington, the sole member to take his chances at trial, was convicted by a jury of two Hobbs Act robbery charges and two drug charges (18 U.S.C. § 1951(a) and 21 U.S.C. § 846), although he was acquitted on a gun charge.

Developed by the ATF in the 1980s to combat a rise in professional robbery crews targeting stash houses, reverse sting operations have grown increasingly controversial over the years, even as they have grown safer and more refined. For one, they empower law enforcement to craft offenses out of whole cloth, often corresponding to statutory offense thresholds. Here, the entirely fictitious 10 kilograms of cocaine triggered a very real 20-year mandatory minimum for Washington, contributing to a total sentence of 264 months in prison—far more than even the ringleader of the conspiracy received. For another, and as Washington claimed on multiple occasions before the District Court—and now again on appeal—people of color are allegedly swept up in the stings in disproportionate numbers.

These elements of controversy are bound up in the three claims Washington now raises on appeal. Two are constitutional claims: Washington challenges his conviction and sentence by arguing that the use of the statutory mandatory minimum term violated his rights to due process,

and he also alleges that the attorney who represented him at trial rendered constitutionally ineffective assistance.  While stash-house reverse stings can raise constitutional concerns, the use of a mandatory minimum sentence on these particular facts did not deprive Washington of his right to due process. And while this is the rare case where a claim of ineffective assistance of counsel was properly raised on direct appeal instead of through a collateral attack, Washington has not shown prejudice sufficient to call into doubt the integrity of his trial.  We thus conclude that both constitutional claims are without merit.

The remaining claim challenges the District Court's decision to deny Washington pretrial discovery on ATF's operations and enforcement statistics.  Washington contends that, in denying his motion, the District Court erroneously relied on the hard-to-meet test for "selective prosecution" discovery developed by the Supreme Court in *United States v. Armstrong*[2] and *United States v. Bass*[3] (which we will refer to as "*Armstrong/Bass*").  He encourages us to follow instead the *en banc* Seventh Circuit's recent opinion in *United States v. Davis*,[4] which distinguished between claims of selective prosecution and selective *law enforcement* and appeared to endorse a relaxed discovery standard for the latter.

Like the Seventh Circuit, we conclude that the proposed distinction between enforcement and prosecution is well taken, and that the law supports greater flexibility when

---

[2] 517 U.S. 456 (1996).

[3] 536 U.S. 862 (2002) (per curiam).

[4] 793 F.3d 712 (7th Cir. 2015) (en banc).

4

the discretionary decisions of law enforcement, rather than those of prosecutors, are targeted by a defendant's request for discovery. We therefore hold that a district court may exercise its discretion to grant limited discovery, or otherwise to conduct *in camera* analysis of government data before deciding whether limited discovery is warranted. A district court may do so even if a defendant seeking discovery on a selective enforcement claim has not otherwise met his or her full burden under *Armstrong/Bass*. Because the District Court in this case thought that its discretion was cabined by *Armstrong/Bass*, and because we cannot otherwise say that the same result would have occurred under the standard we announce today, we will vacate the orders denying discovery and remand for limited post-judgment proceedings. The judgment of conviction and sentence are otherwise unaffected by this remand.

## I. BACKGROUND

### A. The Plan[5]

Codefendant and ringleader Dwight Berry came to the attention of the ATF in late 2012, when he made it known that he was interested in conducting robberies of drug users and dealers. In the course of asking around, Berry spoke to an acquaintance who, unbeknownst to him, was an ATF confidential informant ("CI"). The CI alerted the ATF, which determined that Berry's criminal history fit its required profile for a sting operation and opened an investigation in February 2013, under the supervision of ATF Special Agent John Bowman. From here on out, many of the meetings and phone calls about the developing robbery plan would be surreptitiously recorded for playback at trial.

Meanwhile, the CI kept Berry on the line with word of a connection: a drug-courier friend who frequented a South Philadelphia stash house on his trips to and from New York. When Berry and the CI met again, they were joined by the

---

[5] Our description of the trial and underlying scheme is drawn primarily from the District Court's opinion denying Washington's motion for a new trial, *United States v. Washington* [hereinafter "*Washington New Trial*"], 184 F. Supp. 3d 149 (E.D. Pa. 2016). Washington accepts the factual accuracy of the District Court's opinion, *see* Washington Br. at 7 n.4, and both parties have structured their briefs around it. As Washington is not challenging the sufficiency of the evidence, we strive to recite the facts in a balanced manner. *See United States v. Cox*, 851 F.3d 113, 118 n.1 (1st Cir. 2017).

supposed drug courier—in reality, undercover ATF Special Agent Patrick Edwards, a veteran of over a dozen robbery scenarios. In his role as the courier, Edwards reported seeing over 10 kilograms of cocaine (in the context of cocaine "bricks") inside a cooler during a trip to the stash house. Berry indicated that he knew of a crew who might be interested in participating in the robbery and that he was willing to engage in violence if necessary.

Washington first entered the picture about a week and a half after this encounter as one of two members of Berry's proposed robbery crew (the other man, never identified, apparently dropped out of the plan shortly afterwards). At another meeting in early March 2013 with Berry, Edwards, and the CI, Washington probed Edwards about the logistics of the robbery: what level of resistance they could expect, whether the house would be watched from the outside, and so on. Prompted by Edwards, the conspirators also discussed how to move and sell the stolen cocaine.[6]

---

[6] As captured by the recording, and as later explained at trial, the conspirators made frequent reference to "jawns" or "jauns," a distinctive Philadelphia regionalism that serves as a wildcard stand-in for other nouns. *See* Dan Nosowitz, *The Enduring Mystery Of 'Jawn', Philadelphia's All-Purpose Noun*, Atlas Obscura, http://www.atlasobscura.com/articles/the-enduring-mystery-of-jawn-philadelphias-allpurpose-noun (last visited Aug. 21, 2017; archived at https://perma.cc/6XM6-JQEW); *see also United States v. Gibbs*, 190 F.3d 188, 200 n.4 (3d Cir. 1999) ("Apparently, 'jawn' is slang for any noun, and throughout this case it was used variously to describe a car, cocaine, a nightclub, and a beeper.").

In a subsequent phone discussion, Edwards pressed Berry on the professionalism of his crew. Berry, in an attempt to reassure, told Edwards that "[t]his is what [our crew] do[es]."[7]  When Edwards singled out Washington for concern over a perceived lack of robbery experience, Berry said that Washington "rock[ed] out" and "put work in," which Edwards interpreted to mean that Washington was some sort of shooter or enforcer.[8]

On the day of the robbery, Washington and Berry met at Berry's mother's house, where Berry picked up two guns and hid them in an Eggo Waffles box.  The group, which had added two new members—codefendants Antonio Ellis and Jermau Johnston—then gathered in the parking lot of the Philadelphia Airport Hilton to review its plan.  (Washington's girlfriend was also present, although she did not participate and remained in her parked car.)  Edwards went over the salient details once more, emphasizing the 10 kilograms of cocaine and explaining that no money would be found in the house.

In three cars—Berry, Ellis, and Johnston in a minivan; Washington and his girlfriend (the latter driving) following behind in a Chrysler 300; and Agent Edwards bringing up the rear—the crew made its way to the chosen address on Passyunk Avenue in southwest Philadelphia.  As the caravan moved in, agents swooped down.  All but Berry surrendered; Berry fled on foot but was apprehended shortly afterwards. From the minivan, law enforcement recovered two guns, ammo, gloves, and zip-ties.  From Washington's Chrysler

---

[7] Supplemental Appendix (S.A.) 55.

[8] S.A. 60–61.

300, they recovered a backpack, gloves, a mask, a lighter, and lighter fluid.

### B. Procedural History

What follows is an abbreviated summary of the criminal proceedings, setting up the claims that Washington now raises on appeal. We will return in greater detail to the salient parts later, in the Analysis section of this opinion.

### 1. Indictment; Codefendants Plead Guilty

In April 2013, the four men were indicted in the Eastern District of Pennsylvania. Counts 1 and 2 of the indictment charged attempt/conspiracy to commit Hobbs Act robbery (18 U.S.C. § 1951(a)), while counts 3 and 4 charged attempt/conspiracy to possess with intent to distribute five kilograms or more of cocaine (21 U.S.C. § 846 through 21 U.S.C. § 841(a)(1), (b)(1)(A)). Count 5 charged all of the defendants with carrying a firearm during a crime of violence (18 U.S.C. § 924(c)) and count 6 charged all but Johnston with being felons in possession of a firearm (18 U.S.C. § 922(g)(1)).[9]

Washington's codefendants eventually pleaded guilty. Johnson and Ellis received 27-month and 46-month sentences, respectively. Although Berry, the ringleader, faced

---

[9] The government later obtained a superseding indictment against Washington. A minor modification of the original, it focused on Washington as a defendant and amplified a few of the factual allegations.

a Guidelines range of 270–322 months, his binding plea agreement reflected a 180-month sentence,[10] and the government did not seek to formally introduce his previous, eligible convictions to secure an enhanced mandatory minimum penalty.  Berry ultimately received the agreed-upon 180-month custodial sentence.

Unlike his codefendants, Washington pleaded not guilty and prepared for trial.  He was assigned a Criminal Justice Act attorney, whom we will refer to as the "defense counsel" or "trial counsel."

## 2.  Motion for Discovery

During the pretrial phase, Washington moved (both pro se and through trial counsel) for discovery relating to sting operations and related prosecutions, which he claimed to be racially motivated.  Trial counsel's filing cited three prior federal prosecutions in which all of the defendants were African American.  The moving papers also clarified that the discovery was sought not for trial defense, but rather to support a motion to dismiss the indictment on the basis of "racial profiling or selective prosecution . . . by the Philadelphia District Office of [ATF] . . . in complicity with" the U.S. Attorney's Office.[11]

After oral argument, and as set forth in a thoughtful opinion, the District Court denied Washington's motion for discovery.  Finding the *Armstrong*/*Bass* standard to control,

---

[10] Plea agreements under Fed. R. Crim. P. 11(c)(1)(C) "bind[] the court once the court accepts the plea agreement."

[11] Discovery Motion at 1, ECF No. 126.

the District Court held that Washington failed to meet this "rigorous standard to obtain discovery,"[12] and later denied Washington's requests for reconsideration.

### 3. Recordings Deemed Admissible; Government Seeks Enhanced Mandatory Penalties

With discovery denied, Washington did not file an actual motion to dismiss the indictment, and the parties otherwise prepared for trial. In an important ruling, the District Court decided that the government could use the audio and video recordings and related transcripts at trial. Meanwhile, the government filed a 21 U.S.C. § 851 information stating that Washington had a prior Pennsylvania drug felony conviction from 2004—a prerequisite to enhanced mandatory minimum penalties at sentencing.

### 4. The District Court Revisits Discovery on the Eve of Trial

In June 2015, prior to opening statements, the District Court revisited the matter of discovery in the context of trial defenses. Referring back to *United States v. Alexander*,[13] a Northern District of Illinois opinion cited in the earlier decision denying discovery, the District Court ordered the government to release redacted portions of an ATF policy

---

[12] *United States v. Washington* [hereinafter "*Washington Discovery*"], No. 13-171-2, 2014 WL 2959493, at *7 (E.D. Pa. June 30, 2014).

[13] No. 11 CR 148-1, 2013 WL 6491476 (N.D. Ill. Dec. 10, 2013).

manual on stash house sting operations—patterned after the disclosures ordered in *Alexander*. The District Court then issued a protective order restricting defense counsel's use of the disclosed material.

### 5. Washington's Trial

Over the five-day trial, defense counsel used the ATF disclosures to advance his theory of the case: Washington did not have the requisite intent to commit a dubious, discriminatory "conspiracy" that ATF had designed from the ground up.[14] For instance, counsel pointed to Washington's use of a separate vehicle and the presence of his girlfriend on the day of the robbery to suggest that he was cautious and not fully committed. Counsel also utilized the disclosed ATF materials to cross-examine supervising ATF Agent Bowman.

But during that cross-examination, trial counsel appeared to fumble. He was attempting to show that, as Agent Bowman would later admit, the only person "targeted" by the ATF prior to the arrest was Berry, and that the ATF knew nothing about the other conspirators and could not have ensured that they fit its target profile, which required (in part) a violent criminal history. But in addition to asking whether Washington had a prior robbery arrest (which he did not), trial counsel also asked Agent Bowman whether Washington had a drug arrest. This question effectively allowed the prosecution to bring out Washington's prior drug conviction on redirect.

---

[14] We note that entrapment was not raised as a defense and is not now at issue on appeal.

### 6. The Jury Verdict

The jury returned a guilty verdict on counts one through four of the superseding indictment: the drug and Hobbs Act robbery charges. It returned a not-guilty verdict on firearm count five; firearm count six was dismissed on the government's motion.[15] The jury specifically found that the government proved beyond a reasonable doubt that the (fictitious) cocaine at the center of the conspiracy was five kilograms or more.

### 7. Pre-Sentencing Investigation into Trial Counsel's Constitutional Effectiveness

Shortly after the trial, Washington wrote a letter to the District Court requesting a substitution of attorney. He alleged, in part, that trial counsel had been under the influence of alcohol throughout the trial.

The District Court swiftly reacted, appointing a new Criminal Justice Act attorney, Mark Greenberg—who has represented Washington ever since—in what became, in effect, a pre-sentencing investigation of trial counsel's performance. After the District Court held an evidentiary hearing, Attorney Greenberg filed a formal motion for new trial predicated on the alleged ineffective assistance of trial counsel. This motion included an attack on trial counsel's questions during cross-examination of Agent Bowman that opened the door to the introduction of Washington's drug conviction. The motion was ultimately denied, with the District Court finding in part that the "mountain" of evidence

---

[15] *See* Order, ECF No. 219.

against Washington forestalled a showing of prejudice under the two-part *Strickland v. Washington*[16] test for ineffective assistance of counsel.[17]

## 8.  Sentencing Proceedings

The ineffectiveness question resolved for the time being, the parties and District Court prepared for sentencing. Because of his criminal history, Washington was classified as a "Career Offender" under the Sentencing Guidelines.  As a result of Guidelines calculations we need not delve into, that Career Offender status overrode the lower Guidelines level derived from quantity of drugs, yielding a sentencing range of 360 months to life in prison.[18]

In his sentencing memoranda, Washington challenged the proposed sentencing range, emphasizing the troubling nature of the sting operation and requesting that the District Court take into account the sentences of his co-conspirators. He also asked the District Court to disregard the mandatory minimum sentence of 20 years; if "the reverse sting in this case involved 0.9 kilograms of non-existent cocaine," he argued, "Mr. Washington would not be facing a mandatory minimum sentence."[19]    In response, the government emphasized that the mandatory minimum penalty was just that: mandatory.    Evincing some discomfort with the 20-year mandatory minimum, the District Court nevertheless

---

[16] 466 U.S. 668 (1984).

[17] *See Washington New Trial*, 184 F. Supp. 3d at 160–62.

[18] *See* U.S.S.G. § 4B1.1(b).

[19] Supplemental Sentencing Memorandum at 2, ECF No. 275.

ruled that he was "bound to follow the law,"[20] imposing a 24-month sentence on the Hobbs Act robbery charges and a 240-month consecutive sentence on the drug charges for a total term of 264 months' imprisonment.  Washington timely appealed.[21]

## II.   Analysis

Washington's constitutional challenges, which directly attack the judgment of conviction and sentence, are considered first.  We will then turn to his *Armstrong/Bass* discovery claim.

### A.  Ineffective Assistance of Counsel

Although he again invokes trial counsel's alcohol use, Washington otherwise limits his ineffectiveness claim on appeal to the incident where trial counsel opened the door to testimony about his drug conviction.  He attacks the District Court's determination that the "overwhelming" evidence at trial precluded a showing of prejudice, and emphasizes, in particular, the jury's acquittal on the firearm count and an alleged conflation of the prejudicial impact of the admission on the robbery counts with the far-greater impact on the drug counts.

---

[20] S.A. 211.

[21] We have appellate jurisdiction through 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

### 1. Ineffectiveness Claims on Direct Appeal

We open with the observation that ineffective assistance of counsel claims are generally not considered on direct appeal. Instead, they are more commonly brought in a collateral proceeding, such as through a post-conviction 28 U.S.C. § 2255 motion to vacate.[22]

Our "general aversion"[23] to reaching ineffectiveness claims on direct appeal derives in part from their inherently collateral nature. The trial record, concerned as it is with the defendant's guilt or innocence, will not in most instances be "developed precisely for the object of litigating or preserving the [ineffective assistance] claim and thus [will] often [be] incomplete or inadequate for this purpose."[24] Deferring the question of ineffectiveness to collateral review also protects

---

[22] *United States v. Hankerson*, 496 F.3d 303, 310 (3d Cir. 2007).

[23] *Gov't of the V.I. v. Vanterpool*, 767 F.3d 157, 164 (3d Cir. 2014).

[24] *Massaro v. United States*, 538 U.S. 500, 504–05 (2003); *see also United States v. McLaughlin*, 386 F.3d 547, 556 (3d Cir. 2004) ("[T]he lack of a fully developed record often precludes a comprehensive inquiry into the elements of strategy or tactics that may have entered into defense counsel's challenged decision.").

16

criminal defendants from the consequences of resolving the claims prematurely.[25]

While cautioning that we will not "open[] the door to ineffective assistance of counsel claims on direct appeal as a matter of course," we have nevertheless recognized an exception to the rule when the trial record "is sufficient to allow determination of ineffective assistance of counsel."[26] Determining sufficiency is case- and claim-dependent.

We think that Washington's is the uncommon case where resolving an ineffectiveness claim on direct appeal is both feasible and efficient. Strictly speaking, he is not raising ineffectiveness for "the first time" on appeal. Rather, ineffectiveness was invoked in and resolved by the District Court, which held a post-trial, pre-sentencing hearing at which Washington and the AUSA both testified (trial counsel was invited to testify, but declined). The District Court—the trial judge—then denied the claim against the backdrop of the recently concluded trial.[27] This development of the record

---

[25] *See, e.g.*, *United States v. Brown*, 849 F.3d 87, 90 n.5 (3d Cir. 2017) ("To spare Brown from having res judicata attach to the ineffective assistance claim, we decline to address it here." (internal quotation marks and citation omitted)).

[26] *United States v. Polk*, 577 F.3d 515, 520 & n.2 (quoting *United States v. Headley*, 923 F.2d 1079, 1083 (3d Cir. 1991)).

[27] *See Massaro*, 538 U.S. at 506 ("[T]he § 2255 motion often will be ruled upon by the same district judge who presided at trial. The judge, having observed the earlier trial, should have an advantageous perspective for determining the effectiveness

amounted to, in effect, a mini collateral proceeding, akin to what is ordinarily expected under § 2255. It provides us with a sufficient foundation for direct appellate review.[28]   We therefore exercise our discretion to reach the ineffectiveness claim.[29]

---

of counsel's conduct and whether any deficiencies were prejudicial.").

[28] *See United States v. Jones*, 336 F.3d 245, 254 (3d Cir. 2003) (reaching ineffectiveness claim when District Court "conducted a hearing with [the defendant] and his new counsel where it specifically considered . . . allegations concerning the representation he received from his prior counsel"). The appendix as initially compiled lacked most of the ineffectiveness-stage papers and transcripts, outside of the District Court's decision itself and a single page of Washington's new-trial motion. We asked the government to supplement our record with the relevant filings (which are all sealed on the District Court docket and, as a result, are not readily available to us), so as to allow for the determination of the sufficiency of the trial record and a more-searching review of Washington's ineffectiveness claim. We thank the government for filing the supplement.

[29] We note that Washington initially asked for substitution of counsel, but not a full hearing on trial counsel's constitutional effectiveness. A district court is ordinarily required to warn pro se litigants when a filing recharacterization might implicate the second-or-successiveness bar of the Antiterrorism and Effective Death Penalty Act of 1996. *See Castro v. United States*, 540 U.S. 375, 383 (2003); 28 U.S.C. § 2244(b). However, Washington's recharacterized filing

## 2. *Strickland v. Washington* and Standard of Review

"Regardless of whether an ineffective assistance of counsel claim is raised in a motion for a new trial, on collateral review, or on direct appeal, the standard of review is the same."[30]    Under the familiar two-part standard established in *Strickland v. Washington*,[31] Washington bears the burden of showing 1) that trial counsel's actions "were not supported by a reasonable strategy" and 2) that trial

---

could not be counted as an initial 28 U.S.C. § 2255 motion, as he was not yet "in custody under sentence of a [federal] court."    28 U.S.C. § 2255(a); *see also United States v. Stockstill*, 26 F.3d 492, 497 n.10 (4th Cir. 1994) ("Because [the defendant] advanced his claims prior to sentencing, a § 2255 motion would not have been appropriate at the time."). Because the § 2244(b) bar was not implicated, and because the mere possibility of preclusion does not otherwise "significantly alter[]" Washington's rights, no warning was necessary here. *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013). *But see Mui v. United States*, 614 F.3d 50, 51 (2d Cir. 2010) ("We hold that a defendant who raises on direct appeal ineffective assistance claims based on the strategies, actions, or inactions of counsel that can be, and are, adjudicated on the merits on the trial record, is precluded from raising new or repetitive claims based on the same strategies, actions, or inactions in a Section 2255 proceeding.").

[30] *United States v. Bishop*, 629 F.3d 462, 469 (5th Cir. 2010).

[31] 466 U.S. 668 (1984).

counsel's errors were prejudicial.[32]  "[B]oth deficiency and prejudice must be proven to have a valid claim for relief."[33] On appeal of the District Court's decision, we exercise plenary review over the legal components of ineffectiveness, assess any underlying findings of fact for clear error, and "exercise independent judgment on whether those facts, as found by the District Court, show that counsel rendered ineffective assistance."[34]

We agree with the District Court that the general allegations of alcohol use do not require a departure from *Strickland*'s two-prong standard—a point conceded by Washington in his new-trial memorandum.[35]  Alcohol or drug use by trial counsel can certainly be relevant to both parts of an ineffectiveness inquiry, especially if amplified or systemic, or on close questions of strategy and jury perception.  But on these facts, alleged substance abuse is not, without more, one of the rare forms of dereliction amounting to the *per se* denial

---

[32] *Massaro*, 538 U.S. at 505.

[33] *United States v. Travillion*, 759 F.3d 281, 289–90 (3d Cir. 2014).

[34] *United States v. Davenport*, 775 F.3d 605, 608 (3d Cir. 2015).

[35] *See Washington New Trial*, 184 F. Supp. 3d at 157; Sealed Supplemental Appendix 78; *see also United States v. Cronic*, 466 U.S. 648, 659–60 & nn.25–26 (1984).

of a defendant's Sixth Amendment right to the effective assistance of counsel.[36]

### 3. Trial Counsel's Cross-Examination of Agent Bowman

Washington now limits his ineffectiveness allegation to the cross-examination of ATF Agent John Bowman, which allowed the prosecutor to bring out Washington's previous drug conviction on redirect. He argues that trial counsel's line of questioning lacked a strategic basis and caused him prejudice, as it undermined the "not committed to the crime" theory of defense.

By way of background: Agent Bowman, who managed the ATF's investigation of the conspiracy, was called to testify as the government's final witness. His testimony established, among other things, the authenticity of the recorded calls and meetings among the conspirators (or "conspirator," in the case of the undercover Agent Edwards) and their incriminating nature. For instance, Bowman

---

[36] *See Williams v. Trammell*, 782 F.3d 1184, 1200–01 (10th Cir. 2015) (analyzing substance abuse ineffectiveness under *Strickland*), *cert. denied*, 136 S. Ct. 806 (2016); *Frye v. Lee*, 235 F.3d 897, 907 (4th Cir. 2000) ("[I]n order for an attorney's alcohol addiction to make his assistance constitutionally ineffective, there must be specific instances of deficient performance attributable to alcohol."); *see also Berry v. King*, 765 F.2d 451, 454 (5th Cir. 1985) ("[U]nder *Strickland* the fact that an attorney used drugs is not, *in and of itself*, relevant to an ineffective assistance claim." (emphasis in original)).

testified that at the March 5 meeting, Berry assured Agent
Edwards that Washington was committed to the robbery plan.

Trial counsel's extensive cross-examination of Agent
Bowman dealt in part with inconsistencies in the investigation
and in ATF's targeting of Washington.  Counsel also probed
the racial dimensions of ATF sting operations; Bowman
admitted that he had participated in three Philadelphia sting
operations, all of which targeted only African American
defendants. (A similar response had earlier been elicited from
Agent Edwards, who admitted that perhaps two defendants in
over 13 scenarios were not African American—and both of
those were Latino.)

Trouble arose when trial counsel began asking
Bowman about Washington's uneasy fit with the ATF
targeting guidelines' requirement of prior criminal histories.

> Q: All right. Now we know that you didn't use – they
> didn't have my client identified before he was arrested.
> You knew him as Ski, or some other name, right?
>
> A: Correct.
>
> Q: So you didn't know if he had a prior criminal
> history, right?
>
> A: No, not during the investigation.
>
> Q: All right. And you found out after the arrest and
> some checking, you found out that my client doesn't
> have a history for robbery, right?
>
> A: (No verbal response)

Q: And he doesn't have a history for drugs, does he?

A: I don't recall.

Q: If he did, you would recall, sir, wouldn't you? Isn't that fair?

A: I don't want to misstate, but I'm pretty sure he had a --

Q: If you're not sure, you probably shouldn't say --

A: -- drug arrest.[37]

Q: -- you probably shouldn't say, you're not sure. I've had his record, and I can say, I didn't see a robbery conviction.

A: I don't think there's a robbery conviction, no.

Q: And I have his record, I didn't see a drug conviction.

A: I don't recall.[38]

---

[37] Washington argues that the jury twice heard evidence of Washington's criminal history, once on direct and once on rebuttal. As the excerpt shows, however, the initial mention of Washington's drug conviction was equivocal—"I'm pretty sure"—and broached in the context of an arrest, not a conviction.

[38] S.A. 176–77.

But Washington *did* have a drug conviction.  In fact, just a few days before Bowman took the stand, the government had filed its 21 U.S.C. § 851 information identifying a "prior felony controlled substance violation" that it intended to use "as the basis for increased punishment" in the event that Washington was convicted.[39]

While Bowman had not directly confirmed Washington's criminal history on cross, the prosecutor saw the door swing open and, on redirect, invited Agent Bowman to stroll through it:

> Q: [Trial counsel] asked you some questions about Mr. Washington's criminal history.
>
> A: Yes.
>
> Q: You said you weren't sure when he asked you specific questions about whether he had a drug conviction, whether he had a robbery conviction, whether he had a violent crime conviction. You said, I don't recall --
>
> . . .
>
> Q: You said you weren't sure, correct?
>
> A: Correct.
>
> Q: I want to take a moment and show you Government Exhibit 403, 404 and 405. That's Government Exhibit 403. Let's move on to 404. And lastly, we move on to

---

[39] Section 851 Information, ECF No. 202.

Government Exhibit 405. Did you review those three exhibits?

A: Yes.

Q: And after reviewing them, are you sure whether or not Mr. Washington has a prior drug conviction?

A: He does have a prior drug conviction.[40]

After this exchange, the issue of Washington's criminal history does not appear to have come up again during trial. Further, trial counsel did not request, and the District Court did not give, any limiting instruction.

### 4. *Strickland*'s Prejudice Prong

We may consider the two *Strickland* prongs in either order; and, as we have observed, it is "often practical to consider the prejudice prong first,"[41] not the least because we "prefer[] to avoid passing judgment on counsel's performance when possible."[42]   Accordingly, we turn first to prejudice, which requires showing a "reasonable probability"—a "probability sufficient to undermine confidence in the outcome"—that, "but for counsel's unprofessional errors, 'the result of the proceeding would have been different.'"[43]

---

[40] June 8, 2015 Tr. at 99–100, ECF No. 245.

[41] *United States v. Fazio*, 795 F.3d 421, 426 (3d Cir. 2015).

[42] *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

[43] *Vanterpool*, 767 F.3d at 165 (quoting *Strickland*, 466 U.S. at 694).

At the outset, we agree with the District Court that the evidence admitted at trial against Washington was daunting and, generally, damning.  His recorded statements alone, bluster or not, showed a willing and inquisitive member of the conspiracy.  On the day of the robbery itself, Washington appeared committed to its success.[44]  Washington attempts to push back on this reading of the record, but the big picture of the trial works against him.

For instance, in support of his argument that the evidence was not actually "overwhelming," he points out that the jury acquitted him of the count-five § 924(c) gun charge—which, unlike counts 1 through 4, was not a conspiracy or attempt charge.  This is true, but we struggle to assign it more than limited relevance.  The trial evidence showed that Berry, not Washington, hid the guns in the Eggo Waffles box, which he then handed to co-conspirator Johnson.  The guns were found in the minivan, not Washington's Chrysler, when the caravan was taken down. Culpability arguably shifted away from Washington, and he has not satisfactorily shown how the jury's apparent doubt with the firearm count is linked with the quantum of proof on the remaining counts of the indictment.

Similarly, Washington points to two jury requests— one to see the video of the takedown, and another regarding

---

[44] *See Washington New Trial*, 184 F. Supp. 3d at 153 (recounting Washington's concern, during the final pre-robbery briefing, that co-conspirators Johnson and Ellis had purchased supplies from a grocery store, where the men could have been—and were—recorded on the store's surveillance system).

the definition of entrapment or enticement—as indicative of its hesitance to convict.  The video was played back, and both the prosecution and defense agreed that entrapment was not at issue.  Beyond that, we do not think that the jury's questions evince the kind of doubt that might meet Washington's burden for showing prejudice.  If anything, all we can draw from the acquittal on this count is that the jury took seriously its duty to view the trial evidence on a count-by-count basis.[45]

Washington also argues that the District Court erred by failing to separate the Hobbs Act robbery and drug counts in determining prejudice, contending the testimony about his drug conviction, and thus his propensity, affected the latter far more than the former.[46]  He emphasizes that the defense's theory of the case rested in part on caution and lack of culpable intent, and points to selections of the recordings, admitted at trial, that show (or so he claims) that he was wary of cocaine and was not interested in dealing with it or

---

[45] In fact, the count-five acquittal strikes *against* Washington's claim that the jury used his drug conviction against him on the grounds of predisposition.  Ample attention was drawn at trial to Washington's alleged trigger-happy statements, yet the jury was not convinced of Washington's guilt on count five.

[46] While Washington's PSR grouped the offenses for sentencing purposes, the District Court did not treat them as a single unit, imposing separate sentences on the robbery and drug counts of the indictment.  Accordingly, we assume without deciding that the counts are appropriately disaggregated for the purposes of *Strickland* prejudice.

27

otherwise becoming involved.  In one of these, Washington is recorded as saying that he "don't fuck with coke."[47]

Even in light of the defense's theory of the case, however, we do not agree that the charges can be so neatly separated.  Washington wants us to view the likelihood of prejudice from admitting the conviction as higher for the drug counts than the robbery counts.[48]  The fundamental flaw of Washington's argument is that he never quite explains, in a way that satisfies his *Strickland* burden, why he would have participated in the robbery, or even in its planning stages, if *not* for the cocaine.  According to the testimony of ATF Agent Edwards, the "drug courier" told the other members of the conspiracy that no money would be found in the house.  Even if Washington did not intend to personally handle the cocaine or move it for sale, he could not help but know that cocaine was the object of the robbery.  Viewed against this

---

[47] *See, e.g.*, Washington Reply Br. at 7.

[48] While we assume without deciding that Washington could have prevailed on this theory, we note that a "caution" or "lack of total commitment" defense is difficult to successfully mount given the broad liability for drug-conspiracy charges. *See United States v. Caraballo-Rodriguez*, 726 F.3d 418, 425 (3d Cir. 2013) (en banc) ("To prove a conspiracy, the government must show: (1) a shared unity of purpose; (2) an intent to achieve a common illegal goal; and (3) an agreement to work toward that goal."); *see also Smith v. United States*, 133 S. Ct. 714, 719 (2013) (explaining withdrawal from a conspiracy); *United States v. Shabani*, 513 U.S. 10, 17 (1994) (holding that proof of an overt act is not required in a § 846 conspiracy).

backdrop, the "I don't fuck with coke" statement does not carry the expansive and exculpatory meaning that he would like to attribute to it.   Moreover, we agree with the government that the broader defense strategy of the case, which focused on showing that Washington lacked the violent criminal history required for ATF targeting, was not necessarily undermined by a fleeting mention of Washington's prior drug conviction, especially in light of his apparent willingness to participate in the broader drug conspiracy.[49]

We do not mean to trivialize the introduction into the case of Washington's drug conviction; although we do not formally reach the *Strickland* performance prong, we struggle to perceive a strategic basis for opening the door. Nevertheless, we agree with the District Court that Washington has not met his burden, under *Strickland*, of showing that the mistake undermined confidence in the jury's verdict.[50]   Accordingly, the ineffective assistance claim fails.

---

[49] The government notes that no additional details were given about the drug offense, so the jury did not know its nature or severity.   However, the jury could infer from the line of questioning that it was not a violent drug offense.

[50] *Cf., e.g.*, *Wilson v. Mazzuca*, 570 F.3d 490, 502, 507 (2d Cir. 2009) (finding prejudice from admission of criminal history, in tandem with other errors, where the government presented a weak case in chief); *Gilliam v. Sec'y for the Dep't of Corr.*, 480 F.3d 1027, 1033–34 (11th Cir. 2007) (per curiam) (finding no prejudice on § 2254(d) review when theory of defense was "sufficiently compromised by other evidence"); *Lyons v. McCotter*, 770 F.2d 529, 532 n.5 (5th

## B. Mandatory Minimum Due Process Challenge

In challenging his 264-month sentence, Washington argues that the District Court erred in following the 20-year mandatory minimum term set forth in 21 U.S.C. § 841(b)(1), which (as applicable here) kicks in when the quantity of cocaine is 5 kilograms or above and the defendant has a prior felony drug conviction.  He does not appear to disagree with the government that, in the ordinary course of things, the "mandatory" minimum is precisely what it says on the tin.[51] Nor does he argue that the facts supporting the mandatory minimum sentence—an indictment charging 5 kilograms or more of cocaine, a corresponding jury verdict, and a properly filed § 851 notice of a prior conviction—were absent or infirm.  Rather, he contends that its application in this kind of case, where the comprising elements were entirely fictitious and in the hands of the government, violates his right to due process.

---

Cir. 1985) ("[W]e conclude that the prosecutor's case was far from overwhelming and that the introduction into evidence of Lyons' prior aggravated robbery conviction undermined the reliability of his present conviction.").

[51] *See, e.g.*, *United States v. Winebarger*, 664 F.3d 388, 392 (3d Cir. 2011) ("[D]istrict courts are required to sentence defendants guilty of that crime to a term of imprisonment no less than the Congressionally prescribed minimum, unless an explicit exception to the minimum sentence applies.").

### 1. Standard of Review

We begin by noting that although Washington did object to the mandatory minimum at sentencing, he argued there on the basis of congressional intent, not due process. The due process argument also does not appear in his three sentencing memoranda. While Washington's failure to develop the constitutional basis for his objection might ordinarily limit the scope of our review, we retain discretion to reach unpreserved arguments in appropriate circumstances.[52] Here, the government asks us to conduct *de novo* review and responds to Washington's argument on the merits. While a party's concession does not control the exercise of our discretion, it is certainly a factor we may consider. Hence, because Washington did raise an objection to the application of the mandatory minimum sentence, and the argument that he relied on came within a stone's throw of the one he raises now, we will "waive the waiver" and consider Washington's claim on the merits.[53]    As a

---

[52] *See United States v. Turner*, 718 F.3d 226, 235 (3d Cir. 2013); *cf. United States v. Archuleta*, 412 F.3d 1003, 1007 (8th Cir. 2005) (reviewing newly raised constitutional argument for plain error)

[53] *See United States v. Castro-Taveras*, 841 F.3d 34, 54 (1st Cir. 2016) (declining to enforce forfeiture when the government addressed the merits of unpreserved Fifth Amendment argument); *United States v. Pendleton*, 832 F.3d 934, 948 n.4 (8th Cir. 2016) ("[T]he Government does not assert forfeiture and instead argues for *de novo* review on the merits. Thus, we choose to apply the usual standard for evaluating the sufficiency-of-the-evidence claim."); *see also United States v. Jones*, 833 F.3d 341, 343 (3d Cir. 2016)

constitutional challenge to the mandatory minimum, it draws plenary review.[54]

---

("Because we would reach the same result under either standard of review, we will apply de novo review, which is more favorable to [the defendant].").

Our decision in *United States v. Joseph*, 730 F.3d 336 (3d Cir. 2013), is not to the contrary. *Joseph* "rectif[ied] imprecisions" in our preservation and waiver jurisprudence, and clarified too the oft-overlooked distinction between "issues" and "arguments," at least as we use those terms in this Circuit. *Id.* at 337, 341–42. To the extent the specific waiver or forfeiture framework in *Joseph* applies outside of Fed. R. Crim. P. 12, *see id.* at 338–39 nn.2–3, it does not limit our discretion to excuse waiver or forfeiture concerns as we do here, especially when the government or appellee overlooks or disregards waiver or forfeiture and instead asks for review of the merits. *See also* Government's Br. in *United States v. Joseph*, No. 12-3808, 2013 WL 1193044, at *16–20 (invoking waiver).

[54] *United States v. Walker*, 473 F.3d 71, 75 (3d Cir. 2007).

### 2.  Outrageous Government Conduct and Sentencing Factor Manipulation[55]

Washington's due process challenge falls within the broader category of "outrageous government conduct"—that

---

[55] The government suggests in its brief that Washington's sentencing challenge is foreclosed by a sentence *above* the mandatory minimum. *See* Gov't Br. at 57–58. We disagree. The District Court was clearly guided by the mandatory minimum term on the drug counts in crafting the overall sentence. As a result, Washington's challenge remains viable despite a sentence above the bare minimum authorized by law. *Compare United States v. Cardena*, 842 F.3d 959, 1001–02 (7th Cir. 2016) (finding that, when the district court appeared to treat the mandatory minimum as the lower bracket for determining a below-Guidelines sentence, court could not say that the mandatory minimum had "absolutely no effect"), *and United States v. Barnes*, 769 F.3d 94, 98–99 (1st Cir. 2014) (reaching the legality of a mandatory minimum sentence although the defendant's net term was 10 years above the minimum because of references throughout to the mandatory minimum), *with United States v. Ramírez-Negrón*, 751 F.3d 42, 49 (1st Cir. 2014) (finding no due process error when a defendant's sentence was based "entirely on Guidelines considerations"), *and United States v. Ramos*, 695 F.3d 1035, 1049 (10th Cir. 2012) (concluding that a defendant lacked standing to challenge constitutionality of mandatory minimum because the "actual sentence of eighty-seven months was not affected by the statutorily prescribed mandatory minimum" but was instead based on "the § 3553(a) factors and the Guidelines").

is, an allegation that the government's conduct was so outrageous that due process and fundamental fairness cannot abide the defendant's conviction.[56]  In our hallmark case on the doctrine, *United States v. Twigg*, we decided that a meth scheme that was substantially engineered by the government—agents supplied precursor chemicals (at a significant discount), glassware, and a rented farmhouse for a lab—displayed the requisite level of outrageousness.[57] *Twigg* led to the ultimate sanction: reversal of the defendant's conviction.[58]

But *Twigg*, decided in 1978, is apparently one of only "two reported court of appeals decisions . . . that have deemed the government's conduct so outrageous as to violate due process."[59]  We have found no occasion since *Twigg* in a published decision to reverse a conviction or invalidate an indictment on the theory that the government has strayed outside of the boundaries contemplated by due process.[60]  In *United States v. Dennis*, for instance, we refused to dismiss an indictment in a reverse sting case not dissimilar to the one

---

[56] *See United States v. Twigg*, 588 F.2d 373, 378 (3d Cir. 1978).

[57] *See id.* at 375–76, 380–81.

[58] *Id.* at 381.

[59] *United States v. Combs*, 827 F.3d 790, 795 (8th Cir. 2016).

[60] *See United States v. Fattah*, 858 F.3d 801, 813 (3d Cir. 2017) (citing *Twigg* for the proposition that "[t]his Court has granted relief on a claim of outrageous government misconduct only once").

now at bar, while emphasizing the "exceedingly great" evidentiary burden placed on the challenging defendant.[61]

While our *Twigg* decision recognized an outrageous government conduct claim in the context of an attack on an indictment—and, by extension, the fact of the judgment of conviction itself—other courts have applied similar reasoning to a narrower universe of sentencing-related claims, often under the label "sentencing factor manipulation"—although they have not done so consistently.[62]  The Eleventh Circuit described one model of sentencing factor manipulation in *United States v. Ciszkowski*:

> [S]entencing factor manipulation occurs when the government's manipulation of a sting operation, even if insufficient to support a due process claim, requires that the manipulation be filtered out of the sentencing calculus. Outrageous government conduct would necessitate the reversal of a defendant's conviction, while sentencing factor manipulation would simply reduce the sentence applied to his conduct.  . . . When a court filters the manipulation out of the sentencing calculus before applying a sentencing provision, no

_____

[61] 826 F.3d 683, 694–95 (3d Cir. 2016); *see also United States v. Mohamud*, 843 F.3d 420, 435 (9th Cir. 2016) (recognizing that dismissal is warranted only in "extreme cases" (citation omitted)).

[62] *See United States v. Sed*, 601 F.3d 224, 229–31 (3d Cir. 2010) (describing the variation across courts of appeals).

mandatory minimum would arise in the first place.[63]

Our previous precedential opinions have declined to take a definitive stance on the viability of this doctrine in our Circuit.[64]   But even assuming without deciding that the generous *Ciszkowski* framing of sentencing factor manipulation should apply—requiring a lesser showing than an "outrageous conduct" claim, and allowing for a District Court to depart below the mandatory minimum range—we find that Washington has failed to demonstrate, on the facts of this case, that the mandatory minimum should be excised from the indictment.

At bottom, Washington argues that the government was uniquely positioned to determine the salient facts of his offense, which he was powerless to refute.  Working through its undercover operative and informant, the ATF did indeed set the amount of the fictitious cocaine (10 kilograms) and

---

[63] *United States v. Ciszkowski*, 492 F.3d 1264, 1270 (11th Cir. 2007); *see also United States v. Rivera-Ruperto*, 852 F.3d 1, 14 (1st Cir. 2017) ("Sentencing factor manipulation occurs where government agents have improperly enlarged the scope or scale of a crime.  . . . Where the government engages in such manipulation, we recognize the court's power to impose a sentence below the statutory mandatory minimum as an equitable remedy." (internal alterations, quotation marks, and citations omitted)).  *But see United States v. Lange*, 862 F.3d 1290, 1296 (11th Cir. 2017) (observing that the Eleventh Circuit "has never reduced a sentence on the basis of sentencing factor manipulation").

[64] *See Sed*, 601 F.3d at 229–31.

played up the likelihood of resistance (thereby encouraging the conspirators to arm themselves).

But even assuming some impropriety here on the part of the government, most of the factors it created for the crime, and which were within its unique control, were not the drivers of Washington's actual sentence. Agent Edwards told the conspirators that they would encounter resistance, so they brought guns—and, had Washington been convicted of the gun charge, he would have faced an additional mandatory consecutive term.[65] But he was not. Further, Agent Edwards told the conspirators that they could expect to recover 10 kilograms of cocaine in the robbery, corresponding to 2014 Guidelines base offense level of 30.[66] However, because he was a career offender, Washington's Guidelines range was not governed directly by the 10 kilogram drug-quantity amount—and the District Court sentenced him far below the recommended Guidelines range anyway.[67]

Instead, the 20-year mandatory minimum was the product of two factors: the 5 kilograms of cocaine charged in the indictment and found by a jury, and the § 851 statement

---

[65] *See* 18 U.S.C. § 924(c)(1).

[66] *See* U.S.S.G. § 2D1.1(c)(5) (2014).

[67] To the extent the government manipulated factors that have not been shown to prejudice Washington, the weight of those factors is diminished. *Cf. Werts v. Vaughn*, 228 F.3d 178, 198 (3d Cir. 2000) (evaluating prosecutorial misconduct due process claim for presence of prejudice).

filed by the government.[68]  The latter, as the Supreme Court has indicated, is a matter of discretion "similar to the discretion a prosecutor exercises when he decides what, if any, charges to bring against a criminal suspect . . . and is appropriate, so long as it is not based upon improper factors."[69]  Washington does not argue that the process envisioned by § 851 was not properly followed or was based on impermissible considerations.[70]

---

[68] The career offender Guideline itself is based on the offense statutory maximum—here, life in prison, with or without the § 851 enhancement—so in that sense the Guidelines sentencing range was determined by a drug quantity.  *See* U.S.S.G. § 4B1.1(b) (2014); 21 U.S.C. 841(b)(1)(A).  Again, though, the District Court did not sentence in accordance with that range, and—as we discuss *infra*—the 5 kilogram amount is far below what courts have approved in other cases.

[69] *United States v. Labonte*, 520 U.S. 751, 762 (1997); *see also United States v. Sanchez*, 517 F.3d 651, 671–72 (2d Cir. 2008) (rejecting due process challenge when the government filed § 851 notice against one defendant, but not his codefendants).

[70] That is not to say that we affirmatively endorse the prosecution's decision here, which has the unavoidable appearance of punishing Washington for exercising his right to go to trial.  But on these facts, this is not enough to declare the government's actions beyond the pale or invidiously motivated, especially with the longstanding recognition—both by us and by the Supreme Court—of the deference afforded to prosecutorial decisions.  For better or worse, prosecutors have a great deal of power to use specific

So it comes down, in the end, to the drug quantity. We acknowledge Washington's concerns, which are well stated and logical, that the drugs did not exist, and that his ironclad mandatory minimum has no real-world foundation. Other courts of appeals, however, have roundly rejected claims that amounts greater than 5 kilograms, or even 10 kilograms, amount to sentencing factor manipulation.[71] Further, Agent

---

charging decisions to guide mandatory sentencing exposure. By way of example, a defendant in one recent New Jersey stash house case was charged in part with conspiring to possess with intent to distribute more than 5 kilograms of cocaine, exposing him to the mandatory minimum term. When the defendant agreed to plead guilty, the government filed a superseding information that simply deleted the drug quantity from the conspiracy charge, thereby eliminating the mandatory minimum. *See* U.S. Dep't of Justice Press Release, *Burlington County, New Jersey, Man Sentenced To Eight Years In Prison For Scheme To Rob Drug Dealers At Gunpoint*, https://www.justice.gov/usao-nj/pr/burlington-county-new-jersey-man-sentenced-eight-years-prison-scheme-rob-drug-dealers (Feb. 8, 2017; archived at https://perma.cc/Y5XD-UULW); *United States v. Forman*, D.N.J. Crim. No. 1:14-cr-00152, ECF Nos. 27, 81.

[71] *See United States v. Hare*, 820 F.3d 93, 102–03 (4th Cir. 2016) (collecting cases for the proposition that "15 to 20 kilograms of cocaine" amounts to "considerably less than the quantity of cocaine at issue in other stash house sting cases"); *United States v. Sanchez*, 138 F.3d 1410, 1414 (11th Cir. 1998) ("The fact that the government's fictitious reverse sting operation involved a large quantity of drugs does not amount to the type of manipulative governmental conduct warranting a downward departure in sentencing.").

Edwards testified at trial that the amount chosen for the sting was a "conservative" number based upon the drug weights found in "a typical [Philadelphia] stash house."[72]    He explained that the proposed scenario "always has to be realistic" or it might be questioned by the robbery crews.[73] Washington has not offered anything to the contrary.   Put simply, there is not enough here for us to conclude that the

---

[72] June 3 Tr. at 84.

[73] June 3 Tr. at 85–86.   These statements were made in the context of Agent Edwards's trial testimony, not at sentencing. It does not appear that the justifications for the amount chosen were re-raised at sentencing.   We acknowledge that Agent Edwards's testimony indicates that all Philadelphia stash-house stings crafted in accordance with ATF methodology will involve, in some sense, an amount above the mandatory minimum threshold.   Insufficient evidence was presented to allow the determination of whether a lesser quantity, below the mandatory minimum, would have sufficed to entice a four-man crew.  *See, e.g.*, June 3 Tr. at 129 (testimony by Agent Edwards that his "courier" wanted only one to one and a half kilogram as a nonparticipant).  *But see Rivera-Ruperto*, 852 F.3d at 15 ("Although it is certainly feasible that . . . the agents could have used some lesser quantity of drugs and still made the deals look realistic, the mere fact that they did not, without more, does not establish that the agents engaged in the kind of extraordinary misconduct . . . that is required of a successful sentencing manipulation claim." (internal quotation marks and citations omitted)).   A district court is, of course, free to probe this reasoning, especially if culpability or entrapment are raised as specific defenses.

government chose the 10 kilogram amount primarily, or even secondarily, "to inflate [Washington's] sentence upon a conviction."[74]

Washington encourages us to follow the reasoning of *United States v. McLean*, in which a different judge in the Eastern District of Pennsylvania sentenced below the mandatory minimum, on due process grounds, in a reverse-sting stash house case.[75]  *McLean*, which is nonbinding,[76] is also distinguishable.  The defendant there received a "split" jury verdict on the amount of cocaine involved: 5 kilograms with regard to conspiracy but 500 grams with regard to attempt.[77]  We detect no equivalent ambiguity in the jury's verdict on Washington's ultimate culpability, and therefore reject this argument.[78]

---

[74] *Ciszkowski*, 492 F.3d at 1271.

[75] 199 F. Supp. 3d 926, 942–45 (E.D. Pa. 2016).

[76] The government sought to appeal the *McLean* sentence, but (as the government explained at oral argument) was unable to obtain the Solicitor General's permission to pursue the appeal.  *See* C.A. No. 16-3227 (order dismissing appeal entered Sept. 15, 2016).  The defendant appealed the judgment of conviction, which we recently affirmed. *See generally United States v. McLean*, No. 16-2993, 2017 WL 3309762 (3d Cir. Aug. 3, 2017) (nonprecedential).

[77] *See McLean*, 199 F. Supp. 3d at 939–40 & n.13.

[78] We note that *McLean* contains an extensive recitation of the facts and factors that caused its district court to depart below the mandatory minimum.  While constitutional challenges to

41

In sum, we conclude that the 5 kilograms of cocaine charged in the indictment and found by the jury did not amount to an impermissible manipulation of sentencing factors by the government.  To the extent that the fictitious 10 kilogram quantity is relevant, we find too that Washington has shown neither improper manipulation nor prejudice. Nevertheless, we remind the government that we have expressed misgivings in the past about the wisdom and viability of reverse stash house stings.  That this case fell on the safe side of the due process divide should not be taken to indicate that all such prosecutions will share the same fate. As one of our colleagues said in a prior case, "I do not find it impossible for the Government to exercise its discretion rationally to set up stash house reverse stings.  But I share the concern that this practice, if not properly checked, eventually will find itself on the wrong side of the line."[79]

## C.  Selective Enforcement Discovery Claim

Finally, Washington appeals in part the denial of his pretrial motion for discovery, which he filed in order to "prepare a motion to dismiss the indictment on the basis of racial profiling and/or selective prosecution of racial minorities by the ATF Office in Philadelphia, in conjunction

---

mandatory minimum sentences draw *de novo* review, it might be the case that a district court's factfinding and underlying reasoning, as opposed to its application of a legal standard, may be due some level of deference.  We need not resolve the question in this appeal.

[79] *See Dennis*, 826 F.3d at 699 (Ambro, J., concurring in part and dissenting in part).

with the local U.S. Attorney's Office."[80]  He contends that the District Court erred in applying a strict discovery standard— *Armstrong/Bass*—to the portions of his motion that pertained to law enforcement and ATF material on stash-house reverse stings, as opposed to those portions (the denial of which he does not appeal) that sought information related to the prosecution of those offenses.  Instead of employing *Armstrong/Bass*, Washington contends, we should follow the Seventh Circuit's opinion in *United States v. Davis*, which appeared to depart from the *Armstrong/Bass* model for claims of selective enforcement in stash house cases.

While discovery rulings are ordinarily reviewed for abuse of discretion, "we exercise *de novo* review over the standards the district court used in exercising its discretion."[81]  And although we decline to adopt *Davis* wholesale, we

---

[80] *Washington Discovery*, 2014 WL 2959493, at *2.

[81] *Redland Soccer Club v. Dep't of the Army*, 55 F.3d 827, 845 (3d Cir. 1995); *see also Koon v. United States*, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law."), *superseded by statute on other grounds as stated in United States v. Thurston*, 358 F.3d 51, 70 (1st Cir. 2004).  Although the government disputes whether Washington's appellate claim matches what he raised below, its response brief generally answers on the merits; the procedural objection is to the scope of his request, not the consistency of his legal theory.  We are satisfied, from our review of the record, that Washington adequately developed the claim across his District Court submissions.

nevertheless agree with the *Davis* court that district judges have more flexibility, outside of the *Armstrong/Bass* framework, to permit and manage discovery on claims like Washington's.  Accordingly, as explained further below, we will vacate the District Court's discovery orders and issue a limited remand for further post-judgment proceedings.

### 1. Substantive Equal Protection Claims: "Clear Evidence" of Discriminatory Effect and Intent

Washington's argument rests on the distinction between "selective prosecution" and "selective enforcement," labels that we (and others) sometimes deploy interchangeably.  Here, we use them as Washington does. "Prosecution" refers to the actions of prosecutors (in their capacity as prosecutors) and "enforcement" to the actions of law enforcement and those affiliated with law-enforcement personnel.

We start with a point of commonality.  *Substantive* claims of selective prosecution and selective enforcement are generally evaluated under the same two-part test, which is derived from a line of seminal Supreme Court cases about the collision between equal protection principles and the criminal justice system.[82]  A defendant challenging a criminal prosecution at either the law enforcement or prosecution

---

[82] *See Wren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he Constitution prohibits selective enforcement of the law based on considerations such as race."); *Wayte v. United States*, 470 U.S. 598, 608 (1985).

inflection points must provide "clear evidence" of discriminatory effect and discriminatory intent (the latter is sometimes referred to as "discriminatory purpose").[83] Meeting this standard generally requires evidence that similarly situated individuals of a difference race or classification were not prosecuted, arrested, or otherwise investigated.[84]

---

[83] *See, e.g.*, *United States v. Taylor*, 686 F.3d 182, 197 (3d Cir. 2012); *Harajli v. Huron Twp.*, 365 F.3d 501, 508 (6th Cir. 2004); *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003); *see also United States v. Whitfield*, 649 F. App'x 192, 196 n.11 (3d Cir. 2016) (nonprecedential) ("[T]he prima facie elements for both selective prosecution and selective enforcement are the same: discriminatory effect and discriminatory intent."), *cert. denied*, 137 S. Ct. 1063 (2017); *Lacey v. Maricopa Cty.*, 693 F.3d 896, 920 (9th Cir. 2012) (discussing a civil selective enforcement claim); *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (same); *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003) ("These standards have been applied to traffic stops challenged on equal protection grounds."). We cite *Whitfield* for its description of the law in our Circuit and do not assign it the weight of precedent.

[84] *See United States v. Hare*, 820 F.3d 93, 98–99 (4th Cir. 2016); *United States v. Brantley*, 803 F.3d 1265, 1271 (11th Cir. 2015); *Johnson v. Crooks*, 326 F.3d 995, 1000 (8th Cir. 2003) ("When the claim is selective enforcement of the traffic laws or a racially-motivated arrest, the plaintiff must normally prove that similarly situated individuals were not stopped or arrested in order to show the requisite discriminatory effect

### 2. *Armstrong/Bass*: "Some Evidence"

A criminal defendant, however, will not often have access to the information, statistical or otherwise, that might satisfy a "clear evidence" burden.  Thus, the two component cases that make up the *Armstrong/Bass* test—*United States v. Armstrong*[85] and *United States v. Bass*[86], both of which arose from selective prosecution challenges—propounded a facially less rigorous standard for criminal defendants seeking *discovery* on an anticipated selective prosecution claim. Instead of "clear evidence," a successful discovery motion can rest on "some evidence."[87]  "Some evidence" must still include a showing that similarly situated persons were not prosecuted.[88]    Furthermore, under *Armstrong/Bass*, the

---

and purpose."); *see also Gov't of V.I. v. Harrigan*, 791 F.2d 34, 36 (3d Cir. 1986).

[85] 517 U.S. 456 (1996).

[86] 536 U.S. 862 (2002) (per curiam).

[87] *See Bass*, 536 U.S. at 863 ("[A] defendant who seeks discovery on a claim of selective prosecution must show some evidence of both discriminatory effect and discriminatory intent."); *see also United States v. Arenas-Ortiz*, 339 F.3d 1066, 1068 (9th Cir. 2003) ("The showing necessary to obtain discovery is somewhat less" than prevailing on the merits).

[88] *Armstrong*, 517 U.S. at 469; *Bass*, 536 U.S. at 864 ("Under *Armstrong*, therefore, because respondent failed to submit relevant evidence that similarly situated persons were treated differently, he was not entitled to discovery.").

defendant's showing must be "credible" and cannot generally be satisfied with nationwide statistics.[89]

*Armstrong/Bass* has proven to be a demanding gatekeeper. In developing it, the Supreme Court sought to "balance[] the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution" by creating a standard that, while difficult to meet, derived from "ordinary equal protection standards" and was not "insuperable."[90] The lived experience, however, has resembled less a challenge and more a rout, as practical and logistical hurdles abound—especially to proving a negative.[91]

---

[89] *See Armstrong*, 517 U.S. at 470; *United States v. Thorpe*, 471 F.3d 652, 657 (6th Cir. 2006); *see also United States v. Al Hedaithy*, 392 F.3d 580, 607–08 & n.24. (3d Cir. 2004) (rejecting under *Armstrong/Bass* a selective prosecution discovery request premised on "numerous newspaper articles" showing rampant cheating on the Test of English as a Foreign Language exam; "[t]he defect in Al Hedaithy's proffer is that none of this evidence indicates that similarly situated persons were treated differently. Demonstrating that thousands of other people have also cheated on the [] exam does nothing to identify persons who are similarly situated").

[90] *Armstrong*, 517 U.S. at 465, 470.

[91] *See, e.g.*, Donna Coker, *Foreword: Addressing the Real World of Racial Injustice in the Criminal Justice System*, 93 J. Crim. L. & Criminology 827, 828–29, 846–47 (2003) (discussing, among other things, the problems with the "similarly situated" discovery standard, including the possibility that the "data . . . may simply not exist" or is in "the exclusive control of the government"); Richard H.

The government itself concedes that "neither the Supreme Court nor this Court has ever found sufficient evidence to permit discovery of a prosecutor's decision-making policies and practices."[92]

So, too, in Washington's case, as the District Court here found that his discovery motion had fallen short of *Armstrong/Bass*. His list of three prior stash house cases, the District Court determined, revealed nothing about similarly situated individuals who were *not* ensnared in stash-house stings, and Washington had otherwise not shown discriminatory intent/purpose.[93]

### 3. *Armstrong/Bass* in "Selective Enforcement" Cases

On appeal, Washington does not argue that the District Court's *Armstrong*/*Bass* analysis was wrong, but rather that

---

McAdams, *Race and Selective Prosecution: Discovering the Pitfalls of* Armstrong, 73 Chi.-Kent L. Rev. 605, 640 (1998) ("The *Armstrong* holding and the implications of its reasoning create a barrier to discovery that, for the great majority of criminal cases, is insuperable."); *Thorpe*, 471 F.3d at 663; *see also Whitfield*, 649 F. App'x at 196 n.11; Erik Luna, *Transparent Policing*, 85 Iowa L. Rev. 1107, 1139 (2000) ("The bar for selective enforcement and prosecution claims has been set at a nearly unreachable height for the vast majority of criminal defendants, an example of an abstract right with no practical remedy.").

[92] Gov't Br. at 31.

[93] *Washington Discovery*, 2014 WL 2959493, at *7.

*Armstrong/Bass*—which arose from discovery aimed at claims of selective prosecution, not selective enforcement—should not have applied at all to the subset of his claims seeking law-enforcement evidence. "The sort of considerations that led to the outcome in *Armstrong*," he contends, "do not apply to . . . ATF agents engaged in racial discrimination when selecting targets for sting operations, or when deciding which suspects to refer for prosecution."[94] Washington also points to the difficulty of obtaining pre-discovery statistics in selective prosecution cases, arguing that requiring the same in law-enforcement cases—when there are likely to be no records of similarly situated individuals who were not arrested or investigated—would transform the functional impossibility of *Armstrong/Bass* into a complete impossibility.[95]    While substantive selective prosecution and enforcement cases must ultimately reach the same destination—"clear evidence" of discriminatory purpose/intent and effect—Washington suggests that enforcement cases, which do not implicate the heightened protections afforded to prosecution decisions, should be permitted to travel on a less rocky path.

We have not previously addressed this particular prosecution/enforcement distinction in a precedential decision.[96]    And it is true that *Armstrong* and *Bass*, both of

---

[94] Washington Br. at 19.

[95] *See id.* (citing *Hare*, 820 F.3d at 100).

[96] *See Whitfield*, 649 F. App'x at 196 n.11.  The government says that we have been "reluctant to permit discovery into the government's investigatory and prosecutorial practices without a substantial showing by the defendant."  Gov't Br. at

which arose from selective prosecution claims, were grounded in part on the special solicitude courts have shown to prosecutors' discretion.  For instance, the *Armstrong* Court said that a "selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution," and because of the great deference owed to prosecutorial decision-making, the Court was reluctant to abrogate the "background presumption" that "the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims."[97]

Other courts of appeals, however, have extended the reasoning of *Armstrong/Bass* to claims of selective enforcement and have applied the same burden ("some evidence") to the related discovery requests.  The Fourth and Tenth Circuits are two,[98] and until recently the Seventh

---

31.  While that is true, the two cases the government cites— *Al Hedaithy* and *United States v. Abuhouran*, 161 F.3d 206 (3d Cir. 1998)—discussed prosecutorial decision-making, such as the (nonconstitutional) challenge to substantial assistance motions in *Abuhouran*, *see* 161 F.3d at 216.  They do not provide a definitive answer to the question here: whether we may look behind the law-enforcement curtain.

[97] *Armstrong*, 517 U.S. at 463–64 (internal quotation marks and citation omitted).

[98] *See United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) ("[*Armstrong*'s] elements are essentially the same for a *selective-enforcement* claim."); *United States v. Mason*, 774 F.3d 824, 829–30 (4th Cir. 2014).

Circuit appeared to be another.  In *United States v. Barlow*, the Seventh Circuit addressed a discovery claim based on racial profiling, a "selective law enforcement tactic."[99]  In deciding that the District Court had not abused its discretion in denying discovery, the *Barlow* court followed *Armstrong* (*Bass* had not yet been issued), finding that defendant Barlow had not presented relevant and reliable data on the "similarly situated" prong of the test.[100]

### 4. The Seventh Circuit's *Davis* Decision

But in *United States v. Davis*,[101] the *en banc* Seventh Circuit appeared to narrow the scope of *Armstrong/Bass*. *Davis* was an appeal from a pretrial order granting discovery in a stash-house reverse-sting case.[102]  The defendants had alleged that the prosecutor, FBI, and ATF had engaged in racial discrimination, pointing to some discomfiting statistics: out of 94 defendants across 20 Northern District of Illinois stash-house sting prosecutions, only six were non-Hispanic

---

[99] 310 F.3d 1007, 1010 (7th Cir. 2002).

[100] *See id.* at 1010–11.

[101] 793 F.3d 712 (7th Cir. 2015).

[102] We need not address *Davis*'s procedural intrigue, although we note that it marked the dividing line between the *en banc* majority and dissent.  *See Davis*, 793 F.3d at 723 (Rovner, J., joined by Hamilton, J., dissenting) ("For all of the prudential reasons that we do not permit civil litigants to manufacture appellate jurisdiction, we should not allow an appeal based on the sort of non-final dismissal that was fabricated here.").

whites.[103]   The statistics, however, revealed nothing about similarly situated persons who were *not* prosecuted.[104] Nevertheless, the district court granted a broad discovery order, reasoning in part that the "overwhelming majority" of those prosecuted being persons of color met, by inference, the defendants' burden under *Armstrong/Bass*.[105]

The Seventh Circuit agreed with the government that the district court's reasoning was inconsistent with *Armstrong*.   If *Armstrong*'s record, which showed the exclusive prosecution of African Americans for crack offenses, was not sufficient, then a showing that "three-quarters of the defendants in stash-house cases have been black does not suffice."[106]

The Seventh Circuit then addressed whether *Armstrong/Bass* was the relevant test at all.   In this Circuit's view, the key distinction lay between prosecutors, who are "protected by a powerful privilege or covered by a presumption of constitutional behavior" recognized by *Armstrong*, and FBI/ATF agents, who "regularly testify in criminal cases" and whose "credibility may be relentlessly attacked by defense counsel."[107]   For these and other reasons, the Seventh Circuit decided that "the sort of considerations

---

[103] *Davis*, 793 F.3d at 714–15.

[104] *See id.* at 715.

[105] *See* Order at 2, *United States v. Davis*, N.D. Il. Crim. No. 13-cr-63-2 (order entered October 30, 2013).

[106] *Davis*, 793 F.3d at 719–20.

[107] *Id.* at 720.

that led to the outcome in *Armstrong* do not apply to a contention that agents of the FBI or ATF engaged in racial discrimination when selecting targets for sting operations, or when deciding which suspects to refer for prosecution."[108]

Having ruled that *Armstrong*/*Bass* did not quite govern the law-enforcement aspects of the defendants' discovery request, the Seventh Circuit decided that the District Court's comprehensive discovery order was nonetheless an abuse of discretion. Sweeping and overbroad, the order engulfed too much that *did* implicate prosecutorial discretion and was not tailored to the boundaries of the case nor the scope of the defendants' proffer.[109]

On remand, instead of issuing a "blunderbuss order," the district court was ordered to take "measured steps" to determine the scope and boundaries of discovery.[110] First, the district court was to determine whether there was reason to believe that race played a role in the investigation—that "forbidden selectivity occurred or plausibly could have occurred"[111]—by evaluating the evidence already of record, new evidence acquired by the defendants, and (if necessary) the affidavits and limited testimony of case agents. If the inquiry gave the district court reason to believe that similarly situated persons would not have been pursued by law enforcement, *in camera* disclosure of targeting criteria might

---

[108] *Id.* at 721.

[109] *See id.* at 722.

[110] *Id.*

[111] *Id.* at 723.

be called for.    If the trail of breadcrumbs continued, additional targeted inquiries might be justified; and if the obtained information crossed the *Armstrong/Bass* threshold, the discovery could be "extended to the prosecutor's office."[112]

---

[112] *Id.* at 722–23.  Although it is of limited relevance to the actual legal issue on appeal, the "switch" in *Davis* arose after years of unease in Seventh Circuit district courts—and in the Northern District of Illinois in particular—about reverse sting cases.  *See, e.g.*, *United States v. Paxton*, No. 13 CR 103, 2014 WL 1648746, at *5 (N.D. Ill. Apr. 17, 2014) (granting discovery under *Armstrong/Bass*, in part because "no white defendants have been indicted for phony stash house cases since 2009, despite the diverse makeup of the Northern District of Illinois").  Post-*Davis*, the controversy continues. *See* Jason Meisner & Annie Sweeney, *Lawyers: ATF Stings Racially Biased; U. of C.-led Team says Stash House Cases Show Feds Unfairly Targeted Minorities*, Chi. Trib., Mar. 5, 2017,    at    C1,    *available    at* http://www.chicagotribune.com/news/local/breaking/ct-atf-stash-house-sting-racial-discrimination-met-20170303-story.html (last visited Aug. 21, 2017; archived at https://perma.cc/XY4G-MKYG).  A report in one pending case, prepared by Columbia Law professor Jeffrey Fagan, concludes among other things that "race remains a statistically significant predictor of selection as a Stash House defendant."  *See* Report of Jeffrey Fagan, *United States v. Alfred Washington*, N.D. Il. Crim. No. 12-CR-632, ECF No. 510-2.

### 5. *Davis*'s Application to
### Washington's Claims

In sum, despite not being a straightforward affirmance of a pro-defendant discovery decision, *Davis* does more or less what Washington would like this Court to do: find *Armstrong/Bass* inapplicable in part and send the case back to the District Court to make additional inquiries—bolstered, perhaps, by whatever evidence has become available since.

However, there are good reasons to be cautious about *Davis*, and its practical application in this case is not quite as straightforward as Washington suggests. While the Seventh Circuit did not follow *Armstrong/Bass*, *Davis* does not clearly state whether the test adopted in its stead was a variation of *Armstrong/Bass* or, alternatively, was intended to be a complete departure. For instance, *Davis* does not explicitly discuss the discriminatory purpose/intent prong of the traditional *Armstrong/Bass* analysis.[113] *Davis* might therefore be fairly described as an opinion entirely about discriminatory effect as a gateway to discovery. Moreover, *Davis* does not mention the Seventh Circuit's earlier decision in *Barlow* at all—not to harmonize it, distinguish it, or explicitly overrule it.[114] *Davis* also arose on a different posture, where the

---

[113] It is perhaps true that, in a given investigation, a finding that a defendant would not have been prosecuted if he had been non-Hispanic white is enough to suggest an inference of discriminatory purpose/intent.

[114] At least one court has observed this ambiguity in the Seventh Circuit's case law in declining to adopt the prosecution/enforcement discovery dichotomy. *See United States v. Lamar*, No. 14 CR 726, 2015 WL 4720282, at *5 n.3

defendant had prevailed below and, thus, benefitted from partial appellate deference to the trial court's exercise of discretion.  Here, by contrast, the District Court's decision was not favorable to Washington; this Court's deference thus tips the other way.  The *Davis* framework was further influenced by the Seventh Circuit's review of a *pretrial* decision, as indicated by the court's repeated references to expediency—"limited inquiries that can be conducted in a few weeks" so as to not "sidetrack[]" the case.[115]  While any framework must be mindful of the pretrial context in which discovery motions will be filed and decided, we are reviewing a final judgment, one which (as discussed further below) is not unwound if we decide to remand.

### 6. Strict Application of *Armstrong/Bass* is Inappropriate

Despite our caution, we find ourselves in agreement with the core rationale of *Davis*: the special solicitude shown to prosecutorial discretion, which animated the Supreme Court's reasoning in *Armstrong* and *Bass*—and our own reasoning in our pre-*Armstrong/Bass* case law on the same subject[116]—does not inevitably flow to the actions of law

---

(S.D.N.Y. Aug. 7, 2015).  The government, for its part, argues that *Davis* is wrongly decided, and points in particular to the *Barlow* that did not bark.  *See* Gov't Br. at 39 n.13.

[115] *Davis*, 793 F.3d at 723.

[116] *See, e.g.*, *United States v. Torquato*, 602 F.2d 564, 569–70 (3d Cir. 1979) (discussing the need to "minimize the intrusion on the prosecutorial function" in the context of the burden required to obtain an evidentiary hearing); *see also In re Grand Jury*, 619 F.2d 1022, 1030 (3d Cir. 1980).

enforcement, or even to prosecutors acting in an investigative capacity. Prosecutors are ordinarily shielded by absolute immunity for their prosecutorial acts,[117] but police officers and federal agents enjoy no such categorical protection.[118] And, as the *Davis* court observed, officers and agents are expected to testify in criminal cases, with their honesty and candor "open to challenge."[119] That aspects of law enforcement and prosecutorial discretion are often intertwined does not make the distinction between the two realms any less legitimate; courts are often called upon to determine whether specific acts fall more into one category than the other.[120]

---

[117] *See, e.g.*, *Buckley v. Fitzsimmons*, 509 U.S. 259, 268–71 (1993); *Odd v. Malone*, 538 F.3d 202, 208–09 (3d Cir. 2008).

[118] *See Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995); *Forsyth v. Kleindienst*, 599 F.2d 1203, 1216 (3d Cir. 1979) ("[F]ederal law enforcement officers are entitled only to qualified, or good faith, immunity.").

[119] *Davis*, 793 F.3d at 720.

[120] The government suggests that when a district court is presented with mixed claims, or some selective enforcement and some selective prosecution claims, applying the *Armstrong*/*Bass* standard across the board is appropriate. Gov't Br. at 28. This contention was rejected by *Davis*, 793 F.3d at 723 (observing that, if the "measured steps" discovery rises to the level required by *Armstrong*/*Bass*, the investigation can "extend[] to the prosecutor's office"), and we agree that it unduly penalizes a defendant who casts a wide net. That said, it remains within the discretion of a district court—and, indeed, remains within the discretion of

A challenge to a law-enforcement policy also implicates another area where immunity is limited. The ATF reverse sting model is familiar to us and other courts precisely because it is a defined operation, one with policies, manuals, targeting criteria, and standards. Its appearance from coast to coast is not some kind of convergent law-enforcement evolution, but instead is due to the promulgation of official policies by a federal agency. Claims of unconstitutional policies or practices, lodged against entities rather than individuals, often cannot be met with qualified or good-faith immunity defenses at all.[121]

In sum, while we do not lightly depart from the well-established *Armstrong*/*Bass* framework, the enforcement/prosecution distinction is a legitimate one, and we therefore join the *Davis* court in finding *Armstrong*/*Bass* to be distinguishable on these facts. Accordingly, motions for discovery seeking information on putative claims of unconstitutional selective enforcement are not governed by strict application of the *Armstrong*/*Bass* framework.

Nevertheless, and as tacitly acknowledged by the Seventh Circuit, courts contemplating motions for discovery

---

*this* District Court—to determine that a "selective enforcement" claim was either not appropriately raised or was simply a prosecution claim tailored to avoid the requirements of *Armstrong*/*Bass*. As always, a court must look beyond the labels affixed by the party and focus on the substance of what is sought.

[121] *See Carver v. Foerster*, 102 F.3d 96, 102–04 (3d Cir. 1996) (citing, among other things, *Owen v. City of Independence*, 445 U.S. 622 (1980)).

on selective enforcement claims must still be guided by the spirit of *Armstrong/Bass*, which incorporates the demands placed on the underlying substantive claims: not just "some evidence," but the heightened "clear evidence" standard. Further, while we agree with a general approach of taking "measured steps" over the course of discovery, we decline to mandate a precise system or order that a district court must follow.  As we have often said, matters of docket control and discovery are committed to broad discretion of the district court.[122]  We are confident in the ability of district courts to react to the particular circumstances of a case—the likelihood of a near-term trial date, the complexity of the underlying matter, the strength of a defendant's discovery proffer, the similarity to previous cases raising similar concerns, the need to avoid overly prejudicial or irrelevant disclosure, and so on—in crafting a measured approach to discovery.  Finally, we note that although we are now in a post-trial posture, the fact of the matter is that most, if not all, appeals from criminal discovery orders will be properly brought only after judgment is entered.[123]

---

[122] *See, e.g., Sempier v. Johnson & Higgins*, 45 F.3d 724, 734 (3d Cir. 1995); *In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 817 (3d Cir. 1982); *United States v. Newman*, 476 F.2d 733, 739 (3d Cir. 1973) (referring to criminal discovery rulings under Fed. R. Crim. P. 16).

[123] *See United States v. Sciarra*, 851 F.2d 621, 627–28 (3d Cir. 1988).

### 7. Selective Enforcement Discovery Standard

We therefore hold as follows.  In ruling on a pretrial discovery request that alleges selective prosecution and/or selective enforcement, a district court applies *Armstrong/Bass* to claims that implicate protected prosecutorial functions, such as those that arose in the namesake cases.  If claims of selective law enforcement are raised, or there are "mixed" claims that involve prosecutors acting in investigative or other capacities (in short, performing functions that ordinarily would not draw absolute immunity), the standard guiding the district court's discretion is different.  While *Armstrong/Bass* remains the lodestar, a district court retains the discretion to conduct a limited pretrial inquiry into the challenged law-enforcement practice on a proffer that shows "some evidence" of discriminatory effect.  The proffer must contain reliable statistical evidence, or its equivalent, and may be based in part on patterns of prosecutorial decisions (as was the case in *Davis*) *even if* the underlying challenge is to law enforcement decisions.[124]   Distinct from what is required under *Armstrong/Bass*, a defendant need not, at the initial

---

[124] We do not reach the question of the geographical boundaries of the initial evidence the defendant must provide—whether, in other words, the application of a law enforcement policy or practice in the defendant's specific district might be contextualized by its application elsewhere, so long as the defendant adequately connects the practice elsewhere to his or her situation.  We leave this issue to the district court's discretion and common sense, in light of the need to show that the policy ultimately acted upon, or did not act upon, persons similarly situated to the defendant.

stage, provide "some evidence" of discriminatory intent, or show that (on the effect prong) similarly situated persons of a different race or equal protection classification were not arrested or investigated by law enforcement. However, the proffer must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement.

If a district court finds that the above has been met, it may conduct limited inquiries of the sort recommended in *Davis*, and cabined to the same considerations of judicial economy and the need to avoid protracted pretrial litigation of matters collateral to the upcoming trial—as well as the need to avoid impinging on other areas of executive privilege. Areas of consideration could include the testimony, in person or otherwise, of case agents or supervisors, and the *in camera* analysis of policy statements, manuals, or other agency documents. Relevant information, having passed the filter, can also be disclosed to the defendant, although the district court retains discretion to forgo disclosure of or otherwise restrict the use of information that, while relevant to a selective enforcement claim, might not ordinarily be the sort of discovery material available to a criminal defendant under Fed. R. Crim. P. 16 or *Brady* and its progeny.

Throughout, the district court must be mindful that the end "goal" of such a discovery motion is a valid claim of selective enforcement under the heightened substantive standards, which we are not asked to diminish or distinguish. If the district court's initial or secondary inquiry sees that destination recede or stand still, not advance, the court operates within its discretion to deny additional discovery and to proceed to trial.

That limited discovery of this sort may be granted in one case does not guarantee—and should not guarantee—that it will be granted in another, similar case, even within the same district.[125]   But courts may, of course, consider the product of earlier investigations in deciding whether to conduct pretrial discovery on the individual claims they happen to confront.

### 8. Remand is Necessary for the District Court to Exercise its Discretion under the Correct Framework

Having set forth the governing standard for selective enforcement cases, we address its application to Washington's case.  It is clear that the District Court thought itself bound by the more-demanding *Armstrong/Bass* standard across the entirety of Washington's discovery request, and then again on reconsideration.   Because it exercised its discretion under the incorrect standard, we would normally remand for the District Court to reconsider its ruling in light of its now-enhanced discretion.   The government, however, advances two primary reasons why, in its view, remand is unnecessary.

First, the government emphasizes that it "did not actually select or target any of the defendants," suggesting that a selective enforcement claim is categorically

---

[125] *See Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d 1366, 1371 (3d Cir. 1991) ("[T]here is no such thing as 'the law of the district.'").

forestalled.[126]  This argument was raised in and rejected by *Davis*.  We agree with the Seventh Circuit that, although Berry "himself initiated matters by [asking] the informant for robbery opportunities and then chose his own comrades . . .[,] it remains possible that the [government] would not have pursued the investigation had [the crew] been white."[127]

       Second, the government argues in essence that the matter need not be remanded because any error was harmless; Washington received everything to which he was entitled when the District Court gave him a redacted portion of an ATF manual on the eve of trial.  The Fourth Circuit took such an approach in *United States v. Hare*, decided shortly after *Davis*.  Despite quoting *Davis* with approval and exhibiting some discomfort with the *Armstrong*/*Bass* test as applied to stash-house cases, the Fourth Circuit decided that the defendants "ha[d] not shown that they are entitled to discovery beyond what the government has already produced."[128]  While Washington also has not shown that he is "entitled" to anything beyond what he has already received, we think that the District Court, not our Court, is better positioned to make that determination.[129]

---

[126] Gov't Br. at 35 n.10.

[127] *Davis*, 793 F.3d at 722–23.

[128] 820 F.3d 93, 101 (4th Cir. 2016).

[129] Further, we note that 1) the District Court copied the approach taken in the *Alexander* Northern District of Illinois case, and thus may not have been independently exercising its discretion; and 2) material relevant to a trial defense does not

Accordingly, we will vacate the District Court's discovery orders and remand for a renewed decision under the framework we articulate today. We emphasize that we are not directing the District Court to grant discovery; our collective thumbs are not on the scale. Rather, we commit the inquiry to the District Court's considerable discretion. We note that the District Court may, if it so chooses, consider additional information offered by Washington on remand as part of his proffer, as well as any relevant information (such as testimony about the racial cast of prior prosecutions) that was disclosed at trial.

Two administrative considerations require additional attention. First, as indicated by the Supreme Court in *Armstrong* itself, discovery requests like Washington's exist outside of the framework of Fed. R. Crim. P. 16, and are neither a challenge to nor a defense against the government's actual case.[130] It is well established, moreover, that both discovery orders and substantive equal protection challenges are appealable only after entry of final judgment.[131]

---

necessarily coincide with what is relevant to a challenge to an indictment on equal protection grounds.

[130] *See Armstrong*, 517 U.S. at 463–64.

[131] *See Jarkesy v. SEC*, 803 F.3d 9, 26 (D.C. Cir. 2015); *Adapt of Phila. v. Phila. Hous. Auth.*, 433 F.3d 353, 360 (3d Cir. 2006); *United States v. Howard*, 867 F.2d 548, 552 (9th Cir. 1989); *cf. United States v. Zone*, 403 F.3d 1101, 1106–07 (9th Cir. 2005) (per curiam) (merging discovery and substantive inquiry when underlying Double Jeopardy claim would have been appealable under the collateral order doctrine).

Accordingly, by remanding for partial reconsideration of Washington's discovery request, we do not unwind his conviction or otherwise undermine the jury's verdict. If discovery is granted, and if it leads to a successful selective enforcement claim, then his constitutional rights can be vindicated at that time by striking the indictment in whole or in part.[132] Second, Washington did not file a motion to dismiss the indictment pursuant to Fed. R. Crim. P. 12(b), as his gateway discovery request was denied. Despite the requirement in Rule 12(b)(3) that certain motions be made "before trial," we will not require defendants to file quixotic substantive motions even before their predicate discovery motions are granted or denied. In any event, we note that as of the 2014 revision to Fed. R. Crim. P. 12(b)(3), the language of the rule makes clear that the substantive motion must be made pretrial only if "the basis for the motion is then reasonably available."

## III.        CONCLUSION

For the foregoing reasons, we will affirm the judgment of the District Court, vacate the discovery orders, and remand for further proceedings.

---

[132] *See United States v. Jones*, 159 F.3d 969, 978 & n.8 (6th Cir. 1998) (remanding for discovery on a selective prosecution claim, while noting that the remand "does not warrant a new trial, but only gives [the defendant] the opportunity to move to dismiss the indictment following discovery"); *cf. United States v. Brizendine*, 659 F.2d 215, 222 (D.C. Cir. 1981) (explaining how the court can "provide effective relief" on appeal from final judgment).

**United States v. Washington, 16-2795**

McKEE, *Circuit Judge*, concurring in part and dissenting in part.

I agree with the Majority's thoughtful and persuasive discussion of the discovery and ineffective counsel issues this case presents.  I therefore join Part II.A and Part II.C of the Majority Opinion.  However, I disagree with my colleagues' rejection of Washington's sentencing manipulation claim and his assertion that the mandatory minimum sentence should not apply in these unique circumstances.  Accordingly, I must respectfully dissent from Part II.B.

## I.    Stash-House Sting Operations

Arguably, undercover sting operations, including ones involving fictitious stash houses, can be a valuable investigative tactic for ferreting out those individuals who would otherwise commit crimes in their communities.  I also agree that "[c]ourts should go very slowly before staking out rules that will deter government agents from the proper performance of their investigative duties."[1]

However, the potential for abuse and mischief that is endemic to fictitious stash-house stings should not be ignored. The U.S. Court of Appeals for the Fourth Circuit has cautioned that stash-house stings "appear[] highly susceptible to abuse."[2] The Court of Appeals for the Ninth Circuit is "wary of [stash-house] operations" due to the "the ease with which the government can manipulate . . . factors [like drug quantities][.]"[3]  The Ninth Circuit specifically warned that one of the problems with such operations is that they ignore questions about whether a planned stash-house robbery is within a defendant's actual "ambition and means."[4]  Indeed,

---

[1] *United States v. Montoya*, 62 F.3d 1, 3 (1st Cir. 1995) (citation omitted).
[2] *United States v. Hare*, 820 F.3d 93, 103–04 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 224 (2016), *reh'g denied*, 137 S. Ct. 460 (2016).
[3] *United States v. Briggs*, 623 F.3d 724, 730 (9th Cir. 2010).
[4] *Id.*

my colleagues also express reservations about these operations here, even though they ultimately conclude that Washington is not entitled to relief.  Moreover, federal courts have noted that such sting operations risk opening the door to the very kind of racial profiling Washington is alleging here.[5]  All of these problems with stash-house operations have led noted jurist Richard Posner of the Court of Appeals for the Seventh Circuit to conclude, on the whole, that such operations are "a disreputable tactic."[6]

The facts of this case illustrate that these cautions and misgivings are well-founded.  This investigation began with a confidential informant ("Roc") advising a supervising ATF agent that he knew of an individual (Dwight Berry) who wanted to rob a drug stash house.  After Berry was identified, the ATF embarked upon inventing a scenario that would include weapons, a "crew," and a mythical quantity of cocaine that would be the bait for those who would become ensnared in ATF's trap.

_____

[5] In 2013, for example, Chief Judge Ruben Castillo of the U.S. District Court for the Northern District of Illinois ordered the disclosure of prosecutorial records after defense attorneys filed for discovery.  The defense attorneys argued that since 2011, all of the stash-house targets charged in Chicago's federal courts had been minorities—19 African-American and seven Latino defendants.  Chief Judge Castillo ordered discovery "on the sensitive issue of potential racial profiling" after concluding that "the defendants ha[d] made a strong showing of potential bias in the history of the prosecution of . . . 'phony drug stash house rip off cases.'"  Order, *United States v. Brown*, No. 12-cr-632, ECF No. 153, at 1 (N.D. Ill. July 31, 2013).  Other district courts also have ordered discovery into the basis for ATF and federal prosecutors identifying suspects for investigation.  *See* Maj. Op. at 54 n.112.

[6] *See, e.g.*, *United States v. Kindle*, 698 F.3d 401, 414 (7th Cir. 2012) (Posner, J., dissenting) (criticizing that "[l]aw enforcement uses [such stings] to increase the amount of drugs that can be attributed to the persons stung, so as to jack up their sentences"), *reh'g en banc granted, opinion vacated* (Jan. 16, 2013), *on reh'g en banc sub nom. United States v. Mayfield*, 771 F.3d 417 (7th Cir. 2014).

It was the Government, not Berry, that selected cocaine—instead of, for example, marijuana—as the drug of choice for the stash house.  Although no cocaine actually existed, the Government decided to entice targeted individuals with a predetermined quantity of cocaine—10 kilograms— which was double the amount needed to statutorily trigger the mandatory minimum provisions.  We are told that this quantity was necessary in order to portray a "credible" stash house in the Philadelphia region.

After initiating a plan to rob a stash house with Roc and an undercover Agent, Berry presumably enlisted Washington. Washington was a resident of the community whom the confidential informant had not initially targeted, and he was not of any initial interest to the Government based on past criminal activity.

I realize, of course, that even though Washington was just a secondary target, his statements during the planning meetings and subsequent phone conversations show that he was neither a shrinking violet nor reluctant recruit.  Rather, Washington was clearly interested in participating and even offered a number of disturbingly violent ideas that he thought would facilitate the planned robbery.

Nevertheless, it comes as no surprise that, "having yielded to an extraordinary inducement [Washington] would do everything possible to earn the promised reward."[7] According to the Special Agent's testimony at trial, a *single* kilogram of cocaine was worth upwards of $40,000, as Berry (the person who enlisted Washington) no doubt knew.

Despite the Government's claim that the 10-kilogram quantity was only selected to make the scheme credible, nothing suggests that Washington was motivated by any knowledge of a specific drug quantity, nor is there any evidence of him having any involvement with stash-house robberies.[8]  To the contrary, Washington initially told the

---

[7] *See, e.g.*, *Kindle*, 698 F.3d at 415 (Posner, J., dissenting).

[8] The Agent had only told Berry that he saw over 10 kilograms of cocaine inside a cooler when the two men met.

group that he did not want to be involved with cocaine. He explained that he "don't fuck with coke" and that he didn't "really do this shit." The Agent understood Washington's claim that he didn't "really do this . . ." to mean that Washington did not deal in home invasion robberies. Yet, the Agent and Roc forged ahead, greasing the skids to involve Washington in the criminal conspiracy. Washington was ultimately arrested and charged with conspiracy to possess, and attempt to possess, 5 kilograms or more of cocaine with intent to distribute after he carried out the Government-contrived crime.

Despite Washington's initial statements of disinterest in cocaine and stash-house robberies, I agree that Washington's ultimate actions do establish his intent to carry out an armed theft of cocaine from a stash house. However, that should not obscure a more fundamental point. As another appellate court has explained, "[t]he risk [of targeting] . . . generalized populations [with stash-house investigations] is that the government . . . create[s] a criminal enterprise that would not have come into being but for the temptation of a big payday, a work of fiction spun out by government agents to persons vulnerable to such a ploy who would not otherwise have thought of doing such a robbery."[9]

Here, the Government created a criminal scheme that would not have otherwise existed. Washington had no prior history of stash-house robberies (or violent crimes generally, for that matter), and he expressed reluctance to get involved with cocaine. Thus, here, as in similar cases, there is a strong possibility that had Washington not been "fooled into conspiring and attempting to steal fictitious drugs,"[10] he may well not have been sucked back into the criminal justice system. This is particularly true because he was not even the intended target of this operation. Despite his criminal past,

---

The District Court makes no finding that Berry then told Washington of the exact quantity of drugs to be obtained in a potential stash-house robbery before Washington joined the initial planning meeting.

[9] *United States v. Black*, 733 F.3d 294, 303 (9th Cir. 2013).

[10] *United States v. Yuman-Hernandez*, 712 F.3d 471, 474 (9th Cir. 2013).

Washington was not necessarily destined to commit future crimes. "Criminals do sometimes change and get their lives back on track," and, as Judge Posner reminds us, "we don't want the government pushing [criminals] back into a life of crime." [11,12]

## II.     Sentencing in Stash-House Sting Cases

As is all too often the case, not only do stash-house stings risk ensnaring those who might otherwise not have committed crimes, but also the resulting convictions regularly give rise to particularly dubious applications of the Sentencing Guidelines and mandatory minimum sentences. Here, as is typical of these stings, the Government intentionally set the amount of fictitious drugs at a level that substantially increased Washington's sentencing exposure.

---

[11] *Kindle*, 698 F.3d at 415–16 (Posner, J., dissenting).

As I suggested earlier, given Washington's statements during this scheme, he is not the best example of someone being lured into criminality who may otherwise have continued restoring his life in the community. Nonetheless, he still had the support of a family, and at the sentencing hearing, his loved ones told the court that Washington, after serving time for his first conviction, was "out doing the right thing . . . doing really good," having, for example, acquired his own business and taking children in the community to baseball games. Sentencing Tr. 36. His mother stated: "He was doing a lot of good things and how he got caught up in that situation is beyond me." *Id.*

His statements during the scheme notwithstanding, concerns that have been expressed about fictitious stash-house schemes are no less valid. The tactic still is troubling. [12] *See* Alfred Blumstein and Kiminori Nakamura, *Redemption in the Presence of Widespread Criminal Background Checks*, 47 Criminology 327, 327–59 (2009) ("Recidivism probability declines with time 'clean,' so some point in time is reached when a person with a criminal record, who remained free of further contact with the criminal justice system, is of no greater risk than a counterpart of the same age [who has no criminal record] . . . .").

5

The potential for mischief and abuse is rewarded and encouraged by applying an extraordinarily heavy mandatory sanction that I doubt Congress ever intended to apply where no drugs exist,[13] and where the defendant would not have committed a crime without the government's assistance. Here, the Government decided to charge Washington with a conspiracy involving 5 kilograms or more of cocaine. As the majority notes, given that quantity, Washington's prior convictions subjected him to a 20-year mandatory minimum sentence. Accordingly, the District Court concluded that it was required to impose the 20-year mandatory minimum sentence that Washington received.

Surely, sentences should bear some rational relationship to culpability. Otherwise, the entire enterprise of criminal sanctions is reduced to little more than an abstract matrix of numbers and grids. Yet, on this record, there is absolutely nothing to suggest that Washington would not have conspired to rob a stash house containing, for example, a kilogram less than the 5-kilogram mandatory trigger. No mandatory minimum would have "applied" had this trap been baited with the illusion of a stash house containing four kilograms (translating roughly to upwards of $160,000 in value based on the trial testimony)—thereby placing him beyond the reach of the perceived need to impose a *20-year* statutory mandatory minimum sentence.[14]

It is worth repeating that Washington had no prior history of robbing stash houses containing *any* quantity of cocaine (let alone 10 kilograms of it), or any history of

---

[13] *See infra* Part III for a discussion of what, ostensibly, were Congress's original intentions for tying mandatory minimums to specific drug quantities.

[14] I recognize that the 5-kilogram cutoff is equally arbitrary when defendants are sentenced for a quantity of drugs that actually exists. Some degree of arbitrariness may be necessary to any sentencing scheme, and this is no less true when sentencing ranges are largely determined by artificially constructed Federal Sentencing Guidelines ranges. However, that practical reality does not minimize or negate the very real issues of unfairness and the potential for sentencing manipulation in these kinds of cases.

committing violent crimes. In addition, as I have noted, he initially stated that he did not want to get involved with cocaine. Even if we accept the deterrent value of mandatory minimum sentences, it is fanciful to believe that Washington would not have been deterred from future criminal activity had a much shorter period of incarceration been imposed. As Judge Posner has argued in similar circumstances, if a shorter sentence had been imposed, "[could] there be any serious concern that upon emerging [from prison, Washington] would embark on a career of robbing stash houses? That if approached by anyone [subsequently] inviting him to launch such a career he would listen to the person?"[15] I think not.

My concern is exacerbated by the fact that very few nationally-reported cases of government sting operations or investigations specify any fictional amount of cocaine that is less than the 5 kilograms that triggers this mandatory minimum sentence. Other courts have recognized this problem. For example, the U.S. Court of Appeals for the Second Circuit noted in another stash-house case:

> It is unsettling that in this type of reverse sting, the government has a greater than usual ability to influence a defendant's ultimate Guidelines level and sentence. It appears to be no coincidence that the [government] chose to [use] no less than [the amount of sham cocaine that would trigger as much as 78 more months of imprisonment] . . .[16]

---

[15] *Kindle*, 698 F.3d at 416 (Posner, J., dissenting) (criticizing the fact that the defendant in that stash-house case was imprisoned for 27 years—and proposing that a sentence of 5 years was "more than adequate," in part because, as a result of the sting, "taxpayers w[ould] be supporting [the defendant] at considerable expense for the next quarter century").

[16] *United States v. Caban*, 173 F.3d 89, 93 (2d Cir. 1999) (recognizing the defendant's argument as one paralleling sentence manipulation but concluding that the status of the doctrine at the time was unclear).

In fact, it is usually the government's initial scripting of the stash-house operations, including the quantity of drugs, that automatically subjects defendants to particular sentences.[17]

It is very troubling that the government can initiate and facilitate criminal conduct, and make strategic choices that result in sentences that have a relationship to culpability that is, at best, tenuous and theoretical. As other courts have observed, in fictitious stash-house stings, "the government has virtually unfettered ability to inflate the amount of drugs" involved—in addition to selecting the type of drugs—"thereby obtain[ing] a greater sentence for the defendant."[18] The government can also "minimize the obstacles that a defendant must overcome to obtain the drugs."[19] Though the District Court here felt compelled to rely on the fanciful quantity the Government selected and to impose the corresponding 20-year

---

[17] It is also the government's initial scripting of the *type* of drugs that bears on mandatory minimum sentencing. When asked about choosing that drug for the sting operation in this case, the Government witness described stash-house stings as a "technique . . . developed in the 1980s in response to a trend," and that "[m]any of the robbery crews . . . specifically target houses where cocaine is stored." Trial Tr. 82–83. Therefore, "[the sting operation] has to be realistic" and "mirror what's really going on in the streets for them to believe it and for our safety." *Id.* at 83. The witness explained that "when you're talking about the operation of a stash house, cocaine lends itself . . . as opposed to say another drug like marijuana where—if you're talking about a large scale, typically you're talking about a grow house or something like that." *Id.*

As discussed, *infra*, however, my concerns about the degree to which such street-informed testimony can be tested leave me doubting whether the government *must* use cocaine to achieve its law enforcement objectives. Here, for example, Berry expressed only a general interest in robbing a drug stash house without regard for a specific type.

[18] *United States v. Briggs*, 623 F.3d 724, 729 (9th Cir. 2010).

[19] *Id.* at 730.

mandatory minimum, "the Government assured such a result in advance by the script that it wrote . . . ."[20]

My colleagues correctly note that that there was little, if any, countervailing evidence for the District Court to consider in making the factual determination that the agents could have used an amount less than 10 kilograms in creating the stash house.[21]   The only relevant findings stem from the undercover Agent's trial testimony that the 10-kilogram amount was selected because that quantity mirrored drug weights typically found in stash houses in Philadelphia.  He explained that the proposed scenario had to be realistic, lest robbery crews question the operation's legitimacy.  He also testified that that quantity was based on a consultation with the Drug Enforcement Agency (presumably the Philadelphia Division), which, he claimed, provides "experts in this information."[22]   Apparently, the DEA is "aware of exactly what was going on . . . in the Philadelphia Metropolitan region" and provided the quantity "based on search warrants and investigations that they had conducted."[23]

Another district court considering a stash-house sting prosecution using 10 kilograms of cocaine was faced with similar government evidence.  However, unlike here, that court was able to conclude that "the record [there] [wa]s clear that [the defendant] was 'in for a penny, in for a pound,'"[24] and that the evidence before it had established that the defendant was "'hungry' enough to pursue . . .[the] undertaking regardless of any specific amount of drugs." [25]   That district court explained that "[o]nce the Government established that [the defendant]

[20] *United States v. McLean*, 199 F. Supp. 3d 926, 939 (E.D. Pa. 2016).
[21] While it was ultimately the 5 kilograms of cocaine that the Superseding Indictment charged that drove Washington's 20-year mandatory minimum, the amount the Government selected allowed it to charge Washington with conspiring to rob 5 kilograms or more, and thereby trigger the mandatory minimum.
[22] Trial Tr. 85.
[23] *Id.*
[24] *McLean*, 199 F. Supp. 3d at 935.
[25] *Id.* at 938.

was willing to engage in an armed robbery of any quantity
large enough to resell, its core law enforcement objective was
met."[26]   The court cited to the government's own testimony
that "the street value" of a single kilogram of cocaine was
$36,000 and that stolen narcotics "represent pure profit," both
factors that would seem to make the sting "sufficiently alluring
well below 5 kilograms."[27]

   My agreement with the Majority on this specific issue
notwithstanding, it is nearly impossible for a defendant to ever
rebut the government's "expert"-based explanation for why a
given fictitious quantity is necessary or appropriate.  Accepting
such testimony at face value invites the mischief I mentioned
at the outset to drive the sentencing.   The district court is also
deprived of its well-established sentencing discretion,[28] a
concern compounded by the problems the district court in
*McLean* identified:

> The netherworld of criminal activity is by its very
> nature opaque. For that reason, almost out of
> necessity, law enforcement officers, whose
> experiences give them familiarity with that world,
> are allowed to render certain opinions about use
> of coded language and street slang. When used in
> that way, the opinion testimony is interpretive. In
> stash house sting cases, the Government seeks to
> make   [that opinion testimony] dispositive
> because the charges themselves are the product of
> opinion testimony as to 1) the amount of cocaine
> that would be "expected" to be found in a stash
> house,  and  2)  the  necessity  of  specifying
> substantial amounts to preserve the credibility
> and  safety  of  the  operation.  There  is  a  third
> unstated premise as well—that the targets of the
> sting  would  have  the  same  familiarity  with  the

---

[26] *Id.* at 935.
[27] *Id.* at 937.
[28] *See, e.g.*, *Mistretta v. United States*, 488 U.S. 361, 390
(1989) (discussing the Sentencing Guidelines and Congress's
"strong feeling that sentencing has been and should remain
primarily a judicial function" (internal quotation marks
omitted)).

quantity of narcotics stored at the average stash house.

By definition, such opinions are supported only by personal experience, and the dataset, to the extent that one exists, is created by, and only accessible to, law enforcement. There are no peer-reviewed journals within the narcotics trade. There is no way to test the premises on which these sting operations are based. None of the traditional means by which expert testimony can be tested in a systematic way apply here, yet courts are expected to accept such opinion as the justification for undercover operations that inexorably and indiscriminately give rise to large mandatory minimum sentences. [29]

I agree.

Thus, regardless of whether a claim of sentencing manipulation is raised, any proffered evidence about the need for a given quantity or type of fictitious drugs deserves a great deal more scrutiny than courts give it. [30]  Similarly, requiring evidence that a defendant only agreed to participate because of a given quantity or type of drugs seems more than appropriate. Requiring such scrutiny would not eliminate the myriad of problems that pervade these fictitious stash-house stings, but it would at least help minimize the unfairness that can arise from allowing the government to select the drug and the quantity that will reap the biggest reward at sentencing with little or no fear that a sentencing court would ever question the choices. [31]

_____

[29] *Id.* at 936–37.

[30] Here, the District Court did not probe the testimony, which, as the Majority notes, it certainly was free to do.  Maj. Op. at 40 n.73.  As the Majority further suggests, had there been more fact-finding by the District Court on this issue, some deference to the testimony about the drug quantity may have been appropriate.  *Id.* at 41 n.78.

[31] To accept, wholesale, the unsubstantiated rationale that a fictitious quantity of drugs matches what is "realistic" in a particular geographic region also suggests that defendants across the United States could theoretically be subjected to

We should not be "delegat[ing] [sentencing discretion] all the way down to the individual drug agent operating in the field."[32]

Scrutinizing the basis for the drug quantity would help restore the alignment between culpability and punishment that is jettisoned when the government is allowed to control the defendant's sentencing exposure. "Deeply ingrained in our legal tradition is the idea that the more purposeful is the criminal conduct . . . the more severely it ought to be punished." [33]  Absent unique circumstances not evident here, a defendant's criminal exposure should be linked to actual culpability regarding his/her dealings in specific drug quantities.

Insofar as sentencing manipulation is concerned, "[t]he question is not whether the underlying criminal conviction is lawful, but rather whether there is reason to reduce the sentence due to the inducements used by undercover police or their agents." [34]  Moreover, "a sentence based on an evaluation of a defendant's culpability for particular offense conduct, which *includes* a consideration of police inducements," serves the retributive goals of "proportional and fair punishment," is "compatible with the consequentialist aims of incapacitation and deterrence,"[35] and is "directly supported by the systemic goal of identifying less blameworthy defendants and mitigating their sentences accordingly."[36]  These fundamental principles of criminal justice necessitate closer scrutiny for schemes that originate with, and are driven by, law enforcement because it is highly unlikely that the Sentencing Guidelines were intended to apply to such circumstances.[37]  This scrutiny is appropriate

---

mandatory minimum sentences if the stash-house drug quantities allowing for such a sentence happen to be "realistic" for those geographic areas, as they apparently are in Philadelphia.

[32] *United States v. Staufer*, 38 F.3d 1103, 1107 (9th Cir. 1994).

[33] *Tison v. Arizona*, 481 U.S. 137, 156 (1987).

[34] Eda Katharine Tinto, *Undercover Policing, Overstated Culpability*, 34 Cardozo L. Rev. 1401, 1454 (2013).

[35] *Id.* at 1418 (emphasis added).

[36] *Id.* at 1420.

[37] *See infra* Part III.

even absent specific evidence that the government "intended" to inflate a defendant's sentence.[38]

My colleagues discuss our precedent in *United States v Twigg*[39] in rejecting Washington's claim that the sentence that resulted from this scheme is a denial of his constitutional right to due process. I would emphasize, however, that *Twigg* does not defeat any claim of sentencing manipulation. Indeed, if anything, *Twigg* strongly suggests that we should recognize *some* kind of sentencing factor manipulation claim when appropriate. Although, for reasons the Majority explains, the conduct here may not have crossed the due process threshold,[40]

---

[38] *See* Tinto, *supra* n.34 at 1426 (concluding that "in the context of a sentencing claim, the requirement of an improper [police] motive ignores the needed link between the police conduct and the justification for a reduction in sentence" because "[r]egardless of whether police officers are explicitly making strategic choices based on sentencing laws (and the desire to increase a suspect's sentence), the motivation for the law enforcement conduct or the inducements used may or may not be relevant from the perspective of assessing the defendant's culpability").

[39] 588 F.2d 373 (3d Cir. 1978).

[40] I disagree with the Majority's suggestion that Washington has not shown prejudice because Washington's ultimate sentence was significantly below the recommended Sentencing Guidelines range. The Majority, itself, concludes that the District Court was "clearly guided by the mandatory minimum term on the drug counts in crafting the overall sentence." Maj. Op. at 33 n.55. The District Court never mentioned whether, or the extent to which, it may have departed from the recommended Sentencing Guidelines range had it not been required to impose a sentence of at least 20 years.

Neither do I find persuasive the distinction the Majority makes between this case and *McLean*, to the extent that Washington could rely on that case for whatever persuasive value it may have for his due process argument. The Majority, for example, discusses that the defendant in *McLean* received a "split" jury verdict on the amount of cocaine involved (5 kilograms with regard to conspiracy but

I believe Washington's sentencing manipulation claim is more meritorious than the Majority concludes.

### III.    Sentencing Factor Manipulation and Mandatory Minimum Sentences

The fact that the sentence was mandatory does not necessarily deal a fatal blow to Washington's sentence manipulation claim. It is difficult to believe that Congress ever considered requiring the imposition of a mandatory minimum sentence where 1) the sentence is tied to a fictitious drug quantity in a criminal endeavor that originates with the government, and 2) the defendant would not have engaged in the criminal conduct but for the government's prompting and encouragement.

Congress intended for the 10-year mandatory minimum sentences to apply to "major traffickers,"[41] i.e., "manufacturers or the heads of organizations." [42]    The 5-year mandatory minimums were intended to apply to "serious traffickers," i.e., "managers of the retail level traffic . . . in substantial street

---

500 grams with regard to attempt) and that there was "no equivalent ambiguity" in the jury's verdict for Washington here. But that jury finding, while it highlighted the "inherent problems" these prosecutions presented for the district court, *McLean*, 199 F. Supp. 3d at 939, was not one of the "factors" that led the court to conclude that enforcing the mandatory minimum would "offend due process." *Id.* at 943. Regardless of any "ambiguity," the jury in *McLean* still found the defendant guilty of conspiring to possess 5 kilograms or more of cocaine which, "absent some constitutional prohibition," purportedly "bound" the district court—like the District Court here—to a mandatory minimum sentence. *Id.* at 938.

[41] U.S. Sentencing Comm'n, *Special Report to the Congress: Cocaine and Federal Sentencing Policy*, 119 (1995).

[42] H.R. Rep. No. 99-845, 99th Cong., 2d Sess. 1986, 1986 WL 295596; *see also* 132 Cong. Rec. 27, 193–94 (daily ed. Sept. 30, 1996); 132 Cong. Rec. 22, 993 (daily ed. Sept. 11, 1986).

[42] H.R. Rep. No. 99-845, 99th Cong., 2d Sess. 1986, 1986 WL 295596

quantities."[43]    Despite Congress's intention for mandatory minimums to reflect culpability based on drug quantities, the law instead has, over time, targeted low-level offenders (e.g., street-level dealers and couriers) more often than high-level offenders.[44]  For example, in 2009, offenders sentenced for relatively minor roles represented the biggest share of federal drug offenders, while the highest-level traffickers made up a comparatively small share of federal drug offenders.[45]  The disconnect is not explained by the fact that there are more low-level dealers than high-level traffickers.  The U.S. Sentencing Commission itself concluded in 2011 that "the quantity of drugs involved in an offense is not as closely related to the offender's function in the offense as perhaps Congress expected."[46]

---

[43] *Id.*

[44] U.S. Sentencing Comm'n, *Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System*, Appendix D, Figure D-22, *available at* https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/mandatory-minimum-penalties/20111031-rtc-pdf/Appendix_D.pdf; *see* U.S. Sentencing Comm'n, *Special Report to the Congress: Cocaine and Federal Sentencing Policy*, 20–21, 85 (May 2007).  *See also* Deborah Young, *Rethinking the Commission's Drug Guidelines: Courier Cases where Quantity Overstates Culpability*, 3 Fed. Sent. Rptr. 63 (1990) (tracking the disproportionate severity of quantity-based penalties for lower-level drug offenders and further observing that the quantity-based Sentencing Guidelines often apply to defendants less culpable than the key drug players, who are the "primary targets of the laws").

[45] U.S. Sentencing Comm'n, *Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System* (October 2011), Appendix D, Figure D-22, *available at* https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/mandatory-minimum-penalties/20111031-rtc-pdf/Appendix_D.pdf.

[46] U.S. Sentencing Comm'n, *Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System*, 350, (October 2011) *available at* https://www.ussc.gov/sites/default/files/pdf/news/congression

Thus, there is no reason to believe that Congress anticipated—much less intended—for quantity-based mandatory minimums to reflexively apply in stash-house cases where, as here, the defendant is not only a low-level "drug" offender, but also became involved with non-existent drugs at the government's urging.  The circumstances of such phony stings will rarely lend themselves to a mandatory minimum sentence, or suggest that Congress intended a mandatory minimum to apply.  Concluding otherwise risks both perverting the congressional intent behind the mandatory minimums and, as I have explained, circumventing federal judges' traditional sentencing authority.[47]

Moreover, applying mandatory sentences where the criminal conduct and the type and quantity of drugs exist only in the law enforcement's fertile imagination, rather than an offender's actual possession, defeats the congressional intent of requiring judges to impose sentences that are guided by the factors in 18 U.S.C. § 3553(a).  In *United States v. Olhovsky*, we stressed that "[18 U.S.C. §] 3553(a) clearly states that a court must impose a sentence that is 'sufficient *but not greater than necessary*, to comply with the purposes of [sentencing].'"[48]  We there quoted the Supreme Court's admonition that this requirement, referred to as "the parsimony provision," is 18 U.S.C. § 3553(a)'s "'overarching instruction.'"[49]

_____

al-testimony-and-reports/mandatory-minimum-penalties/20111031-rtc-pdf/Chapter_12.pdf.

[47] My discussion is limited to sentences imposed as punishment for involvement in a phony stash-house sting.  I do not intend to suggest that a sentence designed primarily to incapacitate is necessarily inappropriate.  Such sentences may be necessary for the protection of the community in rare circumstances.  However, phony stash-house stings will rarely, if ever, present a court with such circumstances, and when they do, I have every confidence that the district court will sentence accordingly.

[48] 562 F.3d 530, 547 (3d Cir. 2009), *as amended* (May 5, 2009).

[49] *Id.* at 548 (quoting *Kimbrough v. United States*, 552 U.S. 85, 111 (2008)).

16

Despite our conclusion that 21 U.S.C. § 841(b)'s mandatory minimum sentence provision does not conflict with § 3553(a)'s parsimony provision,[50] abandoning the "demand of parsimony that is the overarching instruction of the congressionally mandated sentencing factors"[51] seems an unintended result in phony drug stings.  There are no drugs that would otherwise endanger the community, and the criminal conspiracy probably would never have been hatched but for law enforcement's intervention and direction.  Congress could not have intended courts to impose otherwise applicable mandatory minimum sentences—which we have described as "draconian"[52]—where the criminal conduct is the result of the government's initiative, rather than a defendant's.  I also find it hard to believe that Congress would create exceptions to mandatory minimums that spare actual drug traffickers exposure to draconian sentences[53] while intending those same harsh sanctions to apply when the government lured a defendant into being involved with drugs that never even

---

[50] *See, e.g.*, *United States v. Walker*, 473 F.3d 71, 85 (3d Cir. 2007) (finding that there is no conflict between § 3553 and a mandatory minimum sentence provision because "§ 3553(a) must be read in conjunction with [] § 3553(e), which prohibits courts from sentencing a defendant below the statutory mandatory minimum sentence unless the Government files a motion permitting such departure").

[51] *Olhovsky*, 562 F.3d at 548 (internal quotation marks omitted).

[52] *See United States v. Williams*, 299 F.3d 250, 258 (3d Cir. 2002).

[53] In *Williams*, we addressed one of those exceptions— Congress's enactment of the "safety valve" in 18 U.S.C. § 3553(f).  *Id.*  It is not surprising that Congress did not include situations such as phony stash-house stings in the statutory exceptions for applying mandatory minimum sentences; Congress likely never contemplated that situation. *Williams* accurately characterizes the lengths of mandatory minimums as "draconian," and exceptions like 18 U.S.C. § 3553(f)'s safety valve, and § 3553(e) (granting authority upon government motion), at minimum, evince Congress's intention that the mandatory sentences need not *always* be imposed.

17

existed.

In addressing Congress's intent, I recognize that there is no ambiguity on the face of the mandatory minimum sentencing statute. 21 U.S.C. § 841(b)(1) does not distinguish between roles in a narcotics conspiracy, nor does it require that drugs actually exist.[54] That is not surprising, as it would have taken something approaching clairvoyance for Congress to foresee that these severe sentences would extend to situations where drugs were not actually involved. In any event, it is, of course, axiomatic that "[w]hen Congress establishes a minimum sentence for a particular crime, district courts are required to sentence defendants guilty of that crime to a term of imprisonment no less than the Congressionally prescribed minimum, unless an explicit exception to the minimum sentence applies."[55] But as the U.S. Court of Appeals for the Eleventh Circuit explained, "[c]onceptually, . . . an adjustment for sentencing factor manipulation is not a departure" that the mandatory minimum statute would otherwise forbid.[56] This is because "[w]hen a court filters the manipulation out of the sentencing calculus before applying a sentencing provision, no mandatory minimum would arise in the first place."[57]

Ironically, it may well be the lay testimony of Rashida Clover, Washington's sister and former caretaker, that best expresses the arbitrariness of applying the mandatory sentence

---

[54] As the Government points out, there are only two circumstances under which a district court can depart downward from a statutorily authorized mandatory minimum sentence: the government must file a motion to recognize the defendant's "substantial assistance," or the defendant must fall within the provisions of the "safety valve" embodied in 18 U.S.C. § 3553(f). *See, e.g.*, *United States v. Kellum*, 356 F.3d 285, 289 (3d Cir. 2004).

[55] *United States v. Winebarger*, 664 F.3d 388, 392 (3d Cir. 2011); *see also United States v. Reevey*, 631 F.3d 110, 113 (3d Cir. 2010) (stating that the "exceptions are the only authority a district court has to depart below a mandatory minimum" (quoting *Kellum*, 356 F.3d at 289)).

[56] *United States v. Ciszkowski*, 492 F.3d 1264, 1270 (11th Cir. 2007).

[57] *Id.*

where the government initiates the crime and no drugs are involved.  At Washington's sentencing hearing, she remarked:

> 20 years? My brother . . . [has] already spent half of his life in jail. . . . That's not doing anything. . . . It's not rehabilitating him. . . . What he needs is education and an opportunity. . . . I understand that [the District Court has] guidelines to go by, but . . . I can't imagine that . . . [the] Guideline book said . . . to go out and entrap young men who are not organized in organized crime and sentence people for fake drugs and put their own limitations on the amount of the drugs just to give them a [minimum] 20 years sentence or more. . . . I hardly think whoever created that book meant for this to happen. I feel like the system is being manipulated by that. And it's . . . embarrassing and it's hurtful because a lot of people are being affected by this. This is not just my brother. . . .This is about a lot of people in our communities that are affected by this. They really are.[58]

I agree that applying mandatory minimum sentences in cases where no drugs exist and the government originates and perpetuates the criminal activity creates such an unfair and irrational divergence between culpability and conduct that Congress could hardly have intended the result.

## IV.    Conclusion

This case is the latest illustration of why federal courts across the country continue to find the government's reliance on phony stash-house sting operations disturbing.  As I have explained, these cases raise serious issues of fairness while destroying the fundamental relationship between culpability and punishment that is so important to sentencing.  The conduct being sanctioned is the direct result of the government's initiative rather than the defendant's.

I reiterate that it is exceedingly difficult to conclude that Congress ever considered that mandatory minimum sentences

---

[58] Sentencing Tr. 36.

would apply here.  Nevertheless, it just may be that the ultimate systematic resolution of this very troublesome approach to sentencing will have to await clarification by Congress, the Sentencing Commission,[59] or the U.S. Supreme Court. Meanwhile, it is worth echoing my colleagues' caution:  The Government's success today should not be interpreted as a clue that "all such prosecutions will share the same fate" in the future.[60]

Hopefully, this problem will be resolved by one of the authorities I have just mentioned.  Until that day comes, we are left with the very poignant observation of Ms. Clover, who has experienced our sentencing laws "up close and personal."  As quoted earlier, she was skeptical that "whoever created that [Sentencing Guidelines] book meant for this to happen," and

---

[59] The Sentencing Commission has already "recognized the potential for government agents to use their knowledge of the Sentencing Guidelines to manipulate the quantity of drugs sold in a reverse sting in order to increase a defendant's sentence."  *United States v. Stavig*, 80 F.3d 1241, 1245–46 (8th Cir. 1996) (discussing how under Application Note 17 of U.S.S.G. § 2D1.1(b)(17), a district court can depart downward when law enforcement agents set a price below market that allows the defendant to purchase a significantly larger quantity of drugs, and that Application Note 12 of § 2D1.1 instructs a district court to remove from the sentencing calculation the amount that a defendant is unable to produce if the produced amount is less than negotiated). The provisions of the Sentencing Guidelines in place "show[ ] that the Sentencing Commission is aware of the unfairness and arbitrariness of allowing drug enforcement agents to put unwarranted pressure on a defendant in order to increase his or her sentence without regard for his predisposition, his capacity to commit the crime on his own, and the extent of his culpability."  *United States v. Staufer*, 38 F.3d 1103, 1107 (9th Cir. 1994).  But the "Sentencing Commission's determination that the defendant may receive a downward departure when the government artificially lowers the price of the drugs . . . only addresses one of the ways in which drug enforcement agents are able to manipulate sentences."  *Id.*

[60] Maj. Op. at 42.

that "the system is being manipulated by that."[61]  She added
that it is "embarrassing and it's hurtful because a lot of people
are being affected by this."[62]  And so they are.

---

[61] Sentencing Tr. 36.

[62] *Id.*